No. 23-2681

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

DYLAN BRANDT, et al.,
Plaintiffs-Appellees,

v.

TIM GRIFFIN,
in his official capacity as the Arkansas Attorney General, et al.,
Defendants-Appellants.

On Appeal from the United States District Court for the
Eastern District of Arkansas
No. 4:21-CV-00450 JM (Hon. James M. Moody, Jr.)

## Defendants-Appellants' Opening Brief

TIM GRIFFIN
  Arkansas Attorney General

NICHOLAS J. BRONNI
  Arkansas Solicitor General

DYLAN L. JACOBS
  Deputy Solicitor General

MICHAEL A. CANTRELL
  Assistant Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
dylan.jacobs@arkansasag.gov

## SUMMARY AND STATEMENT REGARDING ORAL ARGUMENT

This case is about the States' power to protect children from experimental, dangerous, and life-altering gender-transition procedures. The district court—echoing *Brandt*—held that Arkansas's effort to regulate those procedures must survive intermediate scrutiny. Then, applying what it said that meant, the district court held the SAFE Act unconstitutional because Arkansas had failed to show that its law was good policy. And it held that Act likewise violated a newly discovered substantive due-process right to subject children to life-altering gender-transition procedures and a First Amendment right to refer patients for illegal procedures.

This Court should reverse and uphold the SAFE Act. First—as both the Sixth and Eleventh Circuits held in upholding nearly identical state laws—state laws protecting minors from experimental, dangerous, and life-altering gender-transition procedures are only subject to rational-basis review. And Arkansas's law easily passes that test. Second, even if intermediate scrutiny applied, the district court didn't apply that standard but a novel, uniquely demanding balancing test. Applying the proper standard, Arkansas's law readily passes. Third, there is no substantive due-process right to subject children to potentially sterilizing gender-transition procedures. Fourth and finally, there is no First Amendment right to engage in illegal conduct and this Court should reject the Plaintiffs' call to create one. Arkansas respectfully requests 20 minutes of oral argument.

ii

# TABLE OF CONTENTS

Summary and Statement Regarding Oral Argument ................................................ ii

Table of Contents ................................................................................................ iii

Table of Authorities ............................................................................................ v

Statement of Jurisdiction ..................................................................................... 1

Statement of the Issues Presented ........................................................................ 2

Statement of the Case .......................................................................................... 3

    I.   Factual Background—The rise in experimental, dangerous gender transition procedures performed on minors ......................................... 3

    II.  Statutory Background ................................................................................ 9

    III. Procedural Background .......................................................................... 10

Summary of the Argument ................................................................................. 16

Standard of Review ............................................................................................ 19

Argument ........................................................................................................... 20

    I.   The SAFE Act does not violate the Equal Protection Clause. ................. 20

        A.  This Court should overrule *Brandt* and join the Sixth and Eleventh Circuits in holding that rational-basis review applies to regulations of gender-transition procedures. ......................... 20

            1.  The SAFE Act equally protects minors of both sexes from experimental gender-transition procedures. ........................... 21

            2.  Transgender identification is not a suspect classification. ............................................................................ 26

            3.  The SAFE Act does not discriminate based on transgender identifications—even if that were a suspect classification. ........................................................................... 31

        B.  Even if heightened scrutiny did apply, the SAFE Act is constitutional. ................................................................................. 32

            1.  Sex- and status- based classifications based on biological reality are permissible. ............................................. 33

Appellate Case: 23-2681    Page: 3    Date Filed: 11/07/2023 Entry ID: 5333787

2. The Safe Act permissibly classifies based on biological reality. ............................................................................37

3. Intermediate scrutiny does not give courts *carte blanche* to substitute their own policy judgments for a state legislature's. ..............................................................40

II. There is no fundamental right to subject a child to experimental medical procedures. ..........................................................44

III. Prohibiting a practitioner from medically referring patients to another practitioner for a prohibited procedure regulates conduct, not speech. ........................................................................47

Conclusion ........................................................................52

Certificate of Compliance ................................................53

Certificate of Service ......................................................54

iv

# TABLE OF AUTHORITIES

**Cases**

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*,
   495 F.3d 695 (D.C. Cir. 2007)................................................................ 40, 45

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*,
   57 F.4th 791 (11th Cir. 2022) ........................................ 26, 34-35, 41

*Akron v. Akron Ctr. for Reprod. Health, Inc.*,
   462 U.S. 416 (1983)....................................................................................43

*B.P.J. v. W. Va. Bd. of Educ.*,
   649 F. Supp. 3d 220, 232 (S.D.W.V. Jan. 5, 2023)............................36

*Ballard v. United States*,
   329 U.S. 187 (1946)....................................................................................33

*Bose Corp. v. Consumers Union of U.S., Inc.*,
   466 U.S. 485 (1984)....................................................................................19

*Bostock v. Clayton Cnty.*,
   140 S. Ct. 1731 (2020)...............................................................................29

*Brandt by & through Brandt v. Rutledge*,
   47 F.4th 661 (8th Cir. 2022) ..................................... 11, 21-23, 37, 40

*Brandt by & through Brandt v. Rutledge*,
   No. 21-2875, 2022 WL 16957734 (8th Cir. Nov. 16, 2022)..............11

*Brandt v. Rutledge*,
   551 F. Supp. 3d 882 (E.D. Ark. 2021)................................................10

*Bray v. Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993)....................................................................................31

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985)............................................................................. 26-27

*Collins v. City of Harker Heights*,
   503 U.S. 115 (1992)....................................................................................44

*Craig v. Boren*,
   429 U.S. 190 (1976)....................................................................................34

*Dobbs v. Jackson Women's Health Org.*,
   142 S. Ct. 2228 (2022) ............................................... 2, 21, 24, 31

*Eknes-Tucker v. Governor of Ala.*,
    80 F.4th 1205 (11th Cir. 2023) .................................................... *passim*

*EMW Women's Surgical Ctr., P.S.C. v. Beshear*,
    920 F.3d 421(6th Cir. 2019) .................................................................43

*Frontiero v. Richardson*,
    411 U.S. 677 (1973)................................................................... 27, 36

*Gonzales v. Carhart*,
    550 U.S. 124 (2007)..............................................................................40

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991)................................................................... 20, 25

*Hayes v. Metro. Prop. & Cas. Ins. Co.*,
    908 F.3d 370 (8th Cir. 2018) ............................................................19

*Kirchberg v. Feenstra*,
    450 U.S. 455 (1981)..............................................................................34

*L. W. by & through Williams v. Skrmetti*,
    83 F.4th 460 (6th Cir. 2023) ................................................. *passim*

*Leonard v. Dorsey & Whitney LLP*,
    553 F.3d 609 (8th Cir. 2009) ............................................................19

*Lyng v. Castillo*,
    477 U.S. 635 (1986)................................................................... 27, 30

*Mass. Bd. of Ret. v. Murgia*,
    427 U.S. 307 (1976)..............................................................26-27, 29

*Michael M. v. Superior Court*,
    450 U.S. 464 (1981)..............................................................................35

*Miss. Univ. for Women v. Hogan*,
    458 U.S. 718 (1982)................................................................... 33, 37

*Mitchell v. Clayton*,
    995 F.2d 772 (7th Cir. 1993) ............................................................45

*Morrissey v. United States*,
    871 F.3d 1260 (11th Cir. 2017) ......................................................45

*Nat'l Inst. of Fam. & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018)......................................................... 2, 48-49

Appellate Case: 23-2681    Page: 6    Date Filed: 11/07/2023    Entry ID: 5333787

*Nguyen v. INS*,
    533 U.S. 53 (2001) ............................................................... 34-35, 41

*Raich v. Gonzales*,
    500 F.3d 850 (9th Cir. 2007) ................................................. 45

*Reed v. Reed*,
    404 U.S. 71 (1971) ................................................................ 21, 34

*Rutherford v. United States*,
    616 F.2d 455 (10th Cir. 1980) ............................................... 45

*Sable Commc'ns of Cal., Inc. v. F.C.C.*,
    492 U.S. 115 (1989) .............................................................. 25

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973) .................................................................. 26

*Sessions v. Morales-Santana*,
    582 U.S. 47 (2017) ................................................................ 33

*Stanton v. Stanton*,
    421 U.S. 7 (1975) .................................................................. 34

*U.S. Citizens Ass'n v. Sebelius*,
    705 F.3d 588 (6th Cir. 2013) ................................................. 45

*United States v. Virginia*,
    518 U.S. 515 (1996) .............................................................. 34

*Vacco v. Quill*,
    521 U.S. 793 (1997) .............................................................. 20

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) .............................................................. 2, 45-46

**Statutes**

*SAFE Act*
    2021 Ark. Act 626 ................................................................ 9

    2021 Ark. Act 626, sec. 2(4) ................................................. 9, 50

    2021 Ark. Act 626, sec. 2(15) ............................................... 41

    Ark. Code Ann. 20-9-1501(6) ............................................... 20-21, 38

    Ark. Code Ann. 20-9-1501(6)(A) .......................................... 9

Appellate Case: 23-2681    Page: 7    Date Filed: 11/07/2023 Entry ID: 5333787

Ark. Code Ann. 20-9-1501(8)................................................................47

