No. 23-2681

---

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

———————◆———————

DYLAN BRANDT, by and through his mother Joanna Brandt, et al.,
*Plaintiffs-Appellees*,

v.

TIM GRIFFIN, in his official capacity as the Arkansas Attorney General, et al.,
*Defendants-Appellants*.

———————◆———————

On Appeal from the United States District Court for the
Eastern District of Arkansas, No. 4:21-cv-00450-JM

---

### BRIEF OF ALABAMA, MISSOURI, TENNESSEE, AND 18 OTHER STATES AS AMICI CURIAE SUPPORTING APPELLANTS AND REVERSAL

---

Steve Marshall
  *Attorney General*
Edmund G. LaCour Jr.
  *Solicitor General*
A. Barrett Bowdre
  *Principal Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300

Jonathan Skrmetti
  *Attorney General & Reporter*
Steven J. Griffin
  *Senior Counsel for Strategic Litiga-
  tion & Assistant Solicitor General*
OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
(615) 253-5642

Andrew Bailey
  *Attorney General*
Joshua M. Divine
  *Solicitor General*
MISSOURI ATTORNEY GENERAL'S
OFFICE
207 West High St.
Jefferson, CITY MO 65101
(573) 751-3221

*Additional Counsel Listed on
Signature Page*

## CORPORATE DISCLOSURE STATEMENT

As governmental parties, amici are not required to file a certificate of interested persons. Fed. R. App. P. 26.1(a).

i

# TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................ i

Table of Contents ........................................................................................ ii

Table of Authorities .................................................................................... iii

Interests of Amici Curiae and Summary of Argument ............................. 1

Argument ...................................................................................................... 5

    I.    Laws Prohibiting Pediatric Gender-Transition Procedures Do Not Trigger Heightened Scrutiny ....................................................... 6

        A.    Laws Prohibiting Pediatric Gender-Transition Procedures Do Not Discriminate Based on Sex ...................... 6

        B.    Transgender Individuals Are Not a Suspect Class ................ 13

    II.    Arkansas's Law Survives Any Level of Review .............................. 17

        A.    Courts Should Defer to Legislatures in the Face of Medical Uncertainty ........................................................... 17

        B.    Plaintiffs Erroneously Rely on American Medical Interest Groups that are Biased Advocates, Not Neutral Experts ............................................. 21

    III.    The District Court Erred in Granting a Facial Injunction ................ 27

Conclusion .................................................................................................... 28

Certificate of Compliance ........................................................................... 31

Certificate of Service ................................................................................... 32

Appellate Case: 23-2681    Page: 3    Date Filed: 11/15/2023 Entry ID: 5335880

# TABLE OF AUTHORITIES

## Cases

*Abigail All. For Better Access to Developmental Drugs v. von Eschenbach*,
495 F.3d 695 (D.C. Cir. 2007) (en banc) ............................................................. 1

*Boe v. Marshall*,
No. 2:22-cv-184-LCB (N.D. Ala.) ...................................................................... 24

*Bostock v. Clayton Cnty.*,
140 S. Ct. 1731 (2020) ............................................................................... 11, 16

*Brandt by & through Brandt v. Rutledge*,
47 F.4th 661 (8th Cir. 2022) ................................................................. 7, 8, 10, 11

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ................................................................................. 14, 16

*Craig v. Boren*,
429 U.S. 190 (1976) ....................................................................................... 7

*Dent v. West Virginia*,
129 U.S. 114 (1889) ....................................................................................... 1

*Dobbs v. Jackson Women's Health Org.*,
142 S. Ct. 2228 (2022) ........................................................................... *passim*

*Eknes-Tucker v. Gov. of Ala.*,
80 F.4th 1205 (11th Cir. 2023) ................................................................. *passim*

*Frontiero v. Richardson*,
411 U.S. 677 (1973) ..................................................................................... 14

*Geduldig v. Aiello*,
417 U.S. 484 (1974) ..................................................................................... 10

*Gibson v. Collier*,
920 F.3d 212 (5th Cir. 2019) .......................................................................... 26

Appellate Case: 23-2681    Page: 4    Date Filed: 11/15/2023 Entry ID: 5335880

*Gonzales v. Carhart*,
   550 U.S. 124 (2007).....................................................................1, 17

*Kosilek v. Spencer*,
   774 F.3d 63 (1st Cir. 2014) .............................................................26

*L.W. ex rel. Williams v. Skrmetti*,
   83 F.4th 460 (6th Cir. 2023) ..................................................... *passim*

*L.W. v. Skrmetti*,
   73 F.4th 408 (6th Cir. 2023) ...............................................................1

*Lyng v. Castillo*,
   477 U.S. 635 (1986).................................................................. 14, 15

*Marshall v. United States*,
   414 U.S. 417 (1974)...........................................................................17

*Mass. Bd. of Ret. v. Murgia*,
   427 U.S. 307 (1976).................................................................. 14, 15

*Michael M. v. Super. Ct.*,
   450 U.S. 464 (1981).............................................................................7

*Noe v. Parson*,
   Case No. 23AC-CC04530 (Circuit Court of Cole County, Missouri
   (Aug. 25, 2023))...............................................................................20

*Orr v. Orr*,
   440 U.S. 268 (1979).............................................................................7

*Phelps-Roper v. City of Manchester*,
   697 F.3d 678 (8th Cir. 2012) ............................................................27

*Planned Parenthood v. Casey*,
   505 U.S. 833 (1992).........................................................................17

*Poe v. Drummond*,
   No. 23-CV-177-JFH-SH, 2023 WL 6516449
   (N.D. Okla. Oct. 5, 2023) .......................................................... 20, 21

iv

Appellate Case: 23-2681     Page: 5     Date Filed: 11/15/2023 Entry ID: 5335880

*Rucho v. Com. Cause*,
    139 S. Ct. 2484 (2019)....................................................................17

*San Antonio Ind. Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973)................................................................... 14, 15

*Sessions v. Morales-Santana*,
    582 U.S. 47 (2017)...........................................................................7

*Tennessee v. Dep't of Educ.*,
    615 F. Supp. 3d 807 (E.D. Tenn. 2022)............................................16

*Tigner v. Texas*,
    310 U.S. 141 (1940)........................................................................13

*United States v. Hall*,
    44 F.4th 799 (8th Cir. 2022) ...........................................................27

*United States v. Salerno*,
    481 U.S. 739 (1987)........................................................................27

*United States v. Stephens*,
    594 F.3d 1033 (8th Cir. 2010) .................................................. 27, 28

*United States v. Virginia*,
    518 U.S. 515 (1996).........................................................................7

*Washington v. Glucksberg*,
    521 U.S. 702 (1997).....................................................................3, 5

## Statutes

Ala. Code §26-26-4...................................................................................2

Ark. Code Ann. §20-9-1501(6)..................................................................7

Ark. Code Ann. §20-9-1502(a)..................................................................7

Fla. Admin. Code Ann. R.64B8-9.019 ......................................................2

Appellate Case: 23-2681    Page: 6    Date Filed: 11/15/2023 Entry ID: 5335880

Ga. Code Ann. §31-7-3.5 .................................................................2

Idaho Code §18-1506C ...................................................................2

Ind. Code §25-1-22-13 ...................................................................2

Iowa Code §147.164 .......................................................................2

Ky. Rev. Stat. Ann. §311.372 ........................................................2

La. Stat. Ann. §40:1098 ..................................................................2

Miss. Code Ann. §41-141-1-9 ........................................................2

Mo. Rev. Stat. Ann. §191.1720 ......................................................2

S.B. 99, 68th Leg., 2023 Sess. (Mont. 2023)..................................2

Neb. Rev. Stat. §72-7301-07 ..........................................................2

H.B. 808, 2023 Sess. (N.C. 2023)...................................................2

N.D. Cent. Code. §12.1-36.1-02 .....................................................2

Okla. Stat. tit. 63, §2607.1 .............................................................2

H.B. 1080, 98th Leg. Sess. (S.D. 2023)..........................................2

Tenn. Code Ann. §68-33-101 ..........................................................2

S.B. 14, 88th Leg. Sess. (Tex. 2023) ..............................................2

Utah Code Ann. §58-68-502(1)(g) ..................................................2

W. Va. Code §30-3-20 ....................................................................2

Appellate Case: 23-2681     Page: 7     Date Filed: 11/15/2023 Entry ID: 5335880

**Federal Regulations**

Exec. Order No. 13,988, 86 Fed. Reg. 7,023 (Jan. 20, 2021).................................16

**Other Authorities**

AHRQ, *Topic Brief: Treatments for Gender Dysphoria in Transgender Youth*
(Jan. 8, 2021), https://perma.cc/23B5-D7C8 ......................................................18

Andrew Gelman & Eric Loken, *The Statistical Crisis in Science*,
102 AMERICAN SCIENTIST (2014) .....................................................................22

Anna Smith Haghighi, *What To Know About Estrogen in Men*,
MEDICAL NEWS TODAY (Nov. 9, 2020), https://perma.cc/B358-S7UW .............9

Azeen Ghorayshi, *Medical Group Backs Youth Gender Treatments, but Calls for
Research Review*, N.Y. TIMES (Aug. 3, 2023),
https://perma.cc/N3BJ-TB9J...........................................................................4, 22

Chris Drew, *81 Types of Genders & Gender Identities (A to Z List)*,
HELPFULPROFESSOR.COM (Mar. 26, 2022), https://perma.cc/SK4T-J5T4 .........15

E. Coleman et al., *WPATH Standards of Care for the Health of Transgender &
Gender Diverse People, Version 8*, INT'L J. OF TRANSGENDER HEALTH
(Sept. 15, 2022)................................................................................. 3, 4, 15, 24

Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. TIMES MAGAZINE
(June 15, 2022), https://perma.cc/ZMT2-W6DX ..............................................25

Endocrine Society, *Precocious Puberty* (Jan. 24, 2022), https://perma.cc/6Q3E-
PEMP ...................................................................................................................9

Genevieve Gluck, *Top Trans Medical Association Collaborated With Castration,
Child Abuse Fetishists*, REDUXX (May 17, 2022), https://perma.cc/5DWF-
MLRU ...................................................................................................................4

Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent
Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. CLIN.
ENDOCRINOL. METAB. (2017) ............................................................................24

Appellate Case: 23-2681     Page: 8     Date Filed: 11/15/2023 Entry ID: 5335880

Human Rights Campaign, Glossary of Terms, *Gender Fluid,* https://perma.cc/D4ND-7GEQ ...........................................................15

Human Rights Campaign, *Transgender and Non-Binary People FAQ*, https://tinyurl.com/5f9jvs4c ..............................................................15

Jayne Leonard, *What Causes High Testosterone in Women?*, MEDICAL NEWS TODAY (Jan. 12, 2023), https://perma.cc/BT38-L79X ........................................9

Jennifer Block, *Gender dysphoria in young people is rising—and so is professional disagreement*, THE BMJ (Feb. 23, 2023), https://perma.cc/QKB6-5QCR.........23

Jennifer Block, *Norway's Guidance on Paediatric Gender Treatment is Unsafe, Says Review*, THE BMJ (Mar. 23, 2023), https://perma.cc/9FQF-MJJ9.............19

Joshua Safer, *State of the Art: Transgender Hormone Care* (Feb. 15, 2019), https://www.youtube.com/watch?v=m7Xg9gZS_hg (at 5:38-6:18) .................24

Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious Transgender Science*, WALL ST. JOURNAL (Apr. 17, 2022) ...............................23

Karen O. Klein, *Review of Hormone Replacement Therapy in Girls and Adolescents with Hypogonadism*, 32 J. PEDIATRIC & ADOLESCENT GYNECOLOGY (2019), https://perma.cc/WU36-5889 ........................................10

Leor Sapir & Colin Wright, *Medical Journal's False Consensus on "Gender-Affirming Care,"* WALL ST. JOURNAL (June 9, 2023) .......................................25

Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 ARCHIVES OF SEXUAL BEHAVIOR (2021)...........................13

Maria Vogiatzi et al., *Testosterone Use in Adolescent Males*, 5 J. ENDOCRINE SOC'Y (2021), https://perma.cc/E3ZQ-4PZV .......................................9

Nat'l Inst. for Health & Care Excellence *Gender-affirming hormones for children and adolescents with gender dysphoria* (Mar. 11, 2021), https://perma.cc/M8J5-MXVG ................................................................................................19

Appellate Case: 23-2681     Page: 9     Date Filed: 11/15/2023 Entry ID: 5335880

Nat'l Inst. for Health & Care Excellence, *Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria* (Mar. 11, 2021), https://perma.cc/93NB-BGAN............................................9, 19

*Recommendation of the Council for Choices in Health Care in Finland: Medical Treatment Methods for Dysphoria Related to Gender Variance in Minors*, PALKO/COHERE Finland (2020), https://perma.cc/VN38-67WT..................19

Riitakerttu Kaltiala et al., *Youth Gender Transition Is Pushed Without Evidence*, WALL ST. JOURNAL (Jul. 14, 2023)....................................................................26

Roy Eappen & Ian Kingsbury, *The Endocrine Society's Dangerous Transgender Politicization*, WALL ST. JOURNAL (June 28, 2023) ...........................................23

Sweden National Board of Health and Welfare Policy Statement, SOCIALSTYRELSEN, *Care of Children and Adolescents with Gender Dysphoria: Summary* (2022), https://perma.cc/FDS5-BDF3 ................................................19

Videorecording of Dr. Tishelman's WPATH presentation, https://perma.cc/4M52-WG4X ....................................................................................................25

Yuval Levin, *A Time to Build: From Family and Community to Congress and the Campus, How Recommitting to our Institutions Can Revive the American Dream* (2020)....................................................................................................22

ix

# INTERESTS OF AMICI CURIAE AND SUMMARY OF ARGUMENT[1]

Amici curiae are the States of Alabama, Missouri, Tennessee, Florida, Georgia, Idaho, Indiana, Iowa, Louisiana, Kansas, Kentucky, Mississippi, Montana, Nebraska, Oklahoma, South Carolina, South Dakota, Texas, Utah, Virginia, and West Virginia.

"[F]rom time immemorial," amici have exercised their authority to enact health and safety measures—regulating the medical profession, restricting access to potentially dangerous medicines, and banning treatments that are unsafe or unproven. *Dent v. West Virginia*, 129 U.S. 114, 121-24 (1889); *see Abigail All. For Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 703-05 (D.C. Cir. 2007) (en banc).

State legislatures have particularly "wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). And "State[s] plainly ha[ve] authority, in truth a responsibility, to look after the health and safety of [their] children." *L.W. v. Skrmetti*, 73 F.4th 408, 419 (6th Cir. 2023) (staying injunction of similar Tennessee law). So when it comes to experimental gender-transition procedures, States like Arkansas can "choose fairminded caution and their own approach to child welfare" before subjecting their children to irreversible transitioning treatments. *L.W. ex rel. Williams v. Skrmetti*, 83

---

[1] This brief is filed under Federal Rule of Appellate Procedure 29(a)(2).

F.4th 460, 488 (6th Cir. 2023) (vacating preliminary injunctions of similar laws in Tennessee and Kentucky). Indeed, at least twenty other States have laws similar to Arkansas's.[2] "Absent a constitutional mandate to the contrary, these types of issues are quintessentially the sort that our system of government reserves to legislative, not judicial, action." *Eknes-Tucker v. Gov. of Ala.*, 80 F.4th 1205, 1231 (11th Cir. 2023) (vacating preliminary injunction of similar Alabama law).

Yet rather than accord Arkansas's "health and welfare laws" a "strong presumption of validity," *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2284 (2022) (citation omitted), Plaintiffs asked the district court to treat certain medical interest groups as the *real* regulators, authoring standards no mere State could contradict. According to Plaintiffs, the "major medical and mental health professional associations in the United States" endorse the Standards of Care promulgated by the World Professional Association for Transgender Health (WPATH) and the Endocrine Society, so it is *those* standards the Constitution purportedly mandates. Pls' Tr. Br., R.Doc.266 at 3.

---

[2] *See* Ala. Code §26-26-4; Fla. Admin. Code Ann. R.64B8-9.019; Ga. Code Ann. §31-7-3.5; Idaho Code §18-1506C; Ind. Code §25-1-22-13; Iowa Code §147.164; Ky. Rev. Stat. Ann. §311.372; La. Stat. Ann. §40:1098 (effective Jan. 1, 2024); Miss. Code Ann. §41-141-1-9; Mo. Rev. Stat. Ann. §191.1720; S.B. 99, 68th Leg., 2023 Sess. (Mont. 2023); Neb. Rev. Stat. §72-7301-07; H.B. 808, 2023 Sess. (N.C. 2023); N.D. Cent. Code. §12.1-36.1-02; Okla. Stat. tit. 63, §2607.1; H.B. 1080, 98th Leg. Sess. (S.D. 2023); Tenn. Code Ann. §68-33-101; S.B. 14, 88th Leg. Sess. (Tex. 2023); Utah Code Ann. §58-68-502(1)(g); W. Va. Code §30-3-20 (effective Jan. 1, 2024); *see also L.W.*, 83 F.4th at 471.

Appellate Case: 23-2681     Page: 12     Date Filed: 11/15/2023 Entry ID: 5335880

Nonsense. One could scarcely dream up a more radical organization to out-source the regulation of medicine to than WPATH (whose members are also almost entirely responsible for the Endocrine Society Guidelines). While "Americans are engaged in an earnest and profound debate about" how best to help children suffering from gender dysphoria, *cf. Washington v. Glucksberg*, 521 U.S. 702, 735 (1997), WPATH has taken its gender ideology to the extreme and included in its latest Standards an entire chapter on self-identified "eunuchs"—individuals "assigned male at birth" who "wish to eliminate masculine physical features, masculine genitals, or genital functioning."[3] Because eunuchs "wish for a body that is compatible with their eunuch identity," the Standards say, some will need "castration to better align their bodies with their gender identity."[4] WPATH thus deems castration "medically necessary gender-affirming care" for eunuchs to "gain comfort with their gendered self."[5]

And how did WPATH learn that castration constitutes "medically necessary gender-affirming care"? From the Internet of course—specifically from a "large online peer-support community" called the "Eunuch Archive," which WPATH boasts contains "the greatest wealth of information about contemporary eunuch-

---

[3] E. Coleman et al., *WPATH Standards of Care for the Health of Transgender & Gender Diverse People, Version 8*, Int'l J. of Transgender Health (Sept. 15, 2022), S88 ("SOC 8").

[4] *Id.* at S88-89.

[5] *Id.*

Appellate Case: 23-2681     Page: 13     Date Filed: 11/15/2023 Entry ID: 5335880

identified people."[6] Left unannounced is that the Archive also hosts thousands of stories that "focus on the eroticization of child castration" and "involve the sadistic sexual abuse of children."[7] Just as with eunuchs, though, WPATH's Standards consider sterilizing gender-transition procedures to be medically necessary "gender-affirming care" for *minors* suffering from gender dysphoria.[8] This is the stuff of nightmares, not constitutional law.

Even the American Academy of Pediatrics (AAP)—which has aggressively lobbied against laws like Arkansas's—recently acknowledged that there are no systematic reviews supporting the treatments Arkansas has prohibited. It thus promised to conduct an initial review. (Tellingly, the group will continue to recommend the treatments while awaiting evidence of their safety and efficacy—a move Dr. Gordon Guyatt, the father of evidence-based medicine, noted "puts the cart before the horse").[9] Several European countries, meanwhile, have already conducted systematic reviews and, based on their findings, severely curtailed the availability of these treatments outside controlled research settings.

---

[6] *Id.* at S88.

[7] Genevieve Gluck, *Top Trans Medical Association Collaborated With Castration, Child Abuse Fetishists*, REDUXX (May 17, 2022), https://perma.cc/5DWF-MLRU.

[8] *See* SOC 8, *supra*, at S43-S66.

[9] Azeen Ghorayshi, *Medical Group Backs Youth Gender Treatments, but Calls for Research Review*, N.Y. TIMES (Aug. 3, 2023), https://perma.cc/N3BJ-TB9J.

Appellate Case: 23-2681     Page: 14     Date Filed: 11/15/2023 Entry ID: 5335880

Plaintiffs would substitute WPATH's year-old Standards, rejected abroad and in numerous States, for the judgment of Arkansas's legislature. Thankfully, the Constitution does not put WPATH in charge of regulating medicine. The government regulates the medical profession, not the other way around. *See Glucksberg*, 521 U.S. at 731. The most recent federal appellate courts to consider similar laws rejected those plaintiffs' requests to substitute WPATH's judgment for that of Tennessee, Kentucky, and Alabama. *L.W.*, 83 F.4th at 491; *Eknes-Tucker*, 80 F.4th 1231. This Court should do likewise.

## ARGUMENT

Arkansas's Save Adolescents From Experimentation (SAFE) Act is a valid exercise of the State's police power. Like many States, Arkansas became concerned that healthcare providers were risking the long-term health and well-being of gender dysphoric children by prescribing them unproven hormonal and surgical treatments. The Arkansas legislature responded by prohibiting gender-transition procedures for minors.

The district court erred by permanently enjoining Arkansas from enforcing the Act. The court erroneously assumed that heightened scrutiny applies whenever a medical provider must know a patient's sex to determine what care to provide, improperly held that transgender individuals constitute a suspect classification, and seemed to think that any healthcare regulation that conflicts with WPATH's

5

Standards of Care and the position of American medical interest groups cannot survive heightened scrutiny. The Constitution does not cast such a skeptical eye on health and welfare laws, even if they regulate gender-transition treatments. And States do not need to seek approval from WPATH before banning experimental procedures that leave children sterilized. The Court should reverse.

## I. Laws Prohibiting Pediatric Gender-Transition Procedures Do Not Trigger Heightened Scrutiny.

The SAFE Act—like similar laws enacted by many of the amici States—prohibits healthcare providers from performing surgeries on and administering hormones to minors for the purpose of gender transition. The district court erroneously concluded that such laws are subject to heightened scrutiny under the Equal Protection Clause because they purportedly discriminate on the basis of sex and transgender status. To the contrary, the Act equally protects minors of both sexes, and transgender individuals do not constitute a suspect class. As with "other health and welfare laws," rational-basis review applies. *Dobbs*, 142 S. Ct. at 2284.

### A. Laws Prohibiting Pediatric Gender-Transition Procedures Do Not Discriminate Based on Sex.

Following the flawed reasoning of this Court's preliminary injunction panel, the district court determined that the SAFE Act triggers heightened scrutiny because "a minor's sex at birth determines whether the minor can receive certain types of medical care under the law." Op., App.295; R.Doc.283 at 64 (citing *Brandt by &*

6

through *Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022)). As both the Sixth and Eleventh Circuits have recently explained, this was error. *See L.W.*, 83 F.4th at 480-81; *Eknes-Tucker*, 80 F.4th at 1228.

As an initial matter, the Arkansas law regulates gender-transition procedures for *all* minors, regardless of sex. Under the SAFE Act, *no* minor of either sex may receive "*any* medical or surgical service"—including puberty blockers, cross-sex hormones, or surgeries—for the purpose of gender transition. Ark. Code Ann. §§20-9-1502(a), 20-9-1501(6) (emphasis added). This type of "across-the-board regulation lacks any of the hallmarks of sex discrimination" and does not "prefer one sex over the other." *L.W.*, 83 F.4th at 480 (citation omitted). It does not include one sex and exclude the other. *Cf. United States v. Virginia*, 518 U.S. 515, 519-20 (1996). It does not "bestow benefits or burdens based on sex." *Cf. Michael M. v. Super. Ct.*, 450 U.S. 464, 466 (1981) (plurality opinion); *Orr v. Orr*, 440 U.S. 268, 271 (1979). And it does not "apply one rule for males and another for females." *Cf. Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017); *Craig v. Boren*, 429 U.S. 190, 192 (1976). The Act's prohibitions are sex-neutral and treat similarly situated individuals "even-handedly." *L.W.*, 83 F.4th at 479-80.

The panel's decision reflects a fundamental misunderstanding both as to how these statutes operate and how heightened scrutiny works. The Court determined that the SAFE Act "discriminates on the basis of sex" because "[a] minor born as a male

7

may be prescribed testosterone," for example, "but a minor born as a female is not permitted to seek the same medical treatment." 47 F.4th at 669. Thus the panel concluded that "the minor's sex at birth determines whether or not the minor can receive certain types of medical care under the law," triggering heightened scrutiny. *Id.*

Far from "equaliz[ing] burdens or benefits between girls and boys," this logic would "merely force [States] to *either* ban puberty blockers and hormones for all purposes *or* allow them for all purposes." *Eknes-Tucker*, 80 F.4th at 1234 (Brasher, J., concurring). That is because the *Brandt* panel erroneously viewed the administration of testosterone as one monolithic treatment—the "same medical treatment" regardless of whether it's used to treat a boy's testosterone deficiency or transition a teenaged girl. It is not.

*First*, common sense tells us that a physician can use the same drug or procedure to treat different conditions with different risk profiles and that that fact does not make the two "medical treatments" the same. To the diabetic patient, injecting insulin is lifesaving. To the hypoglycemic patient, it can be life ending. Same drugs, different treatments.

This same is true here. For example, puberty blockers are typically used in children to treat precocious puberty, a condition where a child begins puberty at an

Appellate Case: 23-2681     Page: 18     Date Filed: 11/15/2023 Entry ID: 5335880

unusually early age.[10] Unlike gender dysphoria, precocious puberty is a physical abnormality that can be diagnosed through medical tests.[11] When puberty blockers are used to treat precocious puberty, the goal is to ensure that children develop at the normal age of puberty. The goal of using them to treat gender dysphoria, by contrast, is to *block* normally timed puberty. This distinction changes the cost-benefit analysis because using puberty blockers well beyond the normal pubertal age can, at minimum, risk a child's bone growth and social development.[12]

Likewise for testosterone and estrogen, which also serve different purposes and carry different risks when given to boys versus girls. Excess testosterone in females can *cause* infertility,[13] while testosterone is used in males to *alleviate* fertility problems.[14] On the other hand, excessive amounts of estrogen in males can *cause* infertility and sexual dysfunction,[15] but estrogen is often given to females to *treat*

---

[10] Endocrine Society, *Precocious Puberty* (Jan. 24, 2022), https://perma.cc/6Q3E-PEMP.

[11] *Id.*

[12] *See* Nat'l Inst. for Health & Care Excellence (NICE), *Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria* (Mar. 11, 2021), https://perma.cc/93NB-BGAN, at 26-32 ("NICE Puberty Blocker Evidence Review").

[13] Jayne Leonard, *What Causes High Testosterone in Women?*, MEDICAL NEWS TODAY (Jan. 12, 2023), https://perma.cc/BT38-L79X.

[14] Maria Vogiatzi et al., *Testosterone Use in Adolescent Males*, 5 J. ENDOCRINE SOC'Y 1, 2 (2021), https://perma.cc/E3ZQ-4PZV.

[15] Anna Smith Haghighi, *What To Know About Estrogen in Men*, MEDICAL NEWS TODAY (Nov. 9, 2020), https://perma.cc/B358-S7UW.

9

problems with sexual development.[16] Thus, giving testosterone or estrogen to a physically healthy child for the purpose of gender transitioning has a different purpose and different risks than using the same drugs to treat a genetic or congenital condition that occurs exclusively in one sex.[17] *L.W.*, 83 F.4th at 481. These distinctions, among others, makes the use of the same hormones in the different sexes different treatments altogether.

*Second*, a State's medical regulation does not become "a sex-based classification" merely by mentioning sex. *Dobbs*, 142 S. Ct. at 2245 (citing *Geduldig v. Aiello*, 417 U.S. 484, 496 (1974)). That is because the fact that a patient's sex affects the nature of a treatment does not mean anyone is denied equal protection. The Constitution does not look askance on a hospital offering testicular exams only to boys or pap smears only to girls, for instance. And here, "laws banning, permitting, or otherwise regulating [gender-transition procedures] all face the same linguistic destiny of describing the biology of the procedures." *L.W.*, 83 F.4th at 483. They refer to sex only because the procedures they regulate "are themselves sex-based." *Eknes-Tucker*, 80 F.4th at 1228. Yet just as States can enact laws concerning abortion,

---

[16] Karen O. Klein, *Review of Hormone Replacement Therapy in Girls and Adolescents with Hypogonadism*, 32 J. PEDIATRIC & ADOLESCENT GYNECOLOGY 460 (2019), https://perma.cc/WU36-5889.

[17] While there may be some instances in which administering testosterone to a female (for instance) could be necessary—say, to treat symptoms of menopause or a gland disorder—doing so would not be the "same medical treatment" as that given to a male. *Contra Brandt*, 47 F.4th at 669.

Appellate Case: 23-2681    Page: 20    Date Filed: 11/15/2023 Entry ID: 5335880

female genital mutilation, testicular cancer, prostate cancer, breastfeeding, cervical cancer, Cesarean sections, and in-vitro fertilization without those laws being considered "presumptively unconstitutional," so can they regulate experimental gender-transition procedures. *L.W.*, 83 F.4th at 482 (collecting examples).

This is also one reason why the reasoning of *Bostock* does not apply here. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020). Whatever the merits of the Supreme Court's "simple test" "in the workplace" (*id.* at 1737, 1743)—"if changing the employee's sex would have yielded a different choice by the employer," the employer has treated the employee differently "because of sex," *id.* at 1741—it makes no sense to apply the test to medicine, where males and females are not similarly situated. A fertility clinic does not discriminate on the basis of sex by implanting fertilized eggs only in females, even though "changing the [patient's] sex would have yielded a different choice by the [clinic]." There is no stereotype or inequality in the clinic's policy. So here. Administering testosterone to bring a boy's levels into a normal range is not the same treatment as ramping up a young girl's testosterone levels to that of a healthy boy—ten times that of a healthy girl—or, for that matter, as providing the hormone to a Tour de France cyclist seeking a yellow jersey.

Returning to the *Brandt* panel's reasoning, it is *not* true that "[a] minor born as a male may be prescribed testosterone" *to transition*. 47 F.4th at 669. Not only is this because no minor, male *or* female, may be prescribed testosterone *to transition*,

11

but biology dictates that a "minor born as a male" cannot use testosterone *to transition* at all. Only females can use testosterone for the purpose of gender transition—never males. *See L.W.*, 83 F.4th at 481. Although a male can use testosterone for other types of treatment, no amount of testosterone will cause a male to develop female characteristics.

The inverse is true for estrogen gender-transitioning treatments. Estrogen can be used for gender transition *only* in males, never the reverse. *Id*. The same goes for the surgical procedures at issue here. Only females would obtain a double mastectomy or a phalloplasty for the purpose of gender transition. And only males would seek breast enlargement surgery or a vaginoplasty for the purpose of gender transition. These are "medical procedure[s] that only one sex can undergo," making heightened scrutiny inappropriate. *Dobbs*, 142 S. Ct. at 2245; *see L.W.*, 83 F.4th at 481; *Eknes-Tucker*, 80 F.4th at 1229.

As for puberty-blocking gender-transitioning treatment, sex does not matter to Arkansas's law. "In contrast to cross-sex hormones, puberty blockers involve the same drug used equally by gender-transitioning boys and girls." *L.W.*, 83 F.4th at 483. Prohibiting their use for the purpose of gender transition does not depend on sex at all.

In sum, the "right question under the Equal Protection Clause" is whether "those who want to use these drugs to treat a discordance between their sex and

12

gender identity and those who want to use these drugs to treat other conditions" are "similarly situated." *Eknes-Tucker*, 80 F.4th at 1233 (Brasher, J., concurring). To ask the question answers it. Arkansas and other States have discretion to "permit varying treatments of distinct diagnoses, as the 'Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.'" *L.W.*, 83 F.4th at 482-83 (quoting *Tigner v. Texas*, 310 U.S. 141, 147 (1940)).

### B. Transgender Individuals Are Not a Suspect Class.

The district court held that the SAFE Act "prohibits medical care that only transgender people choose to undergo," thereby discriminating based on transgender status. Op., App.296; R.Doc.283 at 65. That assertion is refuted by the growing number of "detransitioners" who received gender-transition procedures but later chose to detransition and live in accordance with their biological sex.[18] If detransitioners were never transgender, then it cannot be true that *only* transgender individuals seek the prohibited procedures. And if detransitioners *were* transgender but no longer are, then transgender status cannot be an immutable characteristic.

In any event, individuals who identify as transgender do not constitute a suspect class. The bar for recognizing new suspect classifications is "high." *L.W.*, 83

---

[18] *E.g.*, Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 ARCHIVES OF SEXUAL BEHAVIOR 3353 (2021).

Appellate Case: 23-2681     Page: 23     Date Filed: 11/15/2023 Entry ID: 5335880

F.4th at 486. Indeed, the Supreme Court has not recognized any new constitutionally protected classes in more than four decades, and it has repeatedly declined to do so. *E.g., City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442-46 (1985) (disability is not a suspect class); *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (same for age); *San Antonio Ind. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973) (same for poverty).

The district court relied on nonbinding authority to hold that transgender people "satisfy all indicia of a suspect class." Op., App.296; R.Doc.283 at 65. But the court made no findings of fact on this issue, nor did it meaningfully grapple with any of the factors used to establish new suspect classes. *See Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (looking for (1) immutable characteristics that define (2) a discrete group, (3) historical discrimination, and (4) political powerlessness).

Transgender status does not pass the test. For one, it is not an obvious or "immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). None of the three minor Plaintiffs in this case identified as transgender until they were adolescents. Op., App.254, 256, 260; R.Doc.283 at 23, 25, 29 (Dylan identified as transgender at age 13; Sabrina at age 15; Parker at 9). And there is "no way to determine if someone is transgender or non-

Appellate Case: 23-2681     Page: 24     Date Filed: 11/15/2023 Entry ID: 5335880

binary unless they share their personal gender identity."[19] The growing number of detransitioners likewise undermines any argument that gender identity is immutable.[20] *L.W.*, 83 F.4th at 487.

Transgender status also hardly defines a "discrete group." *Lyng*, 477 U.S. at 638. The term "transgender" can describe "a huge variety of gender identities and expressions,"[21] with recent estimates citing more than 80 types of gender identities that include "aliagender," "bigender," "demiboy," "gender-fluid," "maverique," "non-binary," "polygender," and many others.[22] Transgender individuals may also "embrace a fluidity of gender identity" or even an "unfixed gender identity."[23]

Nor are transgender individuals a "politically powerless" group. *Rodriguez*, 411 U.S. at 28. To start, they are quite "unlike" those individuals who were long purposefully denied equal protection under the law due to their race, national origin, or sex. *Murgia*, 427 U.S. at 313-14 (rejecting age as suspect class because elderly persons have not faced discrimination "akin to [suspect] classifications"). To take

---

[19] Human Rights Campaign, *Transgender and Non-Binary People FAQ* ("How do I know if someone else is transgender or non-binary?"), https://tinyurl.com/5f9jvs4c.
[20] The district court's permanent injunction ruling completely ignores the testimony of the detransitioners who testified at trial regarding the harmful effects of the prohibited treatments.
[21] WPATH SOC8, *supra*, at S15.
[22] Chris Drew, *81 Types of Genders & Gender Identities (A to Z List)*, HELPFULPROFESSOR.COM (Mar. 26, 2022), https://perma.cc/SK4T-J5T4.
[23] Human Rights Campaign, Glossary of Terms, *Gender Fluid*, https://perma.cc/D4ND-7GEQ .

15

just some recent examples, from his first day in office, President Biden has prioritized "Preventing and Combating Discrimination on the Basis of Gender Identity." Exec. Order No. 13,988, 86 Fed. Reg. 7,023 (Jan. 20, 2021). Executive agencies have attempted to impose new gender-identity obligations on the States. *See, e.g.*, *Tennessee v. Dep't of Educ.*, 615 F. Supp. 3d 807, 838-39 (E.D. Tenn. 2022) (rejecting agency attempts to "go[] beyond the holding of *Bostock*"). And more than a dozen States have enacted laws expressly allowing pediatric gender-transition procedures prohibited under the SAFE Act. *L.W.*, 83 F.4th at 487. It is no wonder that the Plaintiffs here have the support of the Department of Justice, many (American) medical organizations, and prestigious law firms.

State laws regulating gender-transition procedures are recent enactments by policymakers grappling with tough policy questions about how to protect children from the significant risks posed by still-novel medical interventions for gender dysphoria. To the extent a State's regulation of those procedures requires focusing on gender-dysphoric youth, such a classification is a "sensible ground for different treatment," and not the sort of irrelevant grouping that warrants heightened scrutiny. *City of Cleburne*, 473 U.S. at 440. States have taken varying approaches to these issues. Removing these "trying policy choices" from the "arena of public debate and legislative action" and placing them in the hands of the federal judiciary "is not how a constitutional democracy is supposed to work—or at least works best—when

16

confronting evolving social norms." *L.W.*, 83 F.4th at 486-87. Until the Supreme Court says otherwise, "rational basis review applies to transgender-based classifications." *Id.* at 419.

## II. Arkansas's Law Survives Any Level of Review.

The district court erred by analyzing the SAFE Act under any standard besides rational-basis review. But even if the district court were right that heightened scrutiny applies, it was wrong to find that the SAFE Act failed to meet that standard. *See Eknes-Tucker*, 80 F.4th at 1235 (Brasher, J., concurring) (finding "exceedingly persuasive justification" for prohibiting pediatric gender-transition procedures).

### A. Courts Should Defer to Legislatures in the Face of Medical Uncertainty.

States have "wide discretion" to regulate "in areas where there is medical and scientific uncertainty." *Gonzales*, 550 U.S. at 163; *accord Marshall v. United States*, 414 U.S. 417, 427 (1974) ("When [a legislature] undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad."). This deference applies even in cases involving heightened scrutiny. *Gonzales*, 550 U.S. at 163 (stating that "[t]his traditional rule is consistent with [*Planned Parenthood v.*] *Casey*," 505 U.S. 833 (1992), which involved heightened scrutiny)).

The reason for that is clear: The Constitution provides no guidance to courts for choosing between competing medical authorities. *Cf. Rucho v. Com. Cause*, 139 S. Ct. 2484, 2498 (2019) (requiring deference to legislatures unless there are "clear,

17

manageable, and politically neutral" standards for judicial intervention). Federal courts are not equipped to choose, as a constitutional matter, between (on the one hand) the medical opinions of Plaintiffs' expert witnesses and preferred medical interest groups and (on the other hand) the medical opinions of Arkansas's expert witnesses, half a dozen countries in Europe, and the U.S. Agency for Healthcare Research and Quality. That job is for the legislature. *See Eknes-Tucker*, 80 F.4th at 1235 (Brasher, J., concurring) ("Intermediate scrutiny permits the legislature to make a predictive judgment based on competing evidence." (cleaned up)). And "the States are indeed engaged in thoughtful debates about the issue." *L.W.*, 83 F.4th at 471 (citation omitted).

So all Arkansas had to do to prevail is show that there is a medical dispute on the issue at hand, which it did. The U.S. Agency for Healthcare Research and Quality itself admits that these interventions lack evidentiary support: "There is a lack of current evidence-based guidance for the care of children and adolescents who identify as transgender, particularly regarding the benefits and harms of pubertal suppression, medical affirmation with hormone therapy, and surgical affirmation."[24]

Finland's medical authority likewise concluded that, "[i]n light of available evidence, gender reassignment of minors is an experimental practice," and "there

---

[24] AHRQ, *Topic Brief: Treatments for Gender Dysphoria in Transgender Youth* (Jan. 8, 2021), https://perma.cc/23B5-D7C8.

Appellate Case: 23-2681     Page: 28     Date Filed: 11/15/2023 Entry ID: 5335880

are no medical treatment[s] that can be considered evidence-based."[25] So did the United Kingdom's National Health Service, which recently restricted gender-transition interventions to formal research settings after an independent medical review concluded that there is no evidentiary support for these interventions given the "lack of reliable comparative studies."[26] Sweden's National Board of Health and Welfare reached a similar conclusion, finding that "the risk of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits."[27] And earlier this year, the Norwegian Healthcare Investigation Board (Ukom) found "insufficient evidence for the use of puberty blockers and cross sex hormone treatments in young people, especially for teenagers who are increasingly seeking health services."[28] At present, "Ukom defines such treatments as utprøvende behandling, or 'treatments under trial,'" [29]—that is, experimental.

---

[25] *Recommendation of the Council for Choices in Health Care in Finland: Medical Treatment Methods for Dysphoria Related to Gender Variance in Minors*, PALKO/COHERE Finland (2020), https://perma.cc/VN38-67WT.

[26] Nat'l Inst. for Health & Care Excellence *Gender-affirming hormones for children and adolescents with gender dysphoria* (Mar. 11, 2021), https://perma.cc/M8J5-MXVG ("NICE Cross-Sex Hormone Review"); NICE Puberty Blocker Evidence Review, *supra*.

[27] Sweden National Board of Health and Welfare Policy Statement, SOCIALSTYRELSEN, *Care of Children and Adolescents with Gender Dysphoria: Summary* 3 (2022), https://perma.cc/FDS5-BDF3.

[28] Jennifer Block, *Norway's Guidance on Paediatric Gender Treatment is Unsafe, Says Review*, THE BMJ (Mar. 23, 2023), https://perma.cc/9FQF-MJJ9.

[29] *Id.*

Appellate Case: 23-2681     Page: 29     Date Filed: 11/15/2023 Entry ID: 5335880

In fact, calling the treatments "experimental" may be overstating things. As another court recently found, it may be "more accurate to state that the [treatments] are not 'experimental' only because the experimental phase has truly not yet begun." *Poe v. Drummond*, No. 23-CV-177-JFH-SH, 2023 WL 6516449, at *13 (N.D. Okla. Oct. 5, 2023) (denying motion to preliminarily enjoin Oklahoma's similar law).

Federal and state courts also agree that significant scientific uncertainty pervades the practice of providing these interventions to minors. *See Eknes-Tucker*, 80 F.4th at 1225 (noting that gender transition drugs provided to minors have "uncertainty regarding benefits, recent surges in use," "irreversible effects," and "growing concern about the medications' risks." (citations omitted)); *L.W.*, 83 F.4th at 471 (observing that gender transition procedures for minors is "a vexing and novel topic of medical debate.").

Less than three months ago, a trial court in Missouri concluded, after a three-day evidentiary hearing in which multiple experts on both sides of the issue testified, that "[t]he science and medical evidence" regarding the safety and efficacy of performing these medical procedures on minors "is conflicting and unclear" and "raises more questions than answers."[30] An expert witness for the plaintiffs even admitted that the "same data" is leading medical authorities to "different conclusions."[31] *See*

---

[30] Order, *Noe v. Parson*, Case No. 23AC-CC04530, at 2 (Circuit Court of Cole County, Missouri (Aug. 25, 2023)), *available at* https://perma.cc/F6LH-SCVU.
[31] *See* Transcript, *Noe v. Parson*, at 210, *available at* https://perma.cc/2PKJ-6XAT.

Appellate Case: 23-2681    Page: 30    Date Filed: 11/15/2023 Entry ID: 5335880

*also Poe*, 2023 WL 6516449, at *13 ("The record in this case amply demonstrates that there is no consensus in the medical field about the extent of the risks or the benefits of [transitioning treatments].").

In light of this uncertainty, Arkansas had "wide discretion" to restrict these interventions to protect the "health and welfare" of children." *Dobbs*, 142 S. Ct. at 2284. The district court's disregard of the legislature's wide discretion should be reversed.

### B.     Plaintiffs Erroneously Rely on American Medical Interest Groups that are Biased Advocates, Not Neutral Experts.

The district court discounted the European experience because none of the European countries that has conducted a systematic review responded by "impos[ing] a ban on all gender-affirming care" the way the SAFE Act would. Op., App.307; R.Doc.283 at 76. But if the treatments are experimental, what does it matter if England chooses to conduct the experiments? The Constitution does not require Arkansas to offer its children as guinea pigs rather than waiting on results of the ongoing experiments.

While healthcare authorities in Europe have curbed access to pediatric gender-transition procedures, American medical organizations like the American Academy

21

have run in the opposite direction, advocating unfettered access to transitioning treatments even as they admit that more research is needed.[32]

In some ways, it is unsurprising that, until recent decisions by the Sixth and Eleventh Circuits, courts repeatedly deferred to these organizations. One would hope that medical societies like AAP, the Endocrine Society, and WPATH would be honest brokers, reviewing the evidence as Europe has done and responding accordingly. And one would hope that organizations like the American Medical Association—which has not published guidelines on this topic but supports the WPATH Standards of Care—would use their institutional goodwill, built up over time, to be the voice of reason and put the safety of children first.

Sadly, this has not happened. As with other institutions, American medical organizations have become increasingly "performative," treated by their leaders as platforms for advancing the current moment's cause célèbre.[33] Add to this a replication crisis in scientific literature and the ability of researchers to use statistics to make findings appear significant when they are not,[34] and it is no wonder that medical organizations find it easier to just go with the zeitgeist. (Not to mention that the

---

[32] *E.g.*, Ghorayshi, *Medical Group Backs Youth Gender Treatments*, *supra*.

[33] *See generally* Yuval Levin, *A Time to Build: From Family and Community to Congress and the Campus, How Recommitting to our Institutions Can Revive the American Dream* (2020).

[34] *E.g.*, Andrew Gelman & Eric Loken, *The Statistical Crisis in Science*, 102 American Scientist 460, 460-65 (2014) (noting "statistical significance" can "be obtained even from pure noise" by various tricks of the trade).

American interest groups that endorse gender-transition procedures are just that—interest groups, with a strong financial interest in the procedures their members make a living by providing.) Science is *hard*, and there is no reward in the current climate for any organization that questions the safety and efficacy of using sterilizing gender-transition procedures on children.

Take AAP, for instance, which has "decried" "as transphobic" a resolution by its members discussing "the growing international skepticism of pediatric gender transition" and calling for a literature review.[35] As AAP member Dr. Julia Mason concluded, "AAP has stifled debate" and "put its thumb on the scale … in favor of a shoddy but politically correct research agenda."[36]

Similar concerns have been raised about the Endocrine Society,[37] whose guidelines for treating gender dysphoria the *British Medical Journal* recently exposed as having "serious problems" because—remarkably—the "systematic reviews" the guidelines were based on "didn't look at the effect of the interventions on gender dysphoria itself."[38] The Endocrine Society knows that plaintiffs in cases like this one bandy about its Guidelines to justify the procedures its members profit

---

[35] Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious Transgender Science*, WALL ST. JOURNAL (Apr. 17, 2022).

[36] *Id.*

[37] *E.g.*, Roy Eappen & Ian Kingsbury, *The Endocrine Society's Dangerous Transgender Politicization*, WALL ST. JOURNAL (June 28, 2023).

[38] Jennifer Block, *Gender dysphoria in young people is rising—and so is professional disagreement*, THE BMJ (Feb. 23, 2023), https://perma.cc/QKB6-5QCR.

from, yet the Guidelines themselves emphasize that they do not "establish a standard of care."[39] One member of the Guidelines authoring committee acknowledged, when not testifying in court against the States, that the Endocrine Society did not even have "some little data"—they "had none"—to justify the language allowing prescription of cross-sex hormones prior to age 16, a change that gave "cover" to doctors to do so.[40]

Then there is WPATH, which at least confesses to being "an advocacy organization[]." *Boe v. Marshall*, No. 2:22-cv-184-LCB (N.D. Ala.), ECF 208. Ample evidence shows just how true that is. In addition to advocating castration as "medically necessary gender-affirming care" for males whose "gender identity" is "eunuch," WPATH recently removed most minimum-age requirements for gender-modification procedures from its Standards of Care.[41] According to the lead author of the chapter on children, WPATH dropped the age requirements to "bridge th[e] considerations" regarding the need for insurance coverage with the desire to ensure

---

[39] Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. CLIN. ENDOCRINOL. METAB. 3869, 3895 (2017).

[40] Joshua Safer, *State of the Art: Transgender Hormone Care* (Feb. 15, 2019), https://www.youtube.com/watch?v=m7Xg9gZS_hg (at 5:38-6:18).

[41] *See* SOC 8, *supra*, at S43-79.

Appellate Case: 23-2681    Page: 34    Date Filed: 11/15/2023 Entry ID: 5335880

that doctors would not be held liable for malpractice if they deviated from the standards.[42]

WPATH has also suppressed dissent, including canceling the presentation of a prominent researcher who dared to question the safety of transitioning young children and censuring a board member who went public with concerns that medical providers in America are transitioning minors without proper safeguards.[43]

And just recently, WPATH's leaders were successful in having a major scientific publishing house, Springer, retract a published paper that dared to examine the growing phenomenon of groups of adolescents suddenly "declar[ing] a transgender identity after extensive exposure to social media and peer influence."[44] Indeed, WPATH has tried to cancel nearly every researcher that has looked at "Rapid Onset Gender Dysphoria," for the simple reason that, "[e]ven mentioning the possibility that trans identity is socially influenced or a phase threatens [its] claims that children can know early in life they have a permanent transgender identity and therefore that they should have broad access to permanent body-modifying and sterilizing

---

[42] Videorecording of Dr. Tishelman's WPATH presentation, https://perma.cc/4M52-WG4X.

[43] Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. TIMES MAGAZINE (June 15, 2022), https://perma.cc/ZMT2-W6DX.

[44] Leor Sapir & Colin Wright, *Medical Journal's False Consensus on "Gender-Affirming Care,"* WALL ST. JOURNAL (June 9, 2023).

25

procedures."[45] More examples abound. *E.g.*, Amicus Br. of Family Research Council at 7-25.

There is thus good reason for the Supreme Court's observation that medical interest groups' position statements do not "shed light on the meaning of the Constitution." *Dobbs*, 142 S. Ct. at 2267. The First and Fifth Circuits had it right when they found that "the WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate." *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019); *see Kosilek v. Spencer*, 774 F.3d 63, 90 (1st Cir. 2014). While medical organizations are certainly capable of establishing true, evidence-based standards of care, they have utterly failed to act responsibly when it comes to pediatric gender-transition procedures. As a group of respected gender clinicians and researchers from Finland, the UK, Sweden, Norway, Belgium, France, Switzerland, and South Africa recently opined, "medical societies" in the United States should "align their recommendations with the best available evidence—rather than exaggerating the benefits and minimizing the risks."[46] Until they do so, States like Arkansas are forced to step in to protect children.

---

[45] *Id.*
[46] Riitakerttu Kaltiala et al., *Youth Gender Transition Is Pushed Without Evidence*, WALL ST. JOURNAL (Jul. 14, 2023).

### III. The District Court Erred in Granting a Facial Injunction.

Last, even if the plaintiffs could establish that the Act was unlawful as applied to them, they certainly were not entitled to facial relief. Although Plaintiffs avoided using the term "facial," their Complaint sought and the district court awarded facial relief: Plaintiffs obtained a permanent injunction enjoining Defendants from enforcing the SAFE Act against every individual—not just the individual Defendants. App.301-11; R.Doc.283 at 70-80.

This Court has long observed that "'[f]acial challenges are disfavored' because they 'often rest on speculation … [and] raise the risk of premature interpretation of statutes on the basis of factually barebones records.'" *Phelps-Roper v. City of Manchester*, 697 F.3d 678, 685 (8th Cir. 2012) (citation omitted). It is therefore "not suprising[], then, [that] '[a] facial challenge to a legislative Act is … the most difficult challenge to mount successfully.'" *United States v. Stephens*, 594 F.3d 1033, 1037 (8th Cir. 2010) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). The high bar to mount a successful facial challenge to a statute lies in the fact that to succeed, the plaintiff "'must establish that no set of circumstances exists under which the law would be valid.'" *United States v. Hall*, 44 F.4th 799, 805 (8th Cir. 2022) (cleaned up and citation omitted).

Plaintiffs are not entitled to facial relief because, among other reasons, even their own experts agree that gender transition interventions are inappropriate in some

circumstances. As the district court found, the standard of care proposed by Plaintiffs' experts *requires* a "comprehensive bio-psychosocial assessment" before a minor can begin transitioning treatments. App.303-04; R.Doc.283 at 72-73. That assessment must confirm that the patient has had "a history of gender diversity lasting years" and "meet[s] the criteria for a gender dysphoria diagnosis," "includ[ing] six months of clinically significant distress or social or occupational impairment." *Id.* at 73.

So there is at least one "set of circumstances" where there is no dispute that Arkansas could enforce the SAFE Act: where an individual has not received a comprehensive mental health evaluation. Although the district court faulted *Arkansas* for not demonstrating that "doctors in Arkansas negligently prescribe puberty blockers or cross-sex hormones to minors," *id.* at 72, it was *Plaintiffs'* burden to show "no set of circumstances" in which the SAFE Act could constitutionally apply. *E.g. Stephens*, 594 F.3d at 1038 ("Stephens' facial challenge to [the challenged statute] fails because Stephens cannot establish that there are no child pornography defendants for whom a curfew or electronic monitoring is appropriate."). Because they did not do so, Plaintiffs are not entitled to facial relief and this Court should reverse.

## CONCLUSION

The Court should reverse.

28

Dated: November 13, 2023

Respectfully submitted,

Steve Marshall
  *Attorney General*
s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
  *Solicitor General*
A. Barrett Bowdre
  *Principal Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

Jonathan Skrmetti
  *Attorney General & Reporter*
Steven J. Griffin
  *Senior Counsel for Strategic Litigation
& Assistant Solicitor General*
OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
(615) 253-5642
Steven.Griffin@ag.tn.gov

Andrew T. Bailey
  *Attorney General*
Joshua M. Divine
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF MISSOURI
207 West High St.
Jefferson City, MO 65101
(573) 751-8870
Josh.Divine@ago.mo.gov

*Additional Counsel for Amici Curiae Listed on Next Page*

29

## ADDITIONAL COUNSEL

ASHLEY MOODY
Attorney General
State of Florida

AUSTIN KNUDSEN
Attorney General
State of Montana

CHRIS CARR
Attorney General
State of Georgia

MICHAEL T. HILGERS
Attorney General
State of Nebraska

RAÚL R. LABRADOR
Attorney General
State of Idaho

GENTNER DRUMMOND
Attorney General
State of Oklahoma

THEODORE E. ROKITA
Attorney General
State of Indiana

ALAN WILSON
Attorney General
State of South Carolina

BRENNA BIRD
Attorney General
State of Iowa

MARTY JACKLEY
Attorney General
State of South Dakota

JEFF LANDRY
Attorney General
State of Louisiana

KEN PAXTON
Attorney General
State of Texas

KRIS W. KOBACH
Attorney General
State of Kansas

SEAN REYES
Attorney General
State of Utah

DANIEL CAMERON
Attorney General
Commonwealth of Kentucky

JASON MIYARES
Attorney General
Commonwealth of Virginia

LYNN FITCH
Attorney General
State of Mississippi

PATRICK MORRISEY
Attorney General
State of West Virginia

Appellate Case: 23-2681   Page: 40   Date Filed: 11/15/2023 Entry ID: 5335880

## CERTIFICATE OF COMPLIANCE

1.     I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 29(a)(5). This brief contains 6,421 words, including all headings, footnotes, and quotations, and excluding the parts of the response exempted under Fed. R. App. P. 32(f).

2.     In addition, this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated: November 13, 2023

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.

Appellate Case: 23-2681     Page: 41     Date Filed: 11/15/2023 Entry ID: 5335880

## CERTIFICATE OF SERVICE

I certify that on November 13, 2023, I electronically filed this document using the Court's CM/ECF system, which will serve all counsel of record.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Amici Curiae*

32