No. 23-2681

═══════════════════════

**In the**
**United States Court of Appeals for the Eighth Circuit**
─────────────────

DYLAN BRANDT, by and through his mother Joanna Brandt, *ET AL.*,
*Plaintiffs-Appellees*,

v.

TIM GRIFFIN, in his official capacity as the Arkansas Attorney General, *ET AL.*,
*Defendants-Appellants*.
─────────────────

**On Appeal from the**
**United States District Court for**
**the Eastern District of Arkansas, Central Division**
─────────────────

Brief *Amicus Curiae* of
Public Advocate of the United States, America's Future,
U.S. Constitutional Rights Legal Defense Fund,
Fitzgerald Griffin Foundation, Center for Morality,
LONANG Institute, and Conservative Legal Defense and Education Fund
in Support of Defendants-Appellants and Reversal
─────────────────

JAMES N. CLYMER                WILLIAM J. OLSON*
  Lancaster, PA                JEREMIAH L. MORGAN
                               WILLIAM J. OLSON, P.C.
J. MARK BREWER                 370 Maple Avenue West, Suite 4
  Houston, TX                  Vienna, VA  22180-5615
                               (703) 356-5070
                               wjo@mindspring.com
                               *Attorney of Record

                               *Attorneys for Amici Curiae*
                               November 14, 2023

═══════════════════════

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, the corporate *amici* do not have parent corporations, they are not publicly traded companies, and no publicly held corporation owns 10% or more of their stocks.

ii

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT

I.      The District Court's Findings of Fact Cannot Withstand Close
        Examination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.     The District Court Based Its Decision on the Opinions of Medical
        Societies with Vested Financial Interests . . . . . . . . . . . . . . . . . . . . . 15

        A.      Partisan Belligerents Are Not a Reliable Source of Scientific
                Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        B.      WPATH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        C.      The Endocrine Society . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        D.      The Sex-Change Industry Has Exploded into a Market Worth
                Billions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III.    The District Court Erred in Its Constitutional Rulings . . . . . . . . . . . . . 25

        A.      Equal Protection Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        B.      Due Process Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Appellate Case: 23-2681     Page: 3     Date Filed: 11/15/2023 Entry ID: 5335911

C.    The Law of Sterilization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

iv

Appellate Case: 23-2681    Page: 4    Date Filed: 11/15/2023 Entry ID: 5335911

# TABLE OF AUTHORITIES

Page

CONSTITUTION

Amendment I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Amendment XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 25, 26, 27, 28

STATUTES

2020 Ark. Code §§ 20-49-101; 20-49-202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CASES

*Buck v. Bell*, 274 U.S. 200 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) . . . . . . . . . 16, 28
*Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020) . . . . . . . . . . . 26
*Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205 (11th Cir. 2023) . . . . . . . . . . 28
*L.W. v. Skrmetti*, 2023 U.S. App. LEXIS 25697 (6th Cir. 2023). . . . . . . . . . . . . 27
*Roe v. Wade*, 410 U.S. 113 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
*Skinner v. State of Oklahoma, ex rel. Williamson*, 316 U.S. 535 (1942) . . . . . . . 29

MISCELLANEOUS

P. Aatsha, T. Arbor, and K. Krishan, "Embryology, Sexual Development". . . . . . 6
J. Bilek, "The Billionaire Family Pushing Synthetic Sex Identities (SSI),"
    *TabletMag.com* (June 14, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18
K. Bolar, "Trans activist wants you to believe detransitioners aren't real.
    But facts don't lie," *Fox News* (Dec. 17, 2022). . . . . . . . . . . . . . . . . . . . . . 15
R. Bridge, "Doctors & drugs FOR LIFE: Big Pharma's profit on the
    transgender craze," *RT.com* (Sept. 27, 2019) . . . . . . . . . . . . . . . . . 19, 22, 24
P. Cheng, A. Pastuszak, J. Myers, I. Goodwin, and J. Hotaling, "Fertility
    concerns of the transgender patient," Translational Andrology and
    Urology (June 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
"Christine Jorgensen: The GI who had a sex change," BBC (Nov. 29, 2012) . . . . 7
A. Court, "4 out of 5 kids who question gender 'grow out of it':
    Transgender expert," *New York Post* (Feb. 22, 2023). . . . . . . . . . . . . . . . . . 8
Dorland's Illustrated Medical Dictionary (29th edt.) (W.B. Saunders: 2000) . . . . . 5
R. Eappen and I. Kingsbury, "The Endocrine Society's Dangerous
    Transgender Politicization," *Wall Street Journal* (June 28, 2023) . . . . . . . 21
J. Esses, "What's wrong with WPATH version 8?" *Sex-Matters.org*
    (Sept. 20, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

v

R. Frank, "Billionaires Try to Shrink World's Population, Report Says," *Wall Street Journal* (May 26, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

P. Gonzalez, "Gender ideology is a boon to Big Pharma and threat to parental rights," *New York Post* (Aug. 20, 2021) . . . . . . . . . . . . . . . . . . 23

Walt Heyer, <u>Paper Genders</u> (Make Waves Publishing: 2011). . . . . . . . . . . . . . 13

D. Housman, "Surgeons Are Going To Make Bank On Sex Change Operations In The Next Decade, Market Report Finds," *Daily Caller* (Oct. 5, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

M. Irwig, M. Kyinn, and M. Shefa, "Financial Conflicts of Interest Among Authors of Endocrine Society Clinical Practice Guidelines," 4334 *J. Clin. Endocrinol Metab.* 4335, 4336 (Dec. 2018) . . . . . . . . . . . . 20

Z. Jewell, "It's Unthinkable': Matt Walsh Discusses Shocking Revelation About Vanderbilt University Medical Center With Tucker Carlson," *Daily Wire* (Sept. 21, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

D. Larson, "The billionaire Duke trustee behind the remaking of gender," *Carolina Journal* (Sept. 22, 2022). . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

J. Llamas, "Female Circumcision: The History, the Current Prevalence and the Approach to a Patient" (April 2017) . . . . . . . . . . . . . . . . . . . . . . . . . 26

L. MacRichards, "Bias, not evidence dominates WPATH transgender standard of care," *Canadian Gender Report* . . . . . . . . . . . . . . . . . . . . 17, 19

L. Marchiano, "The Ranks of Gender Detransitioners Are Growing. We Need to Understand Why," *Quillette* (Jan. 2, 2020) . . . . . . . . . . . . . . . . 10

M. Myler, "Blood Money: The Rise of the Gender Reassignment Industry," *Spectator.org* (Oct. 7, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

G. Orwell, <u>1984</u> (Houghton Mifflin: 1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

A. Prestigiacomo, "'Huge Money Maker': Video Reveals Vanderbilt's Shocking Gender 'Care,' Threats Against Dissenting Doctors," *Daily Wire* (Sept. 20, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

"Questioning America's approach to transgender health care," *The Economist* (July 28, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

L. Sapir, "'Trust the Experts' Is Not Enough U.S. Medical Groups Get the Science Wrong on Pediatric 'Gender Affirming' Care," Manhattan Institute (Oct. 17, 2022). . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

L. Sax, "How common is intersex? a response to Anne Fausto-Sterling," *Journal of Sex Research* (Aug. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Abigail Shrier, <u>Irreversible Damage: The Transgender Craze Seducing Our Daughters</u> (Regnery Publishing: 2020) . . . . . . . . . . . . . . . . . . . . . . . . 9

Appellate Case: 23-2681      Page: 6      Date Filed: 11/15/2023 Entry ID: 5335911

B. Smith, "Obama on small-town Pa.: Clinging to religion, guns, xenophobia," *Politico* (Apr. 11, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

P. Spurr, "The parents who transition their children," *Spiked* (Sept. 15, 2023) . . 11

Testimony of Matt Sharp on Kentucky H.B. 470, "Protecting Minors from the Harms of Puberty Blockers, Cross-Sex Hormones, and Irreversible Surgeries" (Feb. 21, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

"Trans substantiation," *The Economist* (Apr. 5, 2023) . . . . . . . . . . . . . . . . . . . . . . 24

Appellate Case: 23-2681     Page: 7     Date Filed: 11/15/2023 Entry ID: 5335911

## INTEREST OF *AMICI CURIAE*

Public Advocate of the United States is exempt from federal income taxation under section 501(c)(4) of the Internal Revenue Code ("IRC"). America's Future, U.S. Constitutional Rights Legal Defense Fund, Fitzgerald Griffin Foundation, Center for Morality, and Conservative Legal Defense and Education Fund are exempt from federal income taxation under IRC section 501(c)(3). LONANG Institute is a nonprofit, educational organization. Each is dedicated, *inter alia*, to the correct construction, interpretation, and application of the law.[1]

## STATEMENT OF THE CASE

On April 6, 2021, the Arkansas legislature passed the "Arkansas Save Adolescents From Experimentation (Safe) Act." The Act "prohibits a physician or other healthcare professional from providing 'gender transition procedures' to any individual under eighteen years of age and from referring any individual under eighteen years of age to any healthcare professional for 'gender transition procedures.'" *Brandt v. Rutledge*, 2023 U.S. Dist. LEXIS 106517, at *5-6 (E.D.

---

[1] All parties have consented to the filing of this brief. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

1

Ark. 2023) ("*Brandt*").  The Act prohibits, *inter alia*, disfiguring surgeries to artificially add or remove body parts in pursuit of "gender transition," and puberty-blocking hormones.  *Id.* at *6.  The Act creates a private right of action against any physician performing such procedures.  *Id.* at *7.

The Act was challenged by a coalition of plaintiffs, including physicians wishing to perform "gender transition" procedures for profit, and minor plaintiffs believing themselves to be "transgender," whose parents sued on their behalf as "first friends."  *Id*. at *1.

The district court initially granted a preliminary injunction against the Act on July 21, 2021.  *See Brandt v. Rutledge*, 2021 U.S. Dist. LEXIS 135534 (E.D. Ark. 2021).  The Eighth Circuit affirmed the preliminary injunction on August 25, 2022.  *See Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022).

On the merits, the district court ruled that the Act violated the Equal Protection Clause for discriminating on the basis of sex and discriminating against transgender people.  *See Brandt v. Rutledge*, 2023 U.S. Dist. LEXIS 106517 at *92-107.  The court also ruled that the Act violated due process of law for infringing on the "fundamental liberty interest" of the minor plaintiffs' parents in directing the medical treatment of their children.  *Id.* at *107-110.  Finally, the court ruled that the Act violates the First Amendment for regulating speech by

2

preventing doctors from referring for gender transition treatment. *Id.* at *110-113.

## STATEMENT

The legal issue presented here is whether the Fourteenth Amendment to the United States Constitution was violated when the State of Arkansas enacted the Safe Act to prevent physicians from inflicting radical surgical and chemical alterations to the sexuality of children to achieve so-called "gender transition." Stated in more common parlance, the legal issue presented is:

> Did the Framers and ratifiers of the Fourteenth Amendment in 1868 craft the equal protection and due process clauses to empower federal judges to override state legislatures acting to prevent physicians from enriching themselves by impairing the sexual and physical development of boys and girls through the normal endocrine maturation process, as well as by castrating boys and removing the healthy breasts of girls, and in other ways by permanently mutilating, disfiguring, and rendering untold numbers of children reproductively sterile?

In accord with the dominant political narrative of the cult of "transgenderism," the district court found no constitutionally permissible justification for Arkansas to protect its children, none of whom are capable of giving their informed consent, from radical treatments from monetarily incentivized physicians. The district court sought to build on a handful of narrow, hotly disputed judicial decisions to break new constitutional ground, oblivious to

3

the way in which its decision would result in both the destruction of the lives of individual children and the undermining of the foundations of our nation.

It is now clear that some federal courts believe that, whenever a case raises any issue related to "sex" or "gender," the equal protection and due process clauses are sufficiently elastic to provide them constitutional cover to reach whatever outcome that they may personally prefer. They do not.

Nevertheless, again and again, federal courts have used raw judicial power to create "rights" which cannot be found anywhere in the Constitution to impose social changes which could not be achieved through representative government. If "gender transition" is not an issue that the Constitution reserves to the States to decide in the exercise of their sovereign prerogative, it is difficult to identify any issue that could not be withdrawn from the electorate and consigned to judicial control.

While Americans have been remarkably docile in the face of many judicial decisions that undermine the morality of the nation, when the victims are young children, a breaking point could be reached and the "consent of the governed" on which the government relies may be withdrawn.

Appellate Case: 23-2681    Page: 11    Date Filed: 11/15/2023 Entry ID: 5335911

**ARGUMENT**

## I. THE DISTRICT COURT'S FINDINGS OF FACT CANNOT WITHSTAND CLOSE EXAMINATION.

The district court's findings of fact contained a remarkable assemblage of politically correct findings which were, at the same time, inconsistent and unscientific. The court accepted without question the assertions by plaintiffs' experts (*see* Findings of Fact 289) while rejecting out of hand all of defendants' experts (*see* Findings of Fact 311). The court's findings assume the legitimacy of modern "gender identity" theory, which rejects the universally recognized medical fact that every person is either a man or a woman, and no one can shift between the sexes.[2] The district court uses pseudo-medical terminology to obscure the fact that its Findings of Fact are presuppositions contrary to real science and medicine, employing the linguistic legerdemain of the cult of transgenderism, which confuses the flexible, political term "gender" with the fixed, biological term "sex."

1. The district court recited the mantra that a person has a sex assigned at birth based on external genitalia. *See* Findings of Fact 2. **The notion that a physician or nurse "assigns" a sex to a neonate is building block number 1** on

---

[2] Dorland's Illustrated Medical Dictionary (29th edt.) (W.B. Saunders: 2000) defines "sex" as: "the **distinction between** male and female.... to determine whether an individual is male **or** female." (Emphasis added.)

5

which the fraud of transgenderism is built.  In fact, sex is not **assigned** at birth, but rather **observed** at birth.  Sex is **determined** — and **fixed** — at the moment of conception.  When an egg and sperm unite, the unborn child irrevocably becomes either a male (XY chromosome) or female (XX chromosome), and every cell of a person's body reflects that essential male or female nature.[3]  Although there is an infinitesimally small number of persons whose external genitalia are ambiguous or deformed, even those persons are either XX or XY, male or female.[4]  With the incantation of "assignment," the court ignores these scientific facts that have been known since time immemorial.

2.  The district court then shifted away from the notion of male or female "sex," preferring to use the term "gender."  **Misapplication of the term "gender" to human beings provides building block number 2** on which the trans lobby relies.  Gender originally was a term used to describe nouns in the romance languages, such as French, which were arbitrarily assigned a "gender" of

---

[3]  *See, e.g.*, P. Aatsha, T. Arbor, and K. Krishan, "Embryology, Sexual Development" ("At the genetic level, chromosomal sex is determined by the chromosomal complement after fertilization, where XY indicates a chromosomal male and XX indicates a chromosomal female.").

[4]  *See, e.g.*, L. Sax, "How common is intersex? a response to Anne Fausto-Sterling," *Journal of Sex Research* (Aug. 2002) (noting that only 0.018 percent of the population are born with truly intersex characteristics as a result of genetic abnormalities).

6

masculine or feminine — not male or female.[5]  At the beginning of the push for recognition of transgenderism as a scientific reality, it was said that persons would undergo "sex change" surgery[6] — but no one believed that a person could change sex, so a new and inventive terminology was required to obscure truth.  Therefore, out with "sex change" surgery; in with "gender reassignment" surgery.

3.  The district court asserted that the "gender identity" of some persons does not match their "birth-assigned" sex.  *See* Findings of Fact 3.  Here, the court came close to stating something that is true, but to be analyzed, that finding would need to be translated out of "Newspeak"[7] back into English.  Using our language before it was perverted to achieve political and irreligious objectives, it is unquestionably true to assert that there are persons who feel uncomfortable with their sexuality, especially during the challenging period of puberty.  Thus, some

---

[5]  "[Why are the Romance languages gendered?](#)" *Britannica*.

[6]  "[Christine Jorgensen: The GI who had a sex change](#)," BBC (Nov. 29, 2012).

[7]  G. Orwell, <u>1984</u> at 285-286 (Houghton Mifflin: 1949) ("The purpose of Newspeak was … to make all other modes of thought impossible [and] a heretical thought … literally unthinkable.…  This was done partly by the invention of new words, but chiefly by eliminating undesirable words and by stripping such words as remained of unorthodox meanings, and so far as possible of all secondary meanings whatever").

Appellate Case: 23-2681     Page: 14     Date Filed: 11/15/2023 Entry ID: 5335911

adolescents[8] suffer from what has been known as "**gender dysphoria**,"[9] which is often — if not generally — a transitory state[10] which passes as the child ages. If a person suffers from a usually transitory mental, emotional, or psychological condition, the remedy should be understanding and counseling, not a permanent, irreversible treatment plan preferred by surgeons and pharmaceutical companies who obtain life-long customers.[11] The district court concluded that "an individual" can neither "control" nor "voluntarily change" gender identity, relying on two physicians — Drs. Karasic and Adkins — whose services are needed whenever they deem an adolescent to need their services. Dr. Karasic admitted that some of his patients "have halted their medical transition [due to] lack of insurance coverage," revealing his interest to be more financial than medical. Findings of Fact 220. This same Dr. Karasic is also the only source of the district court's implicit finding that surgery is preferable to counseling, asserting "[e]fforts

---

    [8] This *amicus* brief addresses only the issue presented by the Arkansas legislation, which involves only minor children, often termed adolescents, not adults.

    [9] "Gender dysphoria" is a mental health condition defined in the Diagnostic and Statistical Manual of Mental Disorders-5.

    [10] A. Court, "4 out of 5 kids who question gender 'grow out of it': Transgender expert," *New York Post* (Feb. 22, 2023).

    [11] "Gender Affirming Hormone Therapy," *DukeHealth.org*.

8

to change an individual's gender identity can harm individuals by increasing feelings of shame...." Findings of Fact 8.

4. The district court, in back-to-back findings, concluded both that "a person's understanding of their gender identity can **change over time**" but also that "it is very **unlikely** that the individual will come to **identify with their sex assigned** at birth later in life." Findings of Fact 10 and 11 (emphasis added). Consider how inconsistent and irrational those findings are with this illustration. If a girl going through puberty feels like she should have been and would rather be a boy, and then her "gender identity" changed over time, what would she be changing to if not her actual female sex? The fact that numerous physicians considered by the district court to be "experts" come to these irrational conclusions does not make their views any more rational or persuasive. It does, however, reveal that there just may be another objective at play here other than sound medical science.

5. The district court rejected out of hand the possibility that the spread of gender dysphoria could have a **social contagion**[12] component, stating that such adolescents "would not meet the criteria of gender dysphoria ... unless they had a longstanding incongruent gender identity and clinically significant distress," citing

_____

[12] *See* extensive discussion in Abigail Shrier, <u>Irreversible Damage: The Transgender Craze Seducing Our Daughters</u> (Regnery Publishing: 2020).

9

again Dr. Karasic. Findings of Fact 21. The illustrations of cases where adolescents were rushed into gender transition based on little more than an intake interview are too many to be discounted.[13] The professionalism of those working in so-called "gender transition" clinics, where there is big money to be made, cannot be assumed because a witness has an M.D. after his or her name.

6. The district court acknowledged that many adolescents could not appreciate the risks and alternatives of the medical odyssey on which they were embarking, but concluded that there was nothing to worry about because "their parents or guardians must still provide informed consent." Findings of Fact 42. Indeed, adolescents who are not legally capable of entering into a contract, or buying cigarettes, or drinking beer, where laws are in place to protect them from the consequences of their actions that they cannot appreciate, should not be deemed to have the capacity to agree to have their penis or breasts cut off. A physician who works for a "gender transition" clinic and is financially compensated from the people attracted to — and found suitable to be treated by — that clinic, is likely not someone who should be trusted to obtain genuine informed

_____

[13] *See, e.g.*, L. Marchiano, "The Ranks of Gender Detransitioners Are Growing. We Need to Understand Why," *Quillette* (Jan. 2, 2020) (citing multiple studies showing significant numbers of "detransitioners").

consent.[14]  And in some circles, there are parents who find it trendy to have a

"trans" child, and would have no problem in sacrificing their child to gain social

status.[15]  In such circumstances, state lawmakers have come forward to take certain

life-altering options off the table to protect children from themselves, their

doctors, and even their parents.

7.  By enjoining the state law's enforcement, the district court implicitly

authorized castrating adolescent boys and performing genital surgeries on

adolescent girls.  To be sure, the district court made findings that such procedures

"are extremely rare," and "should be offered only to patients under 18 with great

caution," but those are statements about current practices — not what the district

court decision allows.  Findings of Fact 66 and 67.  It does not matter if a given

---

[14]  *See* Z. Jewell, "'It's Unthinkable': Matt Walsh Discusses Shocking Revelation About Vanderbilt University Medical Center With Tucker Carlson," *Daily Wire* (Sept. 21, 2022) (a Vanderbilt University Medical Center doctor "openly discussed how lucrative transgender surgeries are for the hospital.... Dr. Shayne Sebold Taylor, who works with VUMC Clinic for Transgender Health, which is separate from pediatrics, admitted in one live-streamed video, 'These surgeries are labor intensive, they require a lot of follow-ups, they require a lot of our time, and they make money,' she emphasized.  'They make money for the hospital.'").

[15]  *See, e.g.*, P. Spurr, "The parents who transition their children," *Spiked* (Sept. 15, 2023) ("When a narcissistic parent sees their child getting attention for transitioning, they latch on to this and run with it for the attention they can then get for themselves.  They wear their child's transitioning like a badge of honour, showing what 'cool' parents they are.").

11

hospital does not now perform certain surgeries, as all it takes is one or more aggressive, dollar-driven surgeons to harm thousands of children in a matter of a few years. The idea that these procedures are "for the children," is made a mockery of by the district court's finding that "the overwhelming majority of surgeries are chest surgeries for adolescent transgender males" (*i.e.*, females). Findings of Fact 68. Therefore, the district court has no problem having young girls have their healthy breasts amputated to make them feel better about themselves during puberty, while permanently depriving them of the ability to nurse children or enjoy sensory pleasure.

8. The district court's findings are schizophrenic about the issue of risks, particularly impairment of fertility. It downplays risks at every turn: "risks ... are not categorically different than ... other types of pediatric healthcare..."; "risks ... comparable to ... many other medical treatments." Findings of Fact 188, 192. The fact that some of these treatments will render the adolescents infertile for life is of no concern to the district court because "[t]here are treatments for conditions other than gender dysphoria that can impair a minor's fertility." Findings of Fact 195. Compare the finding that "[p]uberty blockers are fully reversible [i]f an adolescent discontinues such treatment" (Findings of Fact 203),[16] with the vague finding that

---

[16] Which is false. *See* Testimony of Matt Sharp on Kentucky H.B. 470, "Protecting Minors from the Harms of Puberty Blockers, Cross-Sex Hormones,

12

"[w]hen estrogen is used to treat birth-assigned males, it can impact fertility" requiring discussion of "fertility preservation options...." Findings of Fact 216. What does that mean? The district court did not appear to address whether this curiously constructed finding indicated permanent infertility. Additionally, there is medical literature which warns that many treatments result in permanent infertility.[17]

9. The district court admitted that "some individuals who undergo gender-affirming medical treatment who later come to regret that treatment, and for some, it was because they came to identify with their birth-assigned sex (sometimes referred to as detransitioning)." Findings of Fact 219. Compare this finding to Findings of Fact 11, where a physician testified this is very rare. It is not so rare. *See* Walt Heyer, Paper Genders at 37-45 (Make Waves Publishing: 2011).[18] (It

---

and Irreversible Surgeries" (Feb. 21, 2023).

[17] *See, e.g.*, P. Cheng, A. Pastuszak, J. Myers, I. Goodwin, and J. Hotaling, "Fertility concerns of the transgender patient," Translational Andrology and Urology (June 2019) ("Transgender individuals who undergo gender-affirming medical or surgical therapies are at risk for infertility"). For physicians who agree with the Bill Gates/George Soros theory that there are already too many people in the world, the inability of one more young person to have a child is of no import, as it advances a depopulation agenda. *See, e.g.*, R. Frank, "Billionaires Try to Shrink World's Population, Report Says," *Wall Street Journal* (May 26, 2009).

[18] *See also* David Arthur, "Children Assaulted! Minds Raped! Hearts Darkened! Souls Molested!" *I BelongAmen Ministries* website blog. ("The lgbTQia TransQueer Gender Cult damaged me severely by the age of 10 as I

Appellate Case: 23-2681    Page: 20    Date Filed: 11/15/2023 Entry ID: 5335911

should also be obvious that the term "gender-affirming" to describe radical pharmaceutical and surgical treatments must have been carefully designed, but catering to a person's transitional mental health problem by subjecting them to a permanent, irreversible treatment is not "affirming," but rather is "denying" of reality.)

10.  The district court evidenced considerable hostility to religion in its remarkable Findings of Fact 224.  There, the district court found the stories of two witnesses, Billy Burleigh and Laura Smalts, who had medical transitions only to detransition, to be "credible," but in the end "irrelevant."  The reasons the court gave to deem these stories "irrelevant" reveal the agenda underlying the district court opinion:  "[t]hese witnesses ... (i) neither sought nor received gender-affirming care as a minor (ii) both transitioned as adults; (iii) neither was treated in Arkansas; (iv) they both detransitioned as a result of a religious experience and (v) continued to struggle with living consistently with their birth-assigned sex after deciding to detransition."  *Brandt* at *62 (citations omitted).  If adults make their own choice to have radical treatment, they have only themselves to blame.  If

_____

believed the lie that I was a girl trapped in a boy body.  I had numerous sex partners, had been molested several times and was just a shell of the once happy little boy that dwelled within.....  Please heed my words.  I'm telling you all that I know to be.  This is not just my experience, but that of way too many victims of this movement.  Please do not sacrifice your children to the lgbTQia TransQueer Rainbow Cult.  Please!")

Appellate Case: 23-2681     Page: 21     Date Filed: 11/15/2023 Entry ID: 5335911

the choice is made by parents for vulnerable children, it is no wonder that many have later said, "you were supposed to protect me ... look what you let them do to me."[19]  Whether the detransitioning occurred in Arkansas is patently irrelevant. But to deem a change of heart irrelevant because it is based on a "religious experience," illustrates how some of our nation's elites dismiss millions of Americans for, as Barack Obama famously said, "cling[ing] to guns or religion."[20]

## II. THE DISTRICT COURT BASED ITS DECISION ON THE OPINIONS OF MEDICAL SOCIETIES WITH VESTED FINANCIAL INTERESTS.

### A. Partisan Belligerents Are Not a Reliable Source of Scientific Information.

To support many of its key factual "findings," the district court relied almost exclusively on two organizations whose names may sound medical, but neither of which is a neutral arbiter of scientific information.  The district court cited the World Professional Association for Transgender Health ("WPATH") at least 38

---

[19]  K. Bolar, "Trans activist wants you to believe detransitioners aren't real. But facts don't lie," *Fox News* (Dec. 17, 2022) ("Detransitioner" Cat Cattinson warns that "[i]n the future, we're going to see a lot of children who have detransitioned being angry with their parents and feeling betrayed by them").

[20]  In 2008, President Barack Obama stated his view that due to job losses, people in small towns "get bitter [and] cling to guns or religion...."  *See, e.g.*, B. Smith, "Obama on small-town Pa.: Clinging to religion, guns, xenophobia," *Politico* (Apr. 11, 2008).

15

times, and the Endocrine Society ("ES") at least 25 times. As demonstrated *infra*, both organizations are belligerents in the culture war, not neutral umpires.

The district court's reliance on the WPATH and ES for its factual findings echoes the Supreme Court's reliance in *Roe v. Wade*, on the political views of the American Medical Association ("AMA"). *See Roe v. Wade*, 410 U.S. 113, 144-145 (1973). In *Roe*, the Court relied heavily on the AMA's 1970 reversal of its traditional pro-life position to justify the Court's support for abortion. By contrast, in overturning *Roe*, the *Dobbs* Court criticized its predecessors for relying on the "expertise" of medical activists. *Dobbs v. Jackson Women's Health Org*., 142 S. Ct. 2228, 2267 (2022). The *Dobbs* Court refused to subordinate its judicial authority to the mercurial positions of quasi-political organizations. The district court erred by not doing the same.

### B. WPATH.

WPATH is "an international interdisciplinary, professional organization" whose self-described mission is to "promote a high quality of care for transsexual, transgender, and gender-nonconforming individuals internationally."[21] The group creates "internationally accepted Standards of Care (SOC) ... to promote the health

---

[21] WPATH, "Mission and Vision."

16

and welfare of transgender, transsexual and gender variant persons...." *Id.* It is these SOC which the district court accepted as "best practices." *Brandt* at *17.

In reality, WPATH is anything but a neutral scientific organization. WPATH has been concisely described as "a hybrid professional and activist organization, where activists have become voting members."[22] "There have long been concerns that the organisation acts more as a partisan lobby group underpinned by gender ideology, instead of a body driven by medical evidence. Many of the senior members of WPATH identify as 'trans' or 'non-binary' themselves or are gender activists."[23]

A primary funder of WPATH is the Tawani Foundation, founded by James Pritzker, who now identifies as Jennifer Pritzker.[24] Pritzker, known as the "first transgender billionaire," is the cousin of Illinois Democrat governor J.B. Pritzker. Numerous members of the Pritzker family are funders of the transgender revolution.[25] Since 2013, "Pritzker has used the Tawani Foundation to help fund

---

[22] L. MacRichards, "Bias, not evidence dominates WPATH transgender standard of care," *Canadian Gender Report* (Oct. 1, 2019).

[23] J. Esses, "What's wrong with WPATH version 8?" *Sex-Matters.org* (Sept. 20, 2022).

[24] D. Larson, "The billionaire Duke trustee behind the remaking of gender," *Carolina Journal* (Sept. 22, 2022).

[25] J. Bilek, "The Billionaire Family Pushing Synthetic Sex Identities (SSI)," *TabletMag.com* (June 14, 2022).

17

various institutions that support the concept of a spectrum of human sexes." *Id.* WPATH recognized the Tawani Foundation in 2018 for its financial support in the creation of the 2017 version of the WPATH "Standards of Care."[26] Perhaps not coincidentally, Jennifer Pritzker is reported to profit financially from the sex-change surgery industry.[27]

Governor Pritzker proves that money talks loudly in the medical world. He donated $2.5 million to his alma mater Duke University, was named to the board in 2017, and in 2018, the school created its "Adult Gender Medicine Clinic" and expanded its "Child and Adolescent Gender Care Clinic."[28]

The WPATH committee that produced the SOC 8 is also awash in conflicts of interest:

> All of them either receive income based on recommendations in the guidelines, work at clinics or universities who receive funds from advocacy groups, foundations, or pharmaceutical companies who heavily favour a certain treatment paradigm, or have received grants and published papers or research in transgender care. The majority of the members are from the US, and six of them have affiliations with the same university–the University of Minnesota Program in

---

[26] "Col. Jennifer Pritzker and TAWANI Foundation Win WPATH Philanthropy Award," *Tawani Foundation* (Nov. 6, 2018).

[27] J. Bilek, *supra*.

[28] D. Larson, *supra*.

18

Sexuality, which is primarily funded by [Pritzker's] Tawani Foundation....[29]

Indeed, WPATH reportedly "is run by the for-profit company Veritas, which is represented on the advisory boards for a number of organizations, including Lipocrine Pharma, a company that produces hormones, with a particular focus on testosterone."[30]

An organization named BeyondWPATH consists of "concerned medical and mental health professionals" including numerous doctors, psychiatrists, counselors, and mental health professionals, who attacked WPATH's new SOC 8 for a long list of "errors and ethical failures":

> WPATH endorses **early medicalization** as fundamental while **[European] countries now promote psychosocial support as the first line** of treatment [of gender dysphoria], delaying drugs and surgery until the **age of majority** is reached in all but the most exceptional cases.[31]

In fact, shortly after WPATH's SOC 8 went public, it was amended to **remove "all minimum age requirements** for 'gender affirmative' surgeries,"

---

[29] L. MacRichards, *supra*.

[30] R. Bridge, "Doctors & drugs FOR LIFE: Big Pharma's profit on the transgender craze," *RT.com* (Sept. 27, 2019).

[31] "WPATH Has Discredited Itself," *BeyondWPATH.org* (emphasis added).

19

including "14+ years old for cross-sex hormones [and] 15+ years old for double mastectomies."[32]

### C. The Endocrine Society.

The Endocrine Society supports a laundry list of outlier progressive positions involving experimentation on humans. ES supports the creation of human embryos for experimentation and even creation of "human-animal chimeras" through injection of human stem cells into animal embryos.[33]

Like WPATH, ES receives funding from the Pharmaceutical Industry. And even more so than WPATH, that funding is directly linked to the ES "clinical practice guidelines," such as those referenced by the court below. Findings of Fact 27. In fact, of 113 U.S. authors of ES clinical practice guidelines, 84 received payments from Big Pharma. "Payments to 84 U.S. authors totalled $5.5 million for nonresearch activities and $30.9 million for research," and two authors of ES's "gender dysphoria" guidelines reported conflicts of interest with Big Pharma companies.[34]

_____

[32] "WPATH Explained," *Genspect.org* (Oct. 1, 2022).

[33] "Stem Cell Research," Endocrine Society (Jan. 1, 2018).

[34] M. Irwig, M. Kyinn, and M. Shefa, "Financial Conflicts of Interest Among Authors of Endocrine Society Clinical Practice Guidelines," 4334 *J. Clin. Endocrinol Metab.* 4335, 4336 (Dec. 2018).

20

Dr. Roy Eappen (himself an endocrinologist) and Ian Kingsbury document how "over the past decade transgender activists have co-opted the Endocrine Society and other professional organizations to promote such treatments for adolescents and even young children."[35] "At the time, there was little good research on this issue." *Id.* In fact, "[t]he Endocrine Society has rated its own recommendations as resting on 'low' or 'very low' quality research," and "[a] peer-reviewed, systematic review of clinical guidelines published in 2021 gave Endocrine Society's guidelines a score of 1 out of 6, and WPATH's guidelines a score of 0 out of 6."[36] Nonetheless, the district court relied on the Endocrine Society's guidelines.[37]

### D. The Sex-Change Industry Has Exploded into a Market Worth Billions.

The sex change market was worth nearly $2 billion to its purveyors in 2021, and is projected to reach $5 billion a year in the next decade.[38] When the

---

[35] R. Eappen and I. Kingsbury, "The Endocrine Society's Dangerous Transgender Politicization," *Wall Street Journal* (June 28, 2023).

[36] L. Sapir, "'Trust the Experts' Is Not Enough: U.S. Medical Groups Get the Science Wrong on Pediatric 'Gender Affirming' Care," *Manhattan Institute* (Oct. 17, 2022).

[37] *See* R. Eappen, *supra*.

[38] D. Housman, "Surgeons Are Going To Make Bank On Sex Change Operations In The Next Decade, Market Report Finds," *Daily Caller* (Oct. 5, 2022).

Appellate Case: 23-2681    Page: 28    Date Filed: 11/15/2023 Entry ID: 5335911

Affordable Care Act expanded to cover sex change surgeries in 2016, the number

exploded by 150 percent the next year. *Id.* According to Dr. Austin Crane, a

Texas plastic surgeon who performs genital mutilation surgeries, "a biological

female undergoing an operation to 'become male' can cost between $150,000 to

$200,000, while the cost for a male-to-female operation is between $80,000 and

$100,000. However, these are just the prices of the initial operations."[39]

Vanderbilt University Medical Center's Dr. Shayne Sebold Taylor boasted, "just

one routine hormone treatment, who I'm only seeing a few times a year, can bring

in several thousand dollars … and actually makes money for the hospital."[40]

Not surprisingly, with such huge financial returns, the transgender/medical

complex has employed intense pressure against dissenting physicians, even

demanding that they surrender ethical and religious objections to genital

mutilation of minors. Vanderbilt health law expert Ellen Wright Clayton warned

Vanderbilt staff "that any 'conscientious objection' will be met with

'consequences,' and ... told [them] they probably shouldn't be working at VUMC

---

[39] R. Bridge, *supra*.

[40] A. Prestigiacomo, "'Huge Money Maker': Video Reveals Vanderbilt's Shocking Gender 'Care,' Threats Against Dissenting Doctors," *Daily Wire* (Sept. 20, 2022).

Appellate Case: 23-2681    Page: 29    Date Filed: 11/15/2023 Entry ID: 5335911

if they don't want to participate in the trans surgeries, which include minor patients." *Id.*

Beyond the surgeries, big pharmaceutical companies make billions on pushing "puberty blocker" drugs, including: "Medroxyprogesterone acetate, a common drug in 'gender-affirming therapy,' [which] has long been used to chemically castrate sex offenders."[41]

> Another widely used medication is Lupron [which] was initially developed to lower testosterone levels in men with prostate cancer, effectively chemically castrating them. It's now used as a puberty blocker in the booming business of "transitioning" children. Lupron manufacturer AbbVie made $726 million on the drug alone in 2018. [*Id.*]

Unlike traditional medical care, which is designed to cure problems and return patients to normal functioning, transgender hormone therapies are necessarily lifelong, as the body must be permanently drugged lest it return to normal functioning. Duke University's "Gender Affirming Hormone Therapy" website admits, "Taking hormone therapy is a lifelong commitment to maintain the changes you seek."[42] As numerous writers have noted, "members of the growing transgender demographic who opt to undergo 'gender confirmation

---

[41]  P. Gonzalez, "Gender ideology is a boon to Big Pharma and threat to parental rights," *New York Post* (Aug. 20, 2021).

[42]  *See*, *supra*, n.11.

surgery' inherit a lifetime relationship with the medical industrial complex.  And

... those services do not come cheap."[43]  Not surprisingly, "pharmaceutical

companies are more than happy to cater to life-long customers.  People who take

cross-sex hormones have to set up a regular hormone regimen to maintain the

physical characteristics developed by the estrogen or testosterone.  So when it

comes to transgenderism, cash is king."[44]

According to Dr. William Malone, an endocrinologist with the Society for

Evidence-based Gender Medicine, the transgender-medical complex is a

combination of "Big Pharma, a vulnerable patient population, and physicians

misled by medical organisations or tempted by wealth and prestige."[45]

The organizations relied on by the district court should have been viewed as

advocacy organizations, not oracles of medical truth.

---

[43]  R. Bridge, *supra*.

[44]  M. Myler, "Blood Money: The Rise of the Gender Reassignment Industry," *Spectator.org* (Oct. 7, 2023).

[45]  *See* "Questioning America's approach to transgender health care," *The Economist* (July 28, 2022); *see also* "Trans substantiation," *The Economist* (Apr. 5, 2023).

## III.  THE DISTRICT COURT ERRED IN ITS CONSTITUTIONAL RULINGS.

### A.  Equal Protection Clause.

The district court began its discussion of the Equal Protection challenge with the overly expansive and therefore legally flawed statement:  "The Equal Protection Clause of the Fourteenth Amendment 'is essentially a direction that all persons similarly situated should be treated alike.'"  *Brandt* at *92 (selectively quoting from the Supreme Court's opinion in *City of Cleburne*).  The district court then relied on this Court's decision upholding the preliminary injunction previously entered, stating that the Safe Act "discriminates on the basis of sex because a minor's sex at birth determines whether the minor can receive certain types of medical care under the law."  *Brandt* at *93.  This Court then argued that "under the Act, medical procedures that are permitted for a minor of one sex are prohibited for a minor of another sex."  *Brandt*, 47 F.4th 661, 669 (8th Cir. 2022). It explained its position:  "A minor born as a male may be prescribed testosterone or have breast tissue surgically removed, for example, but a minor born as a female is not permitted to seek the same medical treatment."  *Id*.  This assertion requires reexamination, as by that logic, there could be no law against female

25

circumcision,[46] also known as female genital mutilation, if the law allows males to be circumcised.  Additionally, under the Safe Act, there is no equal protection violation, since it is impermissible to perform a medical procedure on either a minor male or a minor female for the purpose of a gender transition.

The district court also relies on a Fourth Circuit decision, *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020) (cited by *Brandt* at *94), which held that a biological female who self-identifies as a male is similarly situated in all material respects to a "cisgender" biological male.[47]  *Grimm* at 610. By this standard, the Arkansas law prohibits gender transition medical procedures for all minors, and does not discriminate based on the gender identity of the child, and therefore is not inconsistent with *Grimm*.

### B.    Due Process Clause.

The district court held that the Safe Act violates the Due Process Clause, asserting that "'the interest of parents in the care, custody, and control of their children ... is perhaps the oldest of the fundamental liberty interests recognized by

---

[46]  *See* J. Llamas, "Female Circumcision: The History, the Current Prevalence and the Approach to a Patient," (April 2017).

[47]  The numerous flaws in the Fourth Circuit's analysis are set out in an *amicus* brief filed by some of these *amici*.  *See* "Brief *Amicus Curiae* of Public Advocate of the United States, *et al.*," *Gloucester County School Board v. Gavin Grimm*, U.S. Supreme Court, No. 20-1163 (March 26, 2021).

this Court.'" *Brandt* at *107 (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Since the term "fundamental liberty" has no independent meaning apart from decades of flexible usage by federal courts, the district court feels free to invest it with new meaning — a right of parents to have physicians surgically and medically abuse their children. *Id*. at *108. The State Appellants correctly explain that "the district court invented a novel new constitutional right for parents to subject their children to any sort of procedure a practitioner recommends, no matter whether the State has determined that the procedure is experimental and unsafe." Appellants' Br. at 44.

When this Court heard the appeal of the preliminary injunction, it declined to address the Due Process issue, deciding the case on Equal Protection grounds. *Brandt*, 47 F.4th at 972. However, two other courts of appeals which did consider similar Due Process challenges rejected them. In *L.W. v. Skrmetti*, 2023 U.S. App. LEXIS 25697 (6th Cir. 2023), the Sixth Circuit stated:

> The key problem is that the claimants overstate the parental right by climbing up the ladder of generality to a perch — in which parents control all drug and other medical treatments for their children — that the case law and our traditions simply do not support. Level of generality is everything in constitutional law, which is why the Court requires "a 'careful description' of the asserted fundamental liberty interest." [*Id*. at *29.]

27

Likewise, the Eleventh Circuit held that "all of the cases dealing with the fundamental parental right reflect the common thread that states properly may limit the authority of parents where 'it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens.'" *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1224 (11th Cir. 2023). This Court should likewise reject the district court's arbitrary expansion of the doctrine of "substantive due process," which is atextual and highly problematic in any event. *See Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2301 (Thomas, J., concurring).

### C. The Law of Sterilization.

It bears repeating that many of the children being treated with these radical therapies are being rendered sterile even though none are legally capable of giving informed consent. Lifelong sterility is being imposed on minors solely based on the authorization of their parents. Sterilization has been addressed by courts before. There is no issue here of "feeblemindedness" as was once considered by the Supreme Court sufficient to justify sterilization based on the then prevailing science of Eugenics.[48] *See Buck v. Bell*, 274 U.S. 200 (1927). Later, even habitual criminals were entitled to protection from sterilization under the Equal Protection

---

[48] *See* [Testimony of A.H. Estabrook](#), scientific staff member of the Carnegie Institution.

and Due Process Clauses. *See Skinner v. State of Oklahoma, ex rel. Williamson*, 316 U.S. 535 (1942). Moreover, none of the preconditions to sterilization under Arkansas law (for "incompetent persons") are met. *See* 2020 *Ark. Code* §§ 20-49-101; 20-49-202. Characterizing treatments as "gender reassignment" alters not one bit that sterilization is the end result. Arkansas must have the authority to prevent the sterilization of children on the say-so of a parent or guardian.

## CONCLUSION

The decision of the district court should be reversed, the district court's injunction should be lifted, and the State of Arkansas's Safe Act designed to protect its minor children from medical sexual abuse should be allowed to go into effect.

Respectfully submitted,

/s/ *William J. Olson*

JAMES N. CLYMER
CLYMER MUSSER & SARNO, P.C.
  408 West Chestnut St.
  Lancaster, PA  17603

J. MARK BREWER
  800 Bering Drive, Suite 201A
  Houston, TX  77057

WILLIAM J. OLSON*
JEREMIAH L. MORGAN
WILLIAM J. OLSON, P.C.
  370 Maple Avenue West, Suite 4
  Vienna, VA  22180-5615
  (703) 356-5070
*Attorney of Record

November 14, 2023
*Attorneys for Amici Curiae*

29

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

IT IS HEREBY CERTIFIED:

1.     That the foregoing Brief *Amicus Curiae* of Public Advocate of the United States, *et al*., in Support of Defendants-Appellants and Reversal complies with the page limitation set forth by Rule 29(a)(5), because this brief contains 6,378 words, excluding the parts of the brief exempted by Rule 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 21.0.0.194 in 14-point Times New Roman.

　　　　　　　　　　　　　　　　　 /s/ *William J. Olson*　　
　　　　　　　　　　　　　　　William J. Olson
　　　　　　　　　　　　　　　Attorney for *Amici Curiae*

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of Public Advocate of the United States, *et al.*, in Support of Defendants-Appellants and Reversal, was made, this 14th day of November, 2023, by the Court's Case Management/Electronic Case Files system upon the attorneys for the parties.

  /s/ *William J. Olson*
William J. Olson
Attorney for *Amici Curiae*