Ark. Code Ann. 20-9-1502.....................................................................9

Ark. Code Ann. 20-9-1502(a)................................................................9

Ark. Code Ann. 20-9-1502(b)........................................................ 47-48

Ark. Code Ann. 20-9-1502(c)......................................................... 20-21

28 U.S.C. 1291.....................................................................................1

28 U.S.C. 1331.....................................................................................1

Ark. Code Ann. 5-64-308 ....................................................................49

Ark. Code Ann. 20-15-1502(14)...........................................................50

Ark. Code Ann. 20-16-1601(2)..............................................................50

Ark. Code Ann. 20-16-1602(b)..............................................................50

Ark. Code Ann. 20-47-803(17)..............................................................50

Ark. Code Ann. 20-76-705(5)(C)...........................................................50

Ark. Code Ann. 20-77-134 ....................................................................50

Ark. Code Ann. 20-77-146 ....................................................................50

Ark. Code Ann. 20-78-105 ....................................................................50

## Other Authorities

*"Prescription,"* Merriam-Webster Online Dictionary,
https://www.merriam-webster.com/dictionary/prescription.............................49

*"Referral,"* Merriam-Webster Online Dictionary,
https://www.merriam-webster.com/dictionary/referral ....................................48

Centers for Medicare & Medicaid Services, *Referral*
https://www.healthcare.gov/glossary/referral...................................................48

Society for Evidence Based Gender Medicine (SEGM),
*Denmark Joins the List of Countries That Have Sharply Restricted Youth
Gender Transitions* (Aug. 17, 2023), https://perma.cc/9RG8-ETZ2 ..................7

*Standards of Care for the Health of Transgender and Gender Diverse People,
Version 8*, 23 Int'l J. of Transgender Health (2022)......................................6, 28

Appellate Case: 23-2681     Page: 8     Date Filed: 11/07/2023 Entry ID: 5333787

Tonia Poteat et al., *History and Prevalence of Gender Dysphoria*, Transgender
    Medicine, (Leonid Poretsky & Wylie C. Hembree eds., 2019) ..........................8

Appellate Case: 23-2681     Page: 9     Date Filed: 11/07/2023 Entry ID: 5333787

# STATEMENT OF JURISDICTION

The district court's subject-matter jurisdiction rests on 28 U.S.C. 1331. The district court entered judgment in Plaintiffs' favor on June 20, 2023. App. 312, R. Doc. 284. Defendants timely appealed on July 20, 2023. App. 313, R. Doc. 287. This Court has jurisdiction to review the district court's final judgment under 28 U.S.C. 1291.

Appellate Case: 23-2681   Page: 10   Date Filed: 11/07/2023 Entry ID: 5333787

## STATEMENT OF THE ISSUES PRESENTED

1.    The Arkansas General Assembly voted overwhelmingly to protect children from experimental, dangerous, and life-altering gender-transition procedures.  Is the General Assembly's decision subject to heightened scrutiny under the Equal Protection Clause?

> **Apposite Authority:**  *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022); *L. W. by & through Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023); *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205 (11th Cir. 2023)

2.    Do parents have a substantive-due-process right to subject a child to experimental medical procedures that are prohibited by State law?

> **Apposite Authority:**  *Washington v. Glucksberg*, 521 U.S. 702 (1997); *L. W. by & through Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023); *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205 (11th Cir. 2023)

3.    The SAFE Act prohibits medical practitioners from performing gender-transition procedures on minors.  Does it violate the First Amendment to prohibit those same practitioners from referring their patients to another Arkansas-licensed practitioner for the provision of prohibited procedures?

> **Apposite Authority:**  *Nat'l Inst. of Fam. & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372 (2018)

2

## STATEMENT OF THE CASE

### I.   Factual Background—The rise in experimental, dangerous gender tran-
sition procedures performed on minors.

1. *Sex, gender, and gender dysphoria.*   Clinicians treat sex and gender as distinct concepts.  Sex is biological, while gender or "gender identity" refers to "deeply felt internal sense."  App. 236, R. Doc. 283 at 5.  "Gender incongruence" occurs when gender does not correspond with sex, *id.* and when coupled with "clinically significant distress," that may lead to the psychological condition known as "gender dysphoria."  App. 237, R. Doc. 283 at 6.

Until recently, childhood gender incongruence was very rare.  For the few children who did experience gender incongruence, it usually "naturally desist[ed]" by puberty.  App. 272, R. Doc. 283 at 41.  So gender incongruence was treated without surgical or serious medical intervention.  Such "[w]atchful waiting" avoids transitioning a child toward presenting with a cross-sex identity.  App. 272, R. Doc. 283 at 41; Tr. Vol. VII 1107.  And "[p]sychotherapy can be important" for treating "depression and anxiety," which are among the common comorbidities of gender dysphoria.  App. 245, R. Doc. 283 at 14.

This case isn't about those traditional methods.  It's about the "rise in referrals to gender clinics . . .  in recent years," App. 239, R. Doc. 283 at 8, and the corresponding increase in gender-transition procedures.  Tr. Vol. V 783-84, 795.  Un-

3

like established treatments that target a child's psychological distress, those proce-
dures involve both pharmaceutical and surgical intervention designed to transform
a child's sex traits and "align the body with [the child's] gender identity." App.
250, R. Doc. 283 at 19. That effort typically happens in three steps: puberty block-
ers, then cross-sex hormones, then surgeries.

2. *Treatments for gender dysphoria.* "Puberty blockers" are a class of drug
that the FDA has approved to treat precocious (earlier than normal) puberty. App.
268, R. Doc. 283 at 37; Tr. Vol. VIII 1228. These drugs aren't FDA-approved for
gender-dysphoria treatments, where they're used to halt normal puberty. App. 246,
R. Doc. 283 at 15. Instead of treating an abnormality, these treatments leave chil-
dren—who have reached the typical age of puberty—in a prepubertal physical state
for as long as "three or four years." App. 268, R. Doc. 283 at 37. Unsurprisingly,
there are significant health risks associated with such a use. For instance, such
treatments can lower bone density, App. 268-69, R. Doc. 283 at 37-38, and lead to
long-term sexual problems where sex organs don't properly mature. App. 301, R.
Doc. 283 at 70. And such treatments pause a child's development before the point
at which, if left alone, "gender incongruence will naturally desist for most youth."
App. 272, R. Doc. 283 at 41. Because puberty is tied up with adolescent social and
mental development, delaying puberty beyond the normal age risks stunting a
child's social development relative to his or her peers. Tr. Vol. V 827, Vol. VIII

Appellate Case: 23-2681    Page: 13    Date Filed: 11/07/2023 Entry ID: 5333787

1237.  Patients under Plaintiff Stambough's direction ordinarily remain on puberty blockers until age 14, two or three years older than precocious puberty patients. Tr. Vol. III 541-42, 632.

Cross-sex hormones are next.  Normal hormonal treatments (testosterone for males, estrogen for females) are often used to treat medical conditions like delayed puberty.  App. 269, R. Doc. 283 at 38.  Cross-sex hormones (estrogen for males, testosterone for females) are not FDA-approved for gender transition or anything else.  *See L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 478 (6th Cir. 2023).  Cross-sex hormones have serious health risks, including: an increased risk of cardiovascular disease through "changes in cholesterol profile and blood thickness," App. 269, R. Doc. 283 at 38; an increased risk of blood clots and stroke; lower hemoglobin levels; and increased prolactin.  App. 270-71, R. Doc. 283 at 39-40.  And when used in conjunction with puberty blockers, cross-sex hormones nearly always cause permanent sterilization.  App. 270-71, 301, R. Doc. 283 at 39-40, 70.  Other than practitioners treating gender dysphoria, endocrinologists do not prescribe hormones that will cause infertility, outside of treating life-threatening cancer.  Tr. Vol. VIII 1264-65.  They also do not prescribe testosterone or estrogen to treat psychological conditions in any other context.  Tr. Vol. VIII 1256, 1260-61.

Appellate Case: 23-2681     Page: 14     Date Filed: 11/07/2023 Entry ID: 5333787

Finally, some minors pursue surgery, including double mastectomies that remove healthy breasts (which the district court euphemistically dubbed "chest masculinization surgery"). App. 248, R. Doc. 283 at 17. And others pursue irreversible genital surgery (phalloplasty and vaginoplasty). *Id.* Indeed, the WPATH Standards of Care, relied on by Plaintiffs—as well as the district court—allow vaginoplasty with no "age threshold." *Id.*; *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health (2022). Currently, practitioners in Arkansas do not perform those gender-transition surgeries on minors. App. 303, R. Doc. 283 at 72.

3. *Known risks and no proven benefits.* No one seriously disputes that gender-transition procedures carry serious risks and consequences. Both Plaintiffs' witnesses and the district court recognized as much. App. 301, R. Doc. 283 at 70. And the risks aren't only physical. Instead, many children "later come to regret" those procedures and "identify with their" biological sex rather than their perceived gender identity. App. 271-72, R. Doc. 283 at 40-41; *accord* App. 272, R. Doc. 283 at 41 (regret "can happen with individuals who medically transitioned as adolescents or as adults" and "is common in medicine").

Nor is there any real dispute that research regarding these treatments is sparse and low quality. Different types of scientific studies have different levels of reliability. Case studies are the lowest level of evidence. Longitudinal or cross-

6

sectional studies are more reliable; they seek to observe associations between variables. But those associational studies do not identify the cause of any observed effect. Randomized controlled trials isolate a potential cause of the observed effect; thus, they are the most reliable. Tr. Vol. VIII 1272-73.

"There are no randomized controlled clinical trials evaluating the efficacy of gender-affirming medical care for adolescents." App. 265, R. Doc. 283 at 34. What studies do exist are "low or very low-quality evidence." App. 266, R. Doc. 283 at 35. And against that backdrop, many European countries now restrict these procedures. App. 293, R. Doc. 283 at 62; *see also Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1218 (11th Cir. 2023) ("Sweden, Finland, France, Australia, New Zealand, and the United Kingdom have raised concerns about the risks associated with puberty blockers and cross-sex hormone treatment and supported greater caution and/or more restrictive criteria in connection with such interventions.").[1]

4. *The troubling rise in procedures and fall of standards.* The number of children referred to gender clinics has risen dramatically in recent years. App. 239,

---

[1] Since the decision below, Denmark too has shifted its approach. *See* Society for Evidence Based Gender Medicine (SEGM), *Denmark Joins the List of Countries That Have Sharply Restricted Youth Gender Transitions* (Aug. 17, 2023), https://perma.cc/9RG8-ETZ2.

Appellate Case: 23-2681     Page: 16     Date Filed: 11/07/2023 Entry ID: 5333787

R. Doc. 283 at 8; *see also L. W.*, 83 F.4th at 468 (noting that the "number of private clinics that specialize in hormonal and surgical treatments . . . has grown from just a few a decade ago to more than 100 today") (quotation marks omitted). And "the standards of care for minors 'have become less restrictive over the course of time so that fewer procedures require mental health evaluation, fewer recommendation letters are required, and more types of professionals are viewed as capable of providing such evaluations.'" *L. W.*, 83 F.4th at 468 (quoting Tonia Poteat et al., *History and Prevalence of Gender Dysphoria*, in Transgender Medicine 1, 14–15 (Leonid Poretsky & Wylie C. Hembree eds., 2019)).

In Arkansas, children showing up at gender clinics usually present with serious mental-health issues, such as autism, anxiety, depression, or self-harm. Tr. Vol. V 785, 808; Tr. Vol. VII 1103-04; Tr. Vol. III 582-83. Yet multiple practitioners do not require children to participate in therapy or even be diagnosed with gender dysphoria before receiving gender-transition procedures. Tr. Vol. IV 754, 761, Tr. Vol. IV 737. Planned Parenthood, one of the nation's largest providers of cross-sex hormones, will prescribe them on a patient's first visit. Tr. Vol. IV 754. And the risks aren't even discussed with any practitioner until *after* patients have already signed a consent form. Tr. Vol. IV 762, 766. These troubling facts are not unique to Arkansas, and state legislatures around the country have taken action.

Appellate Case: 23-2681    Page: 17    Date Filed: 11/07/2023 Entry ID: 5333787

## II.    Statutory Background

Responding to growing international concern over the explosion in experimental gender-transition procedures performed on minors, Arkansas enacted the Save Adolescents from Experimentation ("SAFE") Act. *See* 2021 Ark. Act 626 (enacting Ark. Code Ann. 20-9-1501 through -1504).  The Act's legislative findings echoed the research discussed above, highlighted the lack of evidence about gender-transition procedures' safety, stressed those procedures' irreversible, lifelong consequences for children, and concluded that "[t]he risks of gender transition procedures far outweigh any benefit at this stage of clinical study." *Id.*, sec. 2(6)-(8), (15).

The SAFE Act therefore prohibited practitioners from performing such procedures on children or referring children for such procedures.  Ark. Code Ann. 20-9-1502.  The Act defines "gender transition procedures" as "any medical or surgical service . . . including . . . puberty-blocking drugs, cross-sex hormones, . . . or genital or nongenital gender reassignment surgery performed for the purpose of assisting an individual with a gender transition." *Id.* 20-9-1501(6)(A).  It does not prohibit any gender-transition procedure for adults. *See id.* 20-9-1502(a).  And it does not prohibit—indeed, it encourages—providing children mental health services to address their psychological distress. *See* SAFE Act, 2021 Ark. Act 626, sec. 2(4).

9

## III. Procedural Background

Plaintiffs sued. First, they claimed the SAFE Act violated the Equal Protection Clause because it discriminates based on sex and transgender status and fails intermediate scrutiny. App. 68, R. Doc. 1, at 41. Second, they claimed the Act violated a fundamental substantive-due-process right to "seek and follow medical advice." App. 70, R. Doc. 1, at 43. Third, they claimed the Act somehow violated the First Amendment by barring doctors from referring children for illegal procedures. App. 71-73, R. Doc. 1, at 44-46.

A. Prior Proceedings. Plaintiffs sought a preliminary injunction, and the district court initially granted that motion from the bench and largely without explanation. App. 76, R. Doc. 59. Then, nearly two weeks later, the district court issued a written order concluding that intermediate scrutiny applied to Plaintiffs' equal-protection claims and strict scrutiny to their fundamental-rights and First Amendment claims and that the Act failed both standards. That order didn't discuss any of the hundreds of pages of expert material, other evidence, or the risks identified by Arkansas. Instead, the district court simply cited an amicus brief filed by medical trade groups and concluded, from it, that "[g]ender affirming treatment is supported by medical evidence that has been subject to rigorous study" and that Arkansas's law was "unnecessar[y]." *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 891 (E.D. Ark. 2021).

10

Arkansas appealed, and a panel of this Court affirmed—but only on the basis of Plaintiffs' equal-protection theory. The panel held that the SAFE Act discriminates based on sex because "under the Act, medical procedures that are permitted for a minor of one sex are prohibited for a minor of another sex." *Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022). It reasoned that "[a] minor born as a male may be prescribed testosterone or have breast tissue surgically removed, . . . but a minor born as a female" may not. *Id.* It ignored the absence of factual findings, opining that there was sufficient information in the record that the district court could have cited.

Arkansas sought en banc review. Five judges voted in favor, agreeing that "this is a case of exceptional importance" and ought to be heard en banc. *Brandt by & through Brandt v. Rutledge*, No. 21-2875, 2022 WL 16957734, at *1 (8th Cir. Nov. 16, 2022) (Stras, J., dissenting from denial). Three judges concluded that such review was "not appropriate" at that time because the case was "in the midst of a [merits] trial." *Id.* (Colloton, J., concurring in denial). Arkansas's petition thus fell one vote short on the ground that a trial ruling might change things.

B. Trial Proceedings. But the trial, and subsequent order, largely mirrored the preliminary-injunction proceedings. Plaintiffs' experts—four practitioners who make money from facilitating pediatric gender-transition procedures and oppose regulatory oversight, App. 283-85, R. Doc. 283 at 52-54—opined that the evidence

11

doesn't justify banning the procedures. And Arkansas's experts (including physicians who don't make their living from facilitating childhood transitions) detailed the undisputed risks associated with gender-transition procedures and explained the lack of evidence supporting the efficacy of such procedures. App. 287-92, R. Doc. 283 at 56-61. The district court generally treated everything Plaintiffs' witnesses had to say as authoritative—despite their obvious financial motivations. App. 287, R. Doc. 283 at 56.

As for Arkansas's experts—physicians who deem these procedures unethical and thus don't participate in them—the district court found that they couldn't be trusted because they are religious. Indeed, citing nothing more than their attendance at a seminar sponsored by "a Christian-based legal advocacy group," the district court found that Dr. Paul Hruz (a respected pediatric endocrinologist) and Dr. Patrick Lappert (a cosmetic and plastic surgeon who "served the Office of the Surgeon General-U.S. Navy as a Specialty Leader in Plastic and Reconstructive Surgery") were testifying "more from a religious doctrinal standpoint" rather than as medical experts. App. 289-90, R. Doc. 283 at 58-59. The district court made a similar finding about Dr. Stephen Levine, an award-winning psychiatrist and researcher who has treated patients with gender dysphoria for decades. App. 287-88, R. Doc. 283 at 56-57. The district court found that Dr. Levine was "a very credible witness," but inexplicably discredited his opinions based on Dr. Levine's "conflict

Appellate Case: 23-2681    Page: 21    Date Filed: 11/07/2023 Entry ID: 5333787

between his scientific understanding for the need for transgender care and his faith." App. 288, R. Doc. 283 at 57. The district court didn't explain what it meant when it referenced Dr. Levine's "faith," and the trial record does not contain any testimony that would lead one to believe Dr. Levine is religious.

The district court permanently enjoined the Act. It reiterated its prior legal conclusions, following the panel's direction that it apply intermediate scrutiny because the Act classifies on the basis of sex. App. 297, R. Doc. 283 at 66. It additionally held, as it did at the preliminary-injunction stage, that transgender identification is a suspect class warranting heightened scrutiny under the Equal Protection Clause. App. 296, R. Doc. 283 at 65. It held that parents have a substantive-due-process right to procure otherwise prohibited medical procedures for their children, so long as a doctor agrees. App. 305-07, R. Doc. 283 at 74-76. And it held that prohibiting Arkansas medical practitioners from giving referrals to other Arkansas-licensed practitioners for prohibited gender-transition procedures violates their First Amendment rights. App. 307-310, R. Doc. 283 at 76-79.

Purporting to apply intermediate scrutiny, the district court held that the State had the "demanding burden of proving the Act advances its articulated interests" and that it had failed to meet it. App. 305, R. Doc. 283 at 74. It acknowledged many of the risks associated with these procedures, including permanent sterilization. *E.g.*, App. 301, R. Doc. 283 at 70. It agreed that some individuals

13

who undergo gender-transition procedures will come to regret it and detransition. App. 271-72, R. Doc. 283 at 40-41. And it recognized that the evidence supporting these procedures is low or very-low quality, lacking any randomized controlled trials that could effectively evaluate whether any patient actually benefits from these procedures. App. 265-66, R. Doc. 283 at 34-35. But it held that practitioners who make money performing such procedures, rather than legislators, should decide how best to evaluate and respond to those risks.

Indeed, in the district court's view of the evidence, the General Assembly's interest in restricting experimental psychological treatments that result in the sterilization of children is not "compelling, genuine, or even rational." App. 310, R. Doc. 283 at 79. Such was the district court's antipathy towards the SAFE Act that it refused to even refer to it by its legal title. App. 232 n.2, R. Doc. 283 at 1 n.2 ("The Arkansas Legislature titled the Act as 'Arkansas Save Adolescents from Experimentation (Safe) Act.' Because the title is misleading, the Court will refer to the Act as 'Act 626' in this order.").

Arkansas timely appealed and successfully sought initial hearing by the en banc court.

15

## SUMMARY OF THE ARGUMENT

This Court should overrule the panel opinion in *Brandt* and join the Sixth and Eleventh Circuits in holding that regulations of gender-transition procedures, like Arkansas's SAFE Act, are subject only to rational-basis review. And applying that standard, this Court should reverse the district court's judgment. Moreover, even if this Court declined to join those circuits, reversal would still be warranted because the district court misapplied intermediate scrutiny and basic First Amendment principles.

First, the district court erroneously applied intermediate scrutiny. It applied the *Brandt* panel opinion to conclude that the SAFE Act discriminates based on sex. That holding is contrary to Supreme Court precedent, and it has been correctly rejected by the Sixth and Eleventh Circuits in upholding nearly identical laws. To the contrary, as those circuits explained, rational basis is the appropriate standard because laws regulating sex-specific treatments do not classify individuals based on sex. And applying rational basis, the SAFE Act easily passes. So this Court should reverse the district court's judgment and uphold Arkansas's law.

Second, even if intermediate scrutiny applied (and it doesn't), the SAFE Act passes. Laws that draw lines based on biological reality—rather than relying on outdated stereotypes—survive intermediate scrutiny. And as the Sixth and Elev-

16

enth Circuits have recognized, gender-transition procedures are sex-based by de-

sign, and there is simply no way to regulate those procedures without referencing

biological sex. The district court only reached a contrary conclusion by substitut-

ing its own policy preferences for that of Arkansas's elected representatives.

Third, the district court invented a novel substantive-due-process right for

parents to subject their children to experimental, dangerous, and prohibited medi-

cal treatments. But no such right exists. Nor did the district court point to any

deeply rooted history supporting such a right. To the contrary, neither the Supreme

Court nor any court of appeals has recognized an affirmative right to *any* medical

treatment under the Due Process Clause—let alone a right to subject children to

such life-altering, experimental procedures. And this Court should join the Sixth

and Eleventh Circuits in rejecting the existence of such a novel, wide-sweep-

ing right.

Fourth, the district court's conclusion that the SAFE Act's referral prohibi-

tion violates the First Amendment misunderstands the nature of the regulation.

Providing a medical referral is professional conduct, not speech. The SAFE Act

does not prevent practitioners from sharing information with patients or doctors.

Instead, it prevents practitioners from professionally handing off patients to other

Arkansas-licensed practitioners for the purpose of providing prohibited gender-

17

transition procedures. The Act regulates the use of the practitioner's position and medical judgment, not speech.

The district court's judgment should therefore be reversed in its entirety.

Appellate Case: 23-2681    Page: 27    Date Filed: 11/07/2023 Entry ID: 5333787

## STANDARD OF REVIEW

This Court "review[s] the district court's findings of fact in the bench trial for clear error and its legal conclusions de novo, overturning the factual findings only if they are not supported by substantial evidence, based upon an erroneous view of the law, or [the Court is] left with the definite and firm conviction that an error has been made." *Hayes v. Metro. Prop. & Cas. Ins. Co.*, 908 F.3d 370, 374 (8th Cir. 2018). Clear-error review does not "inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law." *Leonard v. Dorsey & Whitney LLP*, 553 F.3d 609, 613 (8th Cir. 2009) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 501 (1984)). The issues raised in this appeal are purely questions of law.

Appellate Case: 23-2681    Page: 28    Date Filed: 11/07/2023 Entry ID: 5333787

# ARGUMENT

## I. The SAFE Act does not violate the Equal Protection Clause.

The district court erroneously held that the SAFE Act impermissibly discriminates based on sex and transgender identification.  The SAFE Act does neither, and this Court should reverse.

### A. This Court should overrule *Brandt* and join the Sixth and Eleventh Circuits in holding that rational-basis review applies to regulations of gender-transition procedures.

The SAFE Act draws just two classifications: procedure and age.  It defines "gender-transition procedures" narrowly as "a set of medical procedures intended to modify primary and secondary sex characteristics through medication or surgery in furtherance of gender transition."  *See* Ark. Code Ann. 20-9-1501(6).  And it prohibits practitioners from performing those life-altering, experimental procedures on minors.  Ark. Code Ann. 20-9-1502(c).  Neither classification is constitutionally suspect.  *See Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991) ("[A]ge is not a suspect classification under the Equal Protection Clause."); *Vacco v. Quill*, 521 U.S. 793, 799-800 (1997) (applying rational-basis review to classification based on medical procedure).  And the Act does not discriminate on any other basis.  Rational basis is thus the appropriate standard of review.

20

1.     The SAFE Act equally protects minors of both sexes from experimental gender-transition procedures.

Under the Equal Protection Clause, States may not provide "dissimilar treatment for men and women who are . . . similarly situated." *Reed v. Reed*, 404 U.S. 71, 77 (1971).  Sex-based classifications warrant intermediate scrutiny. *Id.*  The Supreme Court has held that "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245-46 (2022).  That is because such regulations do not classify based on sex, even if—because of biology—they only impact one sex.

The SAFE Act treats males and females equally.  Neither may access gender-transition procedures until they reach adulthood.  Ark. Code Ann. 20-9-1502(c).  Puberty blockers, testosterone, estrogen, and various surgeries are prohibited for minors when used for gender-transition purposes. *See* Ark. Code Ann. 20-9-1501(6).  Those items are allowed for all other purposes.  Thus, the Act does not give a "preference to members of either sex over members of the other," so as to warrant heightened scrutiny. *Reed*, 404 U.S. at 76.

The district court applied the *Brandt* panel opinion to conclude otherwise.  It held that the Act "discriminates on the basis of sex because a minor's sex at birth determines whether the minor can receive certain types of medical care under the law."  App. 295, R. Doc. 283 at 64 (citing *Brandt*, 47 F.4th at 669).  Males are not

21

prohibited from "receiving testosterone or surgical procedures . . . for the purpose of aligning [themselves] with [their] biological sex." App. 295, R. Doc. 283 at 64. Females are not prohibited "from receiving estrogen or surgical procedures . . . to enhance [their] appearance as long as the enhancements align with [their] biological sex." App. 296, R. Doc. 283 at 65. Following *Brandt*, it concluded that the Act discriminates on the basis of sex. App. 296, R. Doc. 283 at 65 ("The biological sex of the minor patient is the basis on which the law distinguishes between those who may receive certain types of medical care and those who may not. The Act is therefore subject to heightened scrutiny.") (quoting *Brandt*, 47 F.4th at 670).

That conclusion is erroneous. The Sixth and Eleventh Circuits—the only two other courts of appeals to consider the issue—have both rejected *Brandt*'s reasoning and held that regulations of gender-transition procedures do not discriminate on the basis of sex. Both agree that laws like Arkansas's are sex-neutral and "lack[] any of the hallmarks of sex discrimination." *See L. W.*, 83 F.4th at 480. A law like Arkansas's providing that "no minor may receive puberty blockers or hormones or surgery in order to transition from one sex to another" "does not prefer one sex over the other," "include one sex and exclude the other," "bestow benefits or burdens based on sex," or "apply one rule for males and another for females." *Id.* Rather, the SAFE Act "establishes a rule that applies equally to both sexes." *Eknes-Tucker*, 80 F.4th at 1228.

Appellate Case: 23-2681     Page: 31     Date Filed: 11/07/2023 Entry ID: 5333787

Both circuits have likewise rejected *Brandt*'s erroneous claim that laws like Arkansas's classify based on sex because "medical procedures . . . are permitted for a minor of one sex" and "prohibited for a minor of another sex." *Brandt*, 47 F.4th at 669. *Brandt* based that holding on its view that under the SAFE Act, a "minor born as a male may be prescribed testosterone . . . , but a minor born as a female is not permitted to seek the same medical treatment." *Id.* That reasoning is faulty. As the Sixth Circuit has held, "[u]sing testosterone or estrogen to treat gender dysphoria (to transition from one sex to another) is a different procedure from using testosterone or estrogen to treat" other conditions because "the underlying condition and overarching goals differ." *L. W.*, 83 F.4th at 481. Thus, minors seeking gender-transition procedures are not similarly situated from other minors seeking traditional endocrine treatments.

Indeed, the defining difference between gender-transition procedures and other uses of these medications is their purpose: transitioning (and sterilizing) a child. Prescribing a female testosterone is not the "same medical treatment" as prescribing it to a male because "only females can use testosterone as a transition treatment." *L. W.*, 83 F.4th at 481; App. 291, R. Doc. 283 at 60. And "only males can use estrogen as a transition treatment." *Id.*; *see Eknes-Tucker*, 80 F.4th at 1228 ("The cross-sex hormone treatments for gender dysphoria are different for males

23

and for females because of biological differences between males and females—females are given testosterone and males are given estrogen."). The uses of testosterone and estrogen for gender transition are thus each "a medical procedure that only one sex can undergo," which "does not trigger heightened constitutional scrutiny." *Dobbs*, 142 S. Ct. at 2245-46.

Moreover, the record below underscores the critical difference between experimental gender-transitions and recognized, established medical procedures. For one, in stark contrast to conditions that puberty blockers and sex hormones have long been used to treat (like precocious puberty and hypogonadism), gender dysphoria isn't diagnosed using objective biological criteria, like via lab work. Tr. Vol. VIII 1223-24; *accord* Tr. Vol. III 571, Tr. Vol. III 626; Tr. Vol. VIII 1248-49, 1258-59); Tr. Vol. VIII 1271-72. Instead, it's the only psychological—rather than physiological—condition that puberty blockers and sex hormones are used to treat. Tr. Vol. VIII 1256, 1260-61. And unlike traditional sex-hormone treatments, which restore a malfunctioning endocrine system to physiologically appropriate levels (Tr. Vol. I 264) (Tr. Vol. VIII 1249-51), gender-dysphoria treatments do the exact opposite, disrupting normal, healthy bodily function (Tr. Vol. VIII 1263). Finally, sterilization is a risk unique to gender-transition procedures. App. 267-68, R. Doc. 283 at 36-37. So gender-transition procedures are not "the same" as traditional uses of puberty blockers and sex hormones.

24

The SAFE Act thus discriminates between procedures—not the sexes. Instead, it discriminates based on age and singles out a particular set of risky, unproven procedures that the district court acknowledged result in sterilization—a decision the General Assembly reasonably concluded children are unprepared to make. It did not single out anyone based on sex in making that commonsense judgment. Indeed, the General Assembly's decision to limit the SAFE Act's reach to children underscores that it was focused on the unique risks to children from experimental, unregulated procedures.

And such age restrictions require only a rational basis under the Constitution. *See Gregory*, 501 U.S. at 470. Here, the General Assembly made a rational decision that while adults are free to shoulder the lifelong consequences of undergoing gender-transition procedures, children are unprepared to make that decision. *See Sable Commc'ns of Cal., Inc. v. F.C.C.,* 492 U.S. 115, 126 (1989) (recognizing "a compelling interest in protecting the physical and psychological well-being of minors"). So the SAFE Act singles out minors for special protection, as States do all the time in myriad situations and the district court fatally erred in holding otherwise.

This Court should overrule *Brandt* and join the Sixth and Eleventh Circuits in holding that regulations of gender-transition procedures do not classify based on

sex.  Instead, laws regulating pediatric gender-transition procedures are merely age restrictions subject to rational-basis review.

> 2.  Transgender identification is not a suspect classification.

The district court also concluded that heightened scrutiny was appropriate because the SAFE Act discriminates based on transgender identification.  But individuals who identify as transgender are not a suspect classification under the Equal Protection Clause.  The district court's contrary conclusion was unsupported by the trial record; indeed, Plaintiffs chose not to put on any evidence from which the district court could have made factual findings relevant to this inquiry.  This Court should join the Sixth and Eleventh Circuits and decline to create a new suspect class.

Aside from the obvious—race, sex, national origin, religion, etc.—the Supreme Court rarely designates suspect or quasi-suspect classes.  *See, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442-46 (1985).  Indeed, the Court has rejected arguments seeking to create new constitutionally suspect classifications for disability, age, and poverty.  *Id.*; *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (per curiam); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973).  The fact that so few classifications rise to the level of "suspect" itself casts "grave doubt" on the assertion that transgender identity does.  *Adams by &*

*through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 803 n.5 (11th Cir. 2022) (en banc) (quotation marks omitted).

Precedent explains why that is so. Classifications are suspect when they single out "distinguishing characteristics" that have historically been divorced from "the interests the State has the authority to implement." *Cleburne*, 473 U.S. at 441 (noting that classifications attain suspect status when they have historically "provided no sensible ground for differential treatment"). Sex classifications, for example, are suspect because they often "reflect outmoded notions of the relative capabilities of men and women," rather than real differences. *Id.* The same is true of racial classifications. *Murgia*, 427 U.S. at 313-14. Thus, to rise to the level of suspect, a classification must single out an immutable characteristic that has historically been the basis for deep discrimination.

Courts analyze four factors to determine whether a group qualifies as a suspect class: (1) immutable characteristics that define (2) a discrete group, (3) historical discrimination, and (4) political powerlessness. *See Lyng v. Castillo*, 477 U.S. 635, 638 (1986). The district court's conclusion that transgender-identified individuals satisfy these factors lacked any explanation or basis in the record. *See* App. 296, R. Doc. 283 at 65. Transgender identity does not check the required boxes.

*Immutable characteristic*. Transgender identification is not "an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*,

27

411 U.S. 677, 686 (1973). To the contrary, individuals identify as transgender when their internal perception of who they are departs from the "immutable characteristic" that is their biological sex. Tr. Vol. VIII 1239, 1311 (biological sex is immutable). The trial record established that gender identity is not immutable and can change over time. Tr. Vol. I 267-68; Tr. Vol. II 332, 335; Tr. Vol. V 805, 877; Tr. Vol. VIII 1195-96; *cf.* App. 237, R. Doc. 283 at 6 (finding that "a person's understanding of their gender identity can change over time"). Researchers do not even have conclusive evidence about what causes an individual to develop a transgender identity—for instance, whether there is a genetic or biological influence. Tr. Vol. I 113-14; Tr. Vol. V 797-800; *see also L. W.*, 83 F.4th at 487 (noting that the experiences of detransitioners establish that a transgender identification is not immutable).

*Discrete group.* The district court defined transgender people as anyone with a gender incongruence, *i.e.*, whose gender identity does not align with their sex. App. 236, R. Doc. 283 at 5. That group is anything but discrete. Indeed, the WPATH Standards of Care 8, relied on by the district court (App. 240, R. Doc. 283 at 9), note that the term "transgender" can describe "a huge variety of gender identities and expressions," *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S15 (2022);

28

*see also L. W.*, 83 F.4th at 487 (relying on WPATH guidelines to conclude that transgender identification is not a discrete group).

*Historical discrimination.* Plaintiffs presented no evidence whatsoever on this point, and against that backdrop, the district court unsurprisingly made no findings concerning any history of purposeful discrimination against transgender-identified individuals. It is not enough to assert or even prove that "the treatment of" those who identify as transgender "in this Nation has not been wholly free of discrimination." *Murgia*, 427 U.S. at 313. Rather, Plaintiffs were required to prove "a 'history of purposeful unequal treatment.'" *Id.* They did not even attempt to do so.

Nor could they have. Transgender individuals as a class look quite "unlike" those individuals who were long denied equal protection because of their race, national origin, or sex. *Id.* at 313-14 (rejecting age as a suspect class because the elderly have not faced discrimination "akin to [suspect] classifications"). States wrongly enshrined purposeful race and sex discrimination into their laws for decades. Conversely, the Supreme Court has explained that transgender individuals have been protected by a "major piece of federal civil rights legislation" for nearly a half-century. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1753 (2020). Indeed, laws like Arkansas's aren't comparable to those historical examples; instead, they are recent enactments that narrowly target the previously unregulated, experimental

Appellate Case: 23-2681    Page: 38    Date Filed: 11/07/2023 Entry ID: 5333787

practice of subjecting children to procedures with serious, life altering consequences, like sterilization.

*Political powerlessness.* Plaintiffs also failed to present any evidence at trial that those who identify as transgender are "politically powerless." *Lyng*, 477 U.S. at 638. Nor could they have done so because—quite to the contrary—individuals who identify as transgender enjoy broad institutional support from all levels of American society. Indeed, uniquely underscoring the point, both below and in the prior appeal, numerous, politically powerful health-policy advocacy organizations, clinician trade groups, other well-heeled special interest groups, and even the United States Department of Justice all weighed in to support Plaintiffs. Moreover, like in the Sixth Circuit, "the only large law firms to make an appearance in the case all entered the controversy in support of the plaintiffs." *L. W.*, 83 F.4th at 487.

Transgender-identifying individuals do not meet the Supreme Court's stringent requirements for recognition as a suspect class under the Equal Protection Clause. The district court's conclusion to the contrary was completely without evidentiary support. This Court should decline to create a new suspect class where the Supreme Court has not done so and apply rational-basis review.

Appellate Case: 23-2681    Page: 39    Date Filed: 11/07/2023 Entry ID: 5333787

3.  The SAFE Act does not discriminate based on transgender identifications—even if that were a suspect classification.

As explained above, the Act classifies based on age and procedure, not on sex or transgender identification. The district court concluded otherwise because, in its view, the Act "prohibits medical care that only transgender people choose to undergo, *i.e.*, medical or surgical procedures related to gender transition." App. 296, R. Doc. 283 at 65. That conclusion is wrong for the same reason as the district court's sex-discrimination ruling.

Even if transgender identification were a suspect class, "[t]he regulation of a medical procedure that only" transgender-identifying individuals "undergo does not trigger heightened constitutional scrutiny." *Dobbs*, 142 S. Ct. at 2245-46. The district court turned that maxim on its head, declaring that *because* only transgender-identifying individuals undergo gender-transition procedures heightened scrutiny must be applied. But the choice to regulate gender-transition procedures does not classify on the basis of transgender identification. To the contrary, as the Eleventh Circuit explained in upholding Alabama's nearly identical law, "the regulation of a course of treatment that, by the nature of things, only transgender individuals would want to undergo would not trigger heightened scrutiny." *Eknes-Tucker*, 80 F.4th at 1230. That is because no one has been singled out for disparate treatment simply because of their transgender identification. *Cf. Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270-71 (1993) (rejecting

31

the argument that "since voluntary abortion is an activity engaged in only by women, to disfavor it is *ipso facto* to discriminate invidiously against women as a class").

This Court should join the Sixth and Eleventh Circuits and reject the district court's misapplication of precedent.

**B.**     Even if heightened scrutiny did apply, the SAFE Act is constitutional.

Even if *Brandt* were correct and heightened scrutiny applied to the SAFE Act, the district court misapplied that standard, and correctly applying that standard, the SAFE Act easily survives. That's because gender-transition procedures are themselves sex-based—that is, they are treatments based on the patient's biological sex to produce a sex-specific goal. For example, testosterone is only given to gender-dysphoric females for the purpose of transitioning to male and a State could not regulate gender-transition procedures at all without at least some reference to sex. That means that any sex-based classification drawn by the Act is not only substantially related, but entirely necessary, to its compelling interest in protecting minors from gender-transition procedures and regulating the field of medicine. The Act thus survives intermediate scrutiny.

The district court rejected that approach and instead held that to survive heightened scrutiny, Arkansas was required to prove to that court's satisfaction that

its regulation—or any regulation of gender-transition procedures performed on minors—is good policy. *See* App. 302, R. Doc. 283 at 71 ("The State has failed to meet their burden to show that the risks of [gender-transition procedures] banned by Act 626 substantially outweigh the benefits."). The upshot of that holding, as the proceedings below illustrate, is that States cannot regulate such procedures at all—leaving children entirely at the mercy of practitioners who make money from sterilizing them. That is not the law, and this Court should reverse.

1. Sex- and status- based classifications based on biological reality are permissible.

To prevail under intermediate scrutiny, the State "must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Sessions v. Morales-Santana*, 582 U.S. 47, 59 (2017) (cleaned up). The State's burden is to show a "direct, substantial relationship between" its "objective and means." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982). "Intermediate scrutiny . . . does not require us to ask whether a law is good or bad policy, but whether a government has a good reason for using a sex-based classification in a law." *Eknes-Tucker*, 80 F.4th at 1234 (Brasher, J., concurring).

And the Constitution does not require States to ignore "[t]he truth . . . that the two sexes are not fungible." *Ballard v. United States*, 329 U.S. 187, 193 (1946). To the contrary, "fail[ing] to acknowledge . . . basic biological differences

33

. . . risks making the guarantee of equal protection superficial, and so disserving it." *Nguyen v. INS*, 533 U.S. 53, 73 (2001). Indeed, "the biological differences between males and females are the reasons intermediate scrutiny," not strict, "applies in sex-discrimination cases in the first place." *Adams*, 57 F.4th at 809; *accord id.* at 803 n.6 (describing biological differences as "the driving force behind the Supreme Court's sex-discrimination jurisprudence"). Intermediate scrutiny exists to ensure that States do not legislate based on "overbroad generalizations about the different talents, capacities, or preferences or males or females"—generalizations that have no basis in biology. *United States v. Virginia*, 518 U.S. 515, 533 (1996). Thus, the Supreme Court has struck down policies grounded in the presumption that women don't like competition, that they have less skill in managing or distributing property, or that they mature faster. *See, e.g.*, *id.* at 541 (single-sex military academy); *Kirchberg v. Feenstra*, 450 U.S. 455, 459-60 (1981) (husband solely controlled marital property); *Reed v. Reed*, 404 U.S. 71, 74 (1971) (mandatory preference for males as executor of an estate); *Craig v. Boren*, 429 U.S. 190, 192 (1976) (earlier drinking age for females); *Stanton v. Stanton*, 421 U.S. 7, 14 (1975) (child support requirement terminated earlier for female children).

But intermediate scrutiny, rather than strict, applies in sex-discrimination cases to ensure that courts don't throw the baby out with the bathwater. Distinctions based on "enduring" and "[i]nherent differences" between the sexes are, by

34

their nature, substantially related to the relevant governmental interest and have thus been upheld time and time again. *Virginia*, 518 U.S. at 533 (internal quotation marks omitted). Take *Nguyen v. INS*, which upheld a citizenship statute requiring children born out-of-wedlock and abroad to U.S. citizen fathers to meet a different standard of proof than children with citizen mothers. 533 U.S. at 58. That distinction was permissible because "[f]athers and mothers are not similarly situated with regard to the proof of biological parenthood." *Id.* at 63. Or consider *Michael M. v. Superior Court*, which upheld a statutory-rape statute that prohibited sex with a minor female only. 450 U.S. 464, 466 (1981). The Court held that classification was permissible because "young men and young women are not similarly situated with respect to the problems and the risks of sexual intercourse. Only women may become pregnant." *Id.* at 471.

Indeed, two recent decisions demonstrate that classifications grounded in biological reality survive intermediate scrutiny, even in claims brought by transgender people. *Adams*, 57 F.4th at 803 n.5 (analysis about sex-based intermediate scrutiny would be the same if transgender individuals were a suspect class). In *Adams*, the Eleventh Circuit, sitting en banc, upheld a school's policy separating bathrooms by biological sex. *Id.* at 808. Because males and females are anatomically different, the school had a legitimate interest in "protecting the privacy inter-

Appellate Case: 23-2681    Page: 44    Date Filed: 11/07/2023 Entry ID: 5333787

ests of students" in "shielding one's body from the opposite sex." *Id.* at 805. Because that interest was grounded in real, physical differences between the sexes, classifying based on sex satisfied intermediate scrutiny. *Id.* And the school's interest didn't change even though the transgender student identified as a member of the opposite sex. That student retained the anatomical features of the student's sex—and indeed, could not change the "immutable characteristic of biological sex" that underpinned the school's real privacy interests. *Id.* at 803 n.6, 807 (citing *Frontiero*, 411 U.S. at 686).

Similarly, in *B.P.J. v. West Virginia Board of Education*, a district court upheld West Virginia's law prohibiting biological males from playing girls' sports, whether or not they identify as transgender. 649 F. Supp. 3d 220, 232 (S.D.W.V. Jan. 5, 2023). That's because "[w]hether a person has male or female sex chromosomes," not what gender he or she identifies as, "determines many of the physical characteristics relevant to athletic performance." *Id.* at 231. And "males [generally] outperform females athletically because of inherent physical differences between the sexes." *Id.* To further its "interest in providing equal athletic opportunities for females," the State could "legislate sports rules" based on biological sex. *Id.* So too, Arkansas can legislate based on sex and transgender status to prevent sex- or status-based harms and pass intermediate scrutiny.

36

2.      The Safe Act permissibly classifies based on biological reality.

No one disputes that the State has a compelling interest in regulating medicine to protect its citizens, especially children.  App. 306, R. Doc. 283 at 75.  And gender-transition procedures do not have any special constitutional status that exempts them from the State's ordinary power to regulate clinicians.  *See L. W.*, 83 F.4th at 474 (noting that "State[s] [can] prohibit individuals from receiving [procedures] they want[] and their physicians wish[] to provide").  The only question is whether any sex- or status-based classification is substantially related to that compelling interest, *i.e.*, whether there is a "direct, substantial relationship between" the State's "objective and means."  *Hogan*, 458 U.S. at 725.  Regulations of gender-transition procedures like Arkansas's satisfy this standard because, to the extent they classify based on sex or transgender identification, it is only because they reflect biological reality.

Here, the State's "objective" is restricting the availability of a class of procedures aimed at permanently modifying a child's sex characteristics to reduce psychological distress.  The district court and *Brandt* described the "means" it chose to employ as defining "gender-transition procedure" such that "[t]he biological sex of the minor patient is the basis on which the law distinguishes between those who may receive certain types of medical care and those who may not."  App. 296, R. Doc. 283 at 65 (quoting *Brandt*, 47 F.4th at 670).

37

But contrary to the district court's analysis, that's not a problem because intermediate scrutiny asks only whether that classification is substantially related to the State's goal of restricting pediatric gender-transition procedures. And sex-specific procedures require sex-specific regulation. Indeed, the record below established that gender-transition procedures are themselves sex specific. Aside from puberty blockers, which are non-sex-selective in their use Tr. Vol. I 256; Tr. Vol. VIII 1234, a practitioner must know a patient's sex in order to prescribe transition treatments. App. 291, R. Doc. 283 at 60. A male cannot be prescribed testosterone to transition, nor can a female be given estrogen to transition. Moreover, gender transition itself cannot be defined without reference to biological sex. *See* App. 238, R. Doc. 283 at 7 (describing the procedures as "medical treatments to align the body with one's gender identity," due to psychological distress over one's sex). Thus, to the extent the SAFE Act references sex, it's because the procedures themselves are defined that way. *See* Ark. Code Ann. 20-9-1501(6).

Both the Sixth and Eleventh Circuits reached similar conclusions in upholding nearly identical laws. *See L. W.*, 83 F.4th at 482 ("The Acts mention the word 'sex,' true. But how could they not? The point of the hormones is to help a minor transition from one gender to another, and laws banning, permitting, or otherwise regulating them all face the same linguistic destiny of describing the biology of the procedures."); *Eknes-Tucker*, 80 F.4th at 1228 ("[I]t is difficult to imagine how a

38

state might regulate the use of puberty blockers and cross-sex hormones for the relevant purposes in specific terms without referencing sex in some way.").

That alone means the SAFE Act passes intermediate scrutiny. States have plenary power to regulate the practice of medicine, and nothing in the Constitution exempts gender-transition procedures from that general rule. If, to regulate a particular procedure, a legislature must necessarily draw distinctions based on sex, then those distinctions are, by definition, substantially related to the reason for the regulation. The same is true for transgender identification. When a legislature chooses to regulate a procedure that, as the district court found, is only sought by transgender-identifying individuals, it is unsurprising that the law might draw some distinction on that basis. Otherwise, it would be impossible to regulate. And that is exactly the upshot of Plaintiffs' argument: *any* regulation of gender-transition procedures would fail the district court's test, leaving financially motivated practitioners unregulated.

To the extent the SAFE Act classifies based on sex or status, it does so only in recognition of biological reality and only as necessary to facilitate its goal to regulate pediatric procedures the General Assembly determined to be too risky at this experimental stage. That satisfies intermediate scrutiny.

3. Intermediate scrutiny does not give courts *carte blanche* to substitute their own policy judgments for a state legislature's.

The district court's approach looked nothing like that analysis. Rather than reviewing the purported sex- and status-based classification drawn by the Act and whether it bears a substantial relationship to the General Assembly's regulation of gender-transition procedures, the district court decided to step into the shoes of a legislator and make its own judgments about what is good and bad policy. It held that the State has a "heavy burden" to justify the prohibition of gender-transition procedures. App. 297, R. Doc. 283 at 66. In the district court's view, it was the State's "demanding burden" to "prove[] the Act advances its articulated interests." App. 305, R. Doc. 283 at 74. In other words, the State was required to convince the district court that the General Assembly's policy reasons for prohibiting pediatric gender-transition procedures were good ones. *Cf. Brandt*, 47 F.4th at 670 (concluding that the General Assembly's concerns weren't good enough to "justify [the] Act"). That was error.

The task of interpreting data, "weighing competing evidence," *Brandt*, 47 F.4th at 670, and making policy judgments about how much risk to children should be allowed is a legislative function, not a judicial one. The Supreme Court "has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007); *see also Abigail All. for Better Access to Developmental Drugs v.*

40

*von Eschenbach*, 495 F.3d 695, 713 (D.C. Cir. 2007) (en banc) ("Our Nation's history and traditions have consistently demonstrated that the democratic branches are better suited to decide the proper balance between the uncertain risks and benefits of medical technology, and are entitled to deference in doing so."). And even in the context of heightened scrutiny, "[n]one of [the Supreme Court's] gender-based classification equal protection cases have required that the statute under consideration must be capable of achieving its ultimate objective in every instance." *Nguyen*, 533 U.S. at 70; *see also Adams*, 57 F.4th at 801 ("[T]he Equal Protection Clause does not demand a perfect fit between means and ends when it comes to sex.").

Weighing the evidence and competing policy claims, the General Assembly determined that the "risks of gender transition procedures [for minors] far outweigh any benefit at this stage of clinical study on these procedures." 2021 Ark. Act 626, sec. 2(15). The evidence at trial showed that this judgment was well-supported. The district court acknowledged that these procedures involve significant risks, including permanent sterilization of children. App. 270-71, 301, R. Doc. 283 at 39-40, 70. It further found that there "are no randomized controlled clinical trials evaluating the efficacy of gender-affirming medical care for adolescents," App. 265, R. Doc. 283 at 34, and the studies conducted thus far are rated as "low or very

Appellate Case: 23-2681    Page: 50    Date Filed: 11/07/2023 Entry ID: 5333787

low-quality evidence," App. 266, R. Doc. 283 at 35. And the district court recognized that "[s]ome individuals [] undergo gender-affirming medical treatment" and "later come to regret" it and "identify with their" biological sex rather than the gender identity they perceived earlier in life. App. 271-72, R. Doc. 283 at 40-41. That is unsurprising given the ever-loosening restrictions on these procedures in the past decade. *See L. W.*, 83 F.4th at 468.

Indeed, the facts surrounding gender-transition procedures have in large part not been in serious dispute in this litigation, despite many volumes of competing expert-witness testimony. All sides agree that there are risks and uncertainties associated with these procedures. *See L. W.*, 83 F.4th at 489 ("[N]o one disputes that these treatments carry risks or that the evidence supporting their use is far from conclusive."). The issue for the Court to decide is not who is correct about whether these procedures, if allowed, will likely do more harm than good for children. The issue is whose risk assessment should govern policy decisions like this one. To be sure, gender-clinic practitioners (including Plaintiffs' witnesses) who have a financial interest in continuing to perform these experimental procedures say that their own judgment is sound, and a plethora of medical-industry trade groups—whose members share those financial interests—have echoed those claims. But the Supreme Court has never required States—nor permitted courts—to blindly defer to the representations of those who profit from procedures or their

42

trade associations.  *See EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 438 (6th Cir. 2019) (recounting how *Casey* and *Gonzales* upheld laws that "conflicted with official positions of ACOG"); *Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 456 (1983) (O'Connor, J., dissenting) (states are not required to defer to, adopt, or "revise [their] standards every time [ACOG] or [a] similar group revises its views about what is and what is not appropriate medical procedure in this area").

In resolving every dispute in Plaintiffs' favor about what ought to be done based on the known risks of these procedures and the uncertain evidence supporting them, the district court engaged not in factfinding but in policymaking.  *See, e.g.*, App. 302, R. Doc. 283 at 71 ("The State failed to meet their burden to show that the risks . . . substantially outweigh the benefits.").  The General Assembly was entitled to look at the evidence (or lack thereof) and to draw their own conclusions regarding the best way to protect Arkansas children, rather than the one that Plaintiffs, their witnesses, and trade organizations would choose.  "The unsettled, developing, in truth still experimental, nature of the treatments in this area surely permits more than one policy approach, and the Constitution does not favor one over the other."  *L. W.*, 83 F.4th at 488.

The General Assembly was well within its authority to reach the same conclusion as multiple European countries and over twenty States that the current state

43

of the evidence regarding gender-transition procedures does not justify the risks to children. The district court believed the General Assembly's conclusion was incorrect, but it was nonetheless required to defer to the legislature's permissible judgment. The decision below should be reversed.

## II. There is no fundamental right to subject a child to experimental medical procedures.

The district court held that parents have a substantive-due-process right "to seek medical care for their children and, in conjunction with their adolescent child's consent and doctor's recommendation, make a judgment that medical care is necessary." App. 306, R. Doc. 283 at 75. In other words, the district court invented a novel new constitutional right for parents to subject their children to any sort of procedure a practitioner recommends, no matter whether the State has determined that the procedure is experimental and unsafe. No such right exists, and the district court's contrary conclusion should be reversed.

The Supreme Court has "been reluctant to expand the concept of due process" and itself "exercise[s] the utmost care whenever" a litigant asks it to set aside rational-basis review and instead "to break new ground in" the field of substantive due process. *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). Accordingly, "most federal courts have held that a patient does not have a constitutional right to obtain a particular type of treatment or to obtain treatment from a

44

particular provider if the government has reasonably prohibited that type of treatment or provider." *U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 599 (6th Cir. 2013) (quoting *Mitchell v. Clayton*, 995 F.2d 772, 775 (7th Cir. 1993)); *see, e.g.*, *Abigail All.*, 495 F.3d at 711 (no "right to procure and use experimental drugs"); *Raich v. Gonzales*, 500 F.3d 850, 864-66 (9th Cir. 2007) (no right to "medical marijuana"); *Rutherford v. United States*, 616 F.2d 455, 456 (10th Cir. 1980) (no right for mentally ill patients "to take whatever treatment they wished"); *Morrissey v. United States*, 871 F.3d 1260, 1269 (11th Cir. 2017) (rejecting fundamental right to IVF surrogacy treatment, not in use "until the mid to late 1980s"). Thus, there is no question that the children here would have no substantive-due-process right to experimental, gender-transition procedures.

Nor do parents have a freestanding right to subject their children to such experimental and life-altering procedures. True, the Supreme Court has said that parents have a general substantive-due-process interest in raising their children. But the Court has never said that right extends to overriding general medical regulations. If the State can permissibly ban abortion, parents don't have a separate substantive-due-process right to get their teenage daughter an abortion. *Cf. Dobbs*, 142 S. Ct. at 2257 (no right to abortion). If the State can ban euthanasia, parents can't ask a doctor to aid in their terminally ill son's suicide. *Cf. Washington v.*

Appellate Case: 23-2681     Page: 54     Date Filed: 11/07/2023 Entry ID: 5333787

*Glucksberg*, 521 U.S. 702, 710 (1997) (no right to assisted suicide). And if substantive due process does not prevent States from barring dangerous gender-transition procedures, parents have no right to put their preteen on puberty blockers. Parents may have a (qualified) right to decide which lawful medical procedures their children receive; they do not have the right to expand the menu of legally available options. *See Eknes-Tucker*, 80 F.4th at 1224 n.18 ("[I]t would make little sense for adults to have a parental right to obtain these medications for their children but not a personal right to obtain the same medications for themselves.") (emphasis omitted).

That's why both the Sixth and Eleventh Circuits have declined to invent a substantive-due-process right for parents to subject their children to prohibited procedures. "This country does not have a 'deeply rooted' tradition of preventing governments from regulating the medical profession in general or certain treatments in particular, whether for adults or their children." *L. W.*, 83 F.4th at 473; *see also Eknes-Tucker*, 80 F.4th at 1224 (rejecting the argument that the "Constitution guarantees a fundamental right to treat one's children with transitioning medications subject to medically accepted standards") (cleaned up). Nor is there a "'deeply rooted' tradition of permitting individuals or their doctors to override contrary state medical laws." *L. W.*, 83 F.4th at 474.

Appellate Case: 23-2681     Page: 55     Date Filed: 11/07/2023 Entry ID: 5333787

The district court's conclusion was that states must satisfy strict scrutiny each time they regulate pediatric medicine to the disagreement of a parent. Its decision should be reversed.

## III. Prohibiting a practitioner from medically referring patients to another practitioner for a prohibited procedure regulates conduct, not speech.

The Act provides that "[a] physician, or other healthcare professional shall not refer any [minor] to any healthcare professional for gender transition procedures." Ark. Code Ann. 20-9-1502(b). The Act defines "healthcare professional" as "a person who is licensed, certified, or otherwise authorized by the laws of this state to administer health care in the ordinary course of the practice of his or her profession." Ark. Code Ann. 20-9-1501(8). In other words, the Act prohibits Arkansas-licensed practitioners—who are prohibited from performing gender-transition procedures—from providing a child with a medical referral to another Arkansas-licensed practitioner for a gender-transition procedure (which they, too, are prohibited from performing).

The district court held that the inability to refer patients to other providers for prohibited gender-transition procedures somehow violates practitioners' First Amendment rights. It held that the Act is "a content and viewpoint-based regulation of speech because it restricts healthcare professionals from making referrals for "gender transition procedures" only, not for other purposes. App. 309, R. Doc. 283 at 78.

47

Medical providers have no First Amendment right to medically refer their patients to other practitioners for procedures that are prohibited because referrals are professional conduct, not speech. While the Act does not define "refer," it is not synonymous with "recommend." In medical terms, a referral is a "written order from [a] primary care doctor" sending patients "to get certain medical services." Centers for Medicare & Medicaid Services, *Referral*[2]; *accord "Referral,"* Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/referral (last visited Nov. 6, 2023) ("the process of directing or redirecting . . . to an appropriate specialist or agency for definitive treatment"). Thus, the Act prohibits ordering a patient to another doctor for cross-sex hormones or a mastectomy. Ark. Code Ann. 20-9-1502(b) (barring referrals to another "healthcare professional").

And that treatment order is professional conduct subject to regulation, not speech. True, ordering a child to see a particular specialist involves incidental speech and dissemination of information: the words on the order and the doctor's signature are literal speech, and sending them to another doctor is a form of communication. But "States may regulate professional conduct, even though that conduct incidentally involves speech." *Nat'l Inst. of Fam. & Life Advocates v.*

---

[2] https://www.healthcare.gov/glossary/referral

48

*Becerra*, 138 S. Ct. 2361, 2372 (2018). For instance, States may require physicians to obtain informed consent because that is part of properly performing a medical procedure, even if that incidentally regulates literal speech. *Id.* at 2373. Even more on point, States may regulate or ban certain prescriptions, *see, e.g.*, Ark. Code Ann. 5-64-308, even though a prescription—"a written direction for the preparation, compounding, and administration of a medicine"—involves incidental speech. *"Prescription,"* Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/prescription (last visited Nov. 6, 2023). Referrals are no different: like an order to obtain a particular drug, an order to obtain a particular medical procedure is conduct that may be prohibited without running afoul of the First Amendment.

Next, the Act's focus on conduct, not communication, is confirmed not only by a proper reading of "refer . . . to any healthcare professional" but also by the Act's structure, its purpose, and the whole of the Arkansas Code. Start with structure. When the Act proscribes referrals, it does so in the context of ensuring that conduct (provision of gender-transition procedures) is banned: in the provision immediately preceding the bar on referrals, the Act proscribes doctors from providing the procedures themselves. As that structure suggests, the ban on referrals covers all the bases to ensure that a doctor doesn't perform gender transition procedures

49

on Arkansas children—whether by herself or by sending the child to someone else. By contrast, nowhere does the Act target communication.

The Act's enacted purpose explains why it targets procedures but not speech: the "efficacy and safety" of gender transition procedures is doubtful, but doctors may be able to treat gender dysphoria without life-altering consequences by *talking*. *See* 2021 Ark. Act 626, sec. 2(4) (legislative findings encouraging psychotherapy). It would be counterproductive for a legislature encouraging doctors to start with psychotherapy—which requires doctors to dig into the reasons a child might want to obtain gender transition procedures and to thoroughly discuss the risks Tr. Vol. V 808-10, 830, 858—to ban any discussion of those procedures whatsoever. To match that purpose, the best reading of "referral" must be "treatment order," not "speech."

Finally, reading "referral" to mean "treatment order" fits with how that term is used elsewhere in the Arkansas Code. The Code consistently uses "refer" or "referral" to refer to formal orders for treatment, not to mean "speech." *See, e.g.*, Ark. Code Ann. 20-15-1502(14); *id.* 20-16-1601(2); *id.* 20-47-803(17); *id.* 20-76-705(5)(C); *id.* 20-77-134; *id.* 20-77-146; *id.* 20-78-105. When it wants to target speech concerning illegal conduct too, it says so directly. *See, e.g.*, *id.* 20-16-1602(b) (barring grant money from going to organizations that "provide[] abortion referrals" *or* "counsel[] in favor of elective abortions").

50

Because the SAFE Act mentions only referrals and not anything resembling speech, it doesn't violate the First Amendment. The district court's contrary reading should be reversed.

## CONCLUSION

For these reasons, the judgment of the district court should be reversed.

Respectfully submitted,

TIM GRIFFIN
  Arkansas Attorney General

NICHOLAS J. BRONNI
  Arkansas Solicitor General

DYLAN L. JACOBS
  Deputy Solicitor General

MICHAEL A. CANTRELL
  Assistant Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
dylan.jacobs@arkansasag.gov

52

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,680 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in 14-point Times New Roman, using Microsoft Word.

I further certify that this PDF file was scanned for viruses, and no viruses were found on the file.

/s/  *Dylan L. Jacobs*
Dylan L. Jacobs

## CERTIFICATE OF SERVICE

I certify that on November 7, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

*/s/  Dylan L. Jacobs*
Dylan L. Jacobs