In the United States Court of Appeals
for the Eighth Circuit

DYLAN BRANDT, et al.,
*Plaintiffs-Appellees*,

v.

TIM GRIFFIN, et al.,
*Defendants-Appellants*.

On Appeal from the United States District Court for the
Eastern District of Arkansas, Central Division
(No. 4:21-CV-00450-JM) (The Hon. James M. Moody, Jr.)

## BRIEF OF PLAINTIFFS-APPELLEES

Leslie Cooper
Chase Strangio
James Esseks
American Civil Liberties Union
Foundation
125 Broad St.
New York, NY 10004
Telephone: (917) 345-1742
lcooper@aclu.org
cstrangio@aclu.org
jesseks@aclu.org
lnowlin-sohl@aclu.org
*Attorneys for the Plaintiffs*

Beth Echols, Ark. Bar No. 2002203
Christopher Travis, Ark. Bar
No. 97093
Drake Mann, Ark. Bar No. 87108
Gill Ragon Owen, P.A.
425 W. Capitol Avenue, Suite 3800
Little Rock, AR 72201
Telephone: (501) 376-3800
echols@gill-law.com
travis@gill-law.com
mann@gill-law.com
*On behalf of the Arkansas Civil
Liberties Union Foundation, Inc.
Attorneys for the Plaintiffs*

Garrard R. Beeney*
Lauren M. Goldsmith*
Alexander S. Holland*
Maxime D. Matthew*
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
beeneyg@sullcrom.com
goldsmithl@sullcrom.com
hollanda@sullcrom.com
matthewm@sullcrom.com
*Attorneys for the Plaintiffs*

Daniel J. Richardson*
Sullivan & Cromwell LLP
1700 New York Avenue, N.W.
Suite 700
Washington, D.C.  20006
Telephone: (202) 956-7500
richardsond@sullcrom.com
*Attorney for the Plaintiffs*

Sarah Everett, Ark. Bar
No. 2017249
Arkansas Civil Liberties Union
Foundation, Inc.
904 W. 2nd Street
Little Rock, AR  72201
Telephone: (501) 374-2842
sarah@acluarkansas.org
*Attorney for the Plaintiffs*

Laura Kabler Oswell*
Aviv S. Halpern*
Sullivan & Cromwell LLP
550 Hamilton Avenue
Palo Alto, CA  94301
Telephone: (650) 461-5600
oswelll@sullcrom.com
halperna@sullcrom.com
*Attorneys for the Plaintiffs*

*Admitted pro hac vice

# SUMMARY AND STATEMENT RESPECTING ORAL ARGUMENT

The district court correctly held that Act 626's ban on gender-affirming medical care for transgender adolescents—care that is provided in accordance with evidence-based medical protocols accepted by every major professional health association in the country—is unconstitutional.

The district court correctly applied heightened scrutiny to the Act, holding that it classifies on the basis of both sex and transgender status, infringes on parents' fundamental right to seek medical care for their children, and punishes speech based on its content and viewpoint. Applying heightened scrutiny, the district court held—based on over 300 findings of fact—that the Act's ban on gender-affirming medical care for transgender adolescents did not substantially advance Arkansas's asserted interest in protecting minors and, in fact, undermined that very interest.

The court's legal conclusions were correct and its factual findings were not clearly erroneous. Plaintiffs-Appellees request 20 minutes of oral argument.

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................... 1

STATEMENT OF THE ISSUES ............................................ 5

STATEMENT OF THE CASE ............................................... 6

    A.    The Treatment of Adolescents with Gender Dysphoria ........ 6

        1.    Diagnosing gender dysphoria ........................................ 6

        2.    The widely accepted protocols for treating adolescents with gender dysphoria ................................. 7

        3.    The efficacy and safety of gender-affirming medical care ............................................................................ 11

        4.    The possibility of desistance, "detransition," and regret .............................................................................. 14

        5.    Treatment in Arkansas .................................................. 14

    B.    Arkansas's Ban on Gender-Affirming Medical Care ............ 16

    C.    The Plaintiffs ..................................................................... 18

    D.    Procedural History ............................................................. 22

SUMMARY OF ARGUMENT .............................................. 27

ARGUMENT ........................................................................... 28

  I.    The District Court Correctly Held That The Act Violates The Equal Protection Clause ................................................... 28

A.    The Act triggers heightened scrutiny because it classifies on the basis of sex ................................. 29

    1.    The Act classifies on the basis of sex assigned at birth ................................................ 29

    2.    The Act classifies based on incongruence between a person's sex assigned at birth and gender identity ...... 34

    3.    The Act intentionally enforces gender conformity ........ 35

B.    The Act triggers heightened scrutiny because it classifies on the basis of transgender status ........................ 37

    1.    The Act explicitly classifies based on transgender status ................................................ 37

    2.    Classifications based on transgender status warrant heightened scrutiny ........................ 38

C.    The Act fails heightened scrutiny ......................... 42

    1.    The district court applied the proper heightened scrutiny test ..................... 43

    2.    Defendants' alternative approach to heightened scrutiny is meritless ........................ 51

D.    The Act fails rational-basis review ...................... 54

II. The District Court Correctly Held That The Act Violates The Due Process Clause ................................................ 57

III. The District Court Correctly Held That The Act Violates The First Amendment ................................................ 60

IV. The District Court Did Not Abuse Its Discretion By Enjoining The Act ................................................ 65

CONCLUSION ................................................ 68

# Table of Authorities

Page(s)

## Cases

*Barr* v. *Am. Ass'n of Pol. Consultants*,
  140 S. Ct. 2335 (2020) ........................................................... 63

*Bd. of Trustees of Univ. of Ala.* v. *Garrett*,
  531 U.S. 356 (2001) ............................................................... 55

*Bostock* v. *Clayton Cnty.*,
  140 S. Ct. 1731 (2020) .............................................. 34, 35, 41

*Bowers* v. *Hardwick*,
  478 U.S. 186 (1986) ............................................................... 59

*Brandt* v. *Rutledge*,
  551 F. Supp. 3d 882 (E.D. Ark. 2021) ........................... *passim*

*Brown* v. *Board of Educ.*,
  347 U.S. 483 (1954) ............................................................... 42

*Christian Legal Soc'y.* v. *Martinez*,
  561 U.S. 661 (2010) ............................................................... 37

*City of Cleburne* v. *Cleburne Living Ctr.*,
  473 U.S. 432 (1985) ............................................................... 55

*Conant* v. *Walters*,
  309 F.3d 629 (9th Cir. 2002) ............................................... 63

*Craig* v. *Boren*,
  429 U.S. 190 (1976) ............................................................... 33

*D.M.* v. *Minn. State High Sch.*,
  917 F.3d 994 (8th Cir. 2019) ............................................... 43

*Dobbs* v. *Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ................................................... 32, 33, 38

*Eknes-Tucker* v. *Governor of Alabama*,
80 F.4th 1205 (11th Cir. 2023) ........................................... 31

*Frontiero* v. *Richardson*,
411 U.S. 677 (1973) ................................................... 39, 41

*Geduldig* v. *Aiello*,
417 U.S. 484 (1974) ....................................................... 33

*Gerlich* v. *Leath*,
861 F.3d 697 (8th Cir. 2017) ............................................. 61

*Grimm* v. *Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ................................. 36, 38, 39

*Heller* v. *Doe*,
509 U.S. 312 (1993) ....................................................... 54

*Hodgson* v. *State of Minn.*,
853 F.2d 1452 (8th Cir. 1988) ........................................... 58

*J.E.B.* v. *Alabama ex rel. T.B.*,
511 U.S. 127 (1994) ............................................ 29, 30, 35

*Johnson* v. *California*,
543 U.S. 499 (2005) ....................................................... 54

*K.C.* v. *Med. Licensing Bd. of Ind.*,
2023 WL 4054086 (S.D. Ind. June 16, 2023) ...................... 35

*Karnoski* v. *Trump*,
926 F.3d 1180 (9th Cir. 2019) ........................................... 38

*L.W. by & through Williams* v. *Skrmetti*,
83 F.4th 460 (6th Cir. 2023) ........................... 10, 31, 48, 60

*Lawrence* v. *Texas*,
539 U.S. 558 (2003) ....................................................... 59

*Lyng* v. *Castillo*,
477 U.S. 635 (1986) ....................................................... 39

*Michael M.* v. *Superior Ct. of Sonoma Cnty.*,
450 U.S. 464 (1981) .......................................................... 53

*Miller* v. *Thurston*,
967 F.3d 727 (8th Cir. 2020) .......................................... 28

*Miss. Univ. for Women* v. *Hogan*,
458 U.S. 718 (1982) .......................................................... 36

*Nat'l Inst. Of Fam.* v. *Becerra*,
138 S. Ct. 2361 (2018) ................................................ 62, 63

*Nken* v. *Holder*,
556 U.S. 418 (2009) .......................................................... 65

*Otto* v. *City of Boca Raton*,
981 F.3d 854 (11th Cir. 2020) ........................................ 62

*Palavra* v. *I.N.S.*,
287 F.3d 690 (8th Cir. 2002) .......................................... 57

*Parham* v. *J.R.*,
442 U.S. 584 (1979) .................................................... 57, 58

*Pers. Adm'r of Mass.* v. *Feeney*,
442 U.S. 256 (1979) .......................................................... 33

*Powers* v. *Ohio*,
499 U.S. 400 (1991) .......................................................... 31

*Reed* v. *Town of Gilbert*,
576 U.S. 155 (2015) .................................................... 60, 61

*Rodgers* v. *Bryant*,
942 F.3d 451 (8th Cir. 2019) .......................................... 66

*Romer* v. *Evans*,
517 U.S. 620 (1996) .............................................. 54, 56, 57

*Sessions* v. *Morales-Santana*,
582 U.S. 47 (2017) ............................................ 43, 53, 54

*Sorrell* v. *IMS Health Inc.*,
  564 U.S. 552 (2011) .................................................................... 61, 62

*Spence* v. *Washington*,
  418 U.S. 405 (1974) .......................................................................... 62

*Telescope Media Grp.* v. *Lucero*,
  936 F.3d 740 (8th Cir. 2019) ............................................................ 61

*Troxel* v. *Granville*,
  530 U.S. 57 (2000) ............................................................. 57, 58, 59, 60

*Tuan Anh Nguyen* v. *I.N.S.*,
  533 U.S. 53 (2001) ............................................................................. 53

*United States* v. *Salerno*,
  481 U.S. 739 (1987) .......................................................................... 66

*United States* v. *Virginia*,
  518 U.S. 515 (1996) ................................................................... *passim*

*Washington* v. *Glucksberg*,
  521 U.S. 702 (1997) ..................................................................... 57, 60

*Windsor* v. *United States*,
  699 F.3d 169 (2d Cir. 2012) ............................................................. 40

*Wisconsin* v. *Yoder*,
  406 U.S. 205 (1972) .......................................................................... 58

## Statutes

ARK. CODE ANN. § 5-14-110(c)(1) ........................................................ 41

ARK. CODE ANN. § 6-1-107 ............................................................ 17, 40

ARK. CODE ANN. § 16-130-101 ............................................................ 17

ARK. CODE ANN. § 16-130-104 ............................................................ 40

ARK. CODE ANN. § 20-9-1501 ...................................................... *passim*

ARK. CODE ANN. § 20-9-1504 ................................................... 16, 61, 64

FLA. STAT. § 553.865 ................................................. 41

N.D. CENT. CODE § 1-01-49(18) ............................... 41

S.D. CODIFIED LAWS § 13-67-1 ................................ 41

**Other Authorities**

Jennifer Levi & Daniel Redman, *The Cross-Dressing Case for Bathroom Equality*, 34 SEATTLE U. L. REV. 133 (2010) ................ 40

# INTRODUCTION

Before Parker Saxton started gender-affirming medical care to treat his gender dysphoria, "there was no future. There was no goal planning. There was no next." Now, Parker is happy and confident, and has goals for the future. R. Doc. 275, at 620. Parker's experience mirrors that of Dylan Brandt, Sabrina Jennen, and many other adolescents in Arkansas for whom gender-affirming medical care has been a lifeline. But, in April 2021, Arkansas enacted Act 626, a law that would eliminate that lifeline by preventing them from receiving the only evidence-based treatment for gender dysphoria. For parents like Donnie Saxton, Joanna Brandt, Aaron and Lacey Jennen, and Amanda and Shayne Dennis, Act 626 has been a waking nightmare, as they have contemplated pulling up their deep roots in Arkansas—despite the financial and emotional impact on their families—to provide their children the care they need.

For more than two years, Defendants have claimed that Arkansas's ban on gender-affirming medical care for transgender adolescents was necessary to protect children. They claimed that gender-affirming medical care was dangerous, that there was no evidence showing that it

was effective, and that many patients come to identify with their birth-assigned sex and regret their treatment.

But last fall, those claims were tested in court. And after an eight-day trial involving the testimony of eight expert witnesses and 13 fact witnesses, Defendants' evidence failed to support their claims. The district court found that decades of clinical experience and scientific research showed that gender-affirming medical care improves the mental health and well-being of adolescents with gender dysphoria; it rejected Defendants' characterization of the evidence supporting this care and its risks; and it found the State could "not explain why only gender-affirming medical care—and all gender-affirming medical care—[was] singled out for prohibition." App. 265-69, 305; R. Doc. 283, at 33-38, 69, 74.

"Rather than [the Act] protecting children," the court found, "the evidence showed that … the State undermined the interests it claims to be advancing." App. 305; R. Doc. 283, at 74. And the district court specifically found that for Parker, Sabrina, and Dylan, gender-affirming medical care allowed them "to grow from depressed, anxious, and withdrawn young people into happy and healthy teenagers who looked forward to their futures." App. 299; R. Doc. 283, at 68.

On appeal, Defendants do not claim that any of the district court's 300+ factual findings are clearly erroneous. Nor could they, given the voluminous record supporting them. Indeed, Defendants' only expert witness with any experience treating gender dysphoria does not support banning gender-affirming medical care for minors, has enabled minors to receive such care on a case-by-case basis, and testified that the psychological impact of cutting off gender-affirming medical care for adolescents currently receiving it would be "shocking" and "devastating." App. 281, 287-88; R. Doc. 283, at 50, 56-57.

Instead, Defendants attempt to water down constitutional safeguards so far that the Court will simply take their word that the Act is a valid exercise of state power. But each of Defendants' legal arguments is either irrelevant to this case or squarely at odds with binding precedent.

The district court held that Act 626 triggered heightened scrutiny because it classifies individuals based on sex and transgender status, infringed the fundamental right of parents to seek medical care for their children, and banned speech based on its content and viewpoint. Consistent with long-standing precedent of the Supreme Court and this

Court, the court then applied heightened scrutiny and considered whether Defendants demonstrated that Act 626 was substantially related to any important governmental interests. It concluded they did not.

Defendants offer a range of legal theories to avoid heightened scrutiny, including inventing an alternative description of "heightened scrutiny" that amounts to no scrutiny at all. But this Court should deny their request to depart from binding precedent to relieve them of the burden they failed to meet at trial.

The judgment should be affirmed.

# STATEMENT OF THE ISSUES

1.  Whether the district court correctly held that Arkansas's ban on gender-affirming medical care for transgender adolescents violates the Equal Protection Clause.

    **Apposite Authority:** *United States* v. *Virginia*, 518 U.S. 515 (1996)

2.  Whether the district court correctly held that Arkansas's ban on gender-affirming medical care for transgender adolescents violates the Due Process Clause.

    **Apposite Authority:** *Parham* v. *J.R.*, 442 U.S. 584 (1979)

3.  Whether the district court correctly held that Arkansas's prohibition on referrals for gender-affirming medical care for transgender adolescents violates the First Amendment.

    **Apposite Authority:** *Nat'l Inst. of Fam. & Life Advocates* v. *Becerra*, 138 S. Ct. 2361 (2018)

4.  Whether the district court abused its discretion by permanently enjoining enforcement of Act 626 throughout Arkansas.

    **Apposite Authority:** *Rodgers* v. *Bryant*, 942 F.3d 451 (8th Cir. 2019)

# STATEMENT OF THE CASE

## A.    The Treatment of Adolescents with Gender Dysphoria[1]

### 1.    Diagnosing gender dysphoria

"Gender identity" is a person's deeply felt internal sense of belonging to a particular gender. App. 236; R. Doc. 283, at 5. It is a "core part" of who a person is and not something an individual can control or voluntarily change. App. 236-37; R. Doc. 283, at 5-6. "Transgender people have a gender identity that does not align with their birth-assigned sex," which may be referred to as "gender incongruence." App. 236; R. Doc. 283, at 5.

Gender incongruence can cause "significant distress" called "gender dysphoria." App. 238; R. Doc. 283, at 7. Gender dysphoria is a serious condition that, if left untreated, can result in depression, anxiety, suicidality, self-harm, and other psychological conditions. *Id.*; *see also* App. 253, 280, 283, 300; R. Doc. 283, at 22, 49, 52, 69. To meet the diagnostic criteria for gender dysphoria, a person's gender incongruence must last for at least six months and be accompanied by "clinically significant distress or impairment in social or occupational function."

---

[1]    Except where citations provided are to the transcript only, all facts are taken directly from the district court's findings of fact.

App. 238; R. Doc. 283, at 7.  As with other mental health conditions, the diagnosis of gender dysphoria is made by a clinician who assesses whether a patient meets criteria based on a clinical interview and the clinician's observations of the patient.  In the case of a minor, the clinician also considers the reports of the patient's parents.  *Id.*

### 2. The widely accepted protocols for treating adolescents with gender dysphoria

It is widely recognized in the medical and mental health fields that, for many people, the distress caused by gender dysphoria can be relieved only by living in accordance with their gender identity, often referred to as "gender transition."  *Id.*  Gender transition may include social transition and, for adolescents and adults, medical transition to align the individual's body with their gender identity.  App. 238-39; R. Doc. 283, at 7-8.  Although psychotherapy can be important for individuals with gender dysphoria to address other conditions, there are no psychotherapeutic interventions that are effective at alleviating gender dysphoria.  App. 245; R. Doc. 283, at 14.

The World Professional Association for Transgender Health ("WPATH") and the Endocrine Society publish widely accepted clinical

practice guidelines for the treatment of gender dysphoria.[2]  Those guidelines are developed by experts in the field and recognized as best practices by the major medical and mental health associations in the United States, including the American Academy of Pediatrics and American Medical Association.  App. 240-41; R. Doc. 283, at 9-10.[3]

Under the clinical practice guidelines, "treatment for gender dysphoria differs depending on whether the patient is a prepubertal child, an adolescent, or an adult."  App. 241; R. Doc. 283, at 10.  Prior to the onset of puberty, no medical interventions are indicated or provided for the treatment of gender dysphoria.  *Id.*  For adolescents—defined as youth after the onset of puberty and prior to the age of majority, App. 235; R. Doc. 283, at 4—treatment for gender dysphoria is tailored to the needs

---

[2]     WPATH has been publishing treatment recommendations since 1979.  Its current version was published in 2022.  The Endocrine Society first published guidelines for the treatment of gender dysphoria in 2011 and issued a second edition in 2017.  App. 240; R. Doc. 283, at 9.

[3]     Like other medical organizations, WPATH and the Endocrine Society also advocate for their patient populations.  App. 240-41; R. Doc. 283, at 9-10.  Although Defendants' amici contend that medical organizations support gender-affirming medical care because of political ideology or profit motives, *see* States' Br. 22-25; Public Advocate of the United States Br. 15-24; Family Research Council Br. 2-5, the court found that "there was no evidence supporting such a conspiratorial assessment."  App. 300; R. Doc. 283, at 69.

of the particular patient and for some, treatment may include "medications to delay puberty ('puberty blockers' or 'pubertal suppression'), hormone therapy, and in some more rare instances, surgery." App. 242; R. Doc. 283, at 11.

"The purpose of puberty blockers is to alleviate or prevent the worsening of the distress of gender dysphoria by pausing the physical changes that come with puberty. This treatment also provides the patient time to further understand their gender identity before initiating any irreversible medical treatments." App. 246; R. Doc. 283, at 15. For an adolescent, endogenous puberty will resume if the patient stops receiving puberty blockers. App. 269; R. Doc. 283, at 38. Under the guidelines, hormone therapy may be recommended if an adolescent's gender incongruence has lasted for years and they demonstrate the emotional and cognitive maturity to understand the risks and long-term consequences of treatment. App. 247; R. Doc. 283, at 16.[4]

_____

[4] Doctors in Arkansas do not perform gender-affirming surgeries on minors. App. 303; R. Doc. 283, at 72. Outside of Arkansas, gender-affirming surgeries for minors are rare, but when they occur, the overwhelming majority are chest surgeries for adolescent transgender males. App. 248; R. Doc. 283, at 17. Genital surgeries for minors are "extremely rare," and WPATH urges "great caution" after a thorough

Before any medical interventions are provided to adolescents with gender dysphoria, the guidelines call for a comprehensive mental health assessment, which includes a thorough history of the patient's gender identity and the stability of that identity; an evaluation of other potential conditions; and the adolescent's ability to make medical decisions and understand the future consequences of those decisions. App. 244; R. Doc. 283, at 13. The guidelines also provide that clinicians should address any co-occurring mental health conditions and state that "mental health professionals should be involved in decisions about whether medical treatments are indicated and appropriate for a given adolescent." App. 244-45; R. Doc. 283, at 13-14.[5] The guidelines also include "provisions for informed consent … that are consistent with principles … used throughout the field of medicine." App. 242; R. Doc. 283, at 11.

---

assessment of the patient's maturity before such treatment is provided to anyone under 18. *Id.*

[5] Defendants incorrectly assert that "the standards of care for minors have become less restrictive over the course of time" and that "fewer procedures require mental health evaluation." Br. 8. Notably, Defendants cite only the decision in *L.W. by & through Williams* v. *Skrmetti* to support that claim. 83 F.4th 460, 468 (6th Cir. 2023). But that decision is inconsistent with this record. App. 303-04; R. Doc. 283, at 72-73.

### 3. The efficacy and safety of gender-affirming medical care

"Decades of clinical experience have shown that adolescents with gender dysphoria experience significant positive benefits to their health and well-being from gender-affirming medical care."  App. 264; R. Doc. 283, at 33; *see also* R. Doc. 219, at 62-63; R. Doc. 275, at 606-09 (discussing the transformative effect of hormone therapy on adolescent patients' mental health, participation in school, and engagement with the world).  The scientific research is consistent with that experience, finding that gender-affirming medical care is "effective at alleviating gender dysphoria and improving a variety of mental health outcomes including anxiety, depression, and suicidality."  App. 264; R. Doc. 283, at 33.

"The evidence base supporting gender-affirming medical care for adolescents is comparable to the evidence base supporting other medical treatments for minors."  App. 265; R. Doc. 283, at 34.  Both cross-sectional studies (comparing treated and untreated individuals) and longitudinal studies (following mental health before and after treatment) demonstrate that care is effective, and treatment recommendations are often based on those types of studies.  Often in medicine, especially in pediatrics, it "would not be ethical or feasible" to conduct randomized-

controlled trials that would deprive some individuals (*i.e.*, those in the "control group") of the only "treatment that is known from clinical experience and research to benefit patients." App. 265-66; R. Doc. 283, at 34-35.

Like all medical treatment, gender-affirming medical care carries potential risks and side effects, which "must be weighed by patients and their parents." App. 266; R. Doc. 283, at 35. "The risks of gender-affirming medical care are not categorically different than the types of risks that other types of pediatric healthcare pose." *Id.* And adverse effects are rare when treatments are administered under the supervision of a doctor. App. 267, 270-71; R. Doc. 283, at 36, 39-40.

The risks of puberty blockers and hormone therapy are not unique to gender-affirming medical care. For example, puberty blockers are used to treat both gender dysphoria and precocious puberty. In both contexts, "[a]n expected effect of puberty blockers is the delay of rapid accrual of bone mineralization that occurs during puberty."[6] App. 268;

---

[6] Once puberty begins—either endogenously or through hormone therapy—the accrual of bone mineralization increases at the usual pubertal rate. R. Doc. 219, at 209-10.

R. Doc. 283, at 37. Similarly, the risks of hormone therapy are generally the same "regardless of the condition for which they are being used"[7] and "whether they are used to treat birth-assigned males or birth-assigned females." App. 267-68; R. Doc. 283, at 36-37.[8]

"For many adolescents the benefits of [gender-affirming medical] treatment greatly outweigh the risks," significantly alleviating their distress of gender dysphoria, improving their mental health, and enabling them to engage in school and social activities. App. 266; R. Doc. 283, at 35. And delaying or denying gender-affirming medical care where indicated puts patients at risk, including the "risk of worsening anxiety,

_____

To support their claim that using puberty blockers to treat gender dysphoria stunts social development, Defendants erroneously state that patients remain on blockers beyond the time when their peers start puberty. Br. 4-5. But as Defendants' acknowledge, Dr. Kathryn Stambough's patients remain on blockers until age 14, and the average age for puberty to start goes up to 14. *See* App. 246; R. Doc. 283, at 15; R. Doc. 275, at 631-32.

[7] For example, testosterone is used to treat delayed puberty and hypogonadism; estrogen is used to treat delayed puberty, ovarian failure, and Turner Syndrome; and anti-androgens are used to treat polycystic ovarian syndrome and hirsutism. App. 269-70; R. Doc. 283, at 38-39.

[8] The one exception is the potential impact on fertility. Like other medical interventions necessary to preserve someone's health, some gender-affirming medical treatments may have an impact on fertility, but treatment can be managed to preserve fertility. App. 267-71; R. Doc. 283, at 36-40.

depression, hospitalization, and suicidality." App. 280; R. Doc. 283, at 49. The harm is so great that Arkansas doctors fear not all of their patients will live to age 18 if they are denied gender-affirming medical care. App. 281-82; R. Doc. 283, at 49-50.

### 4. The possibility of desistance, "detransition," and regret

"Research and clinical experience show that when gender incongruence [persists] after the onset of puberty, it is very unlikely that the individual will come to identify with their sex assigned at birth later in life." App. 237; R. Doc. 283, at 6. And clinical experience and research show it is rare for patients who have received gender-affirming medical care to come to identify with or return to living as their birth-assigned sex (sometimes referred to as "detransitioning") and regret the care. App. 272; R. Doc. 283, at 41; *see also* R. Doc. 275, at 548 (doctors at Arkansas Children's Hospital's ("ACH") gender clinic have had no cases of regret among their patients); R. Doc. 219, at 98-99.

### 5. Treatment in Arkansas

The primary provider of gender-affirming medical care to adolescents in Arkansas is the ACH gender clinic, which has seen more than 300 patients since it opened in 2018. App. 249; R. Doc. 283, at 18.

The clinic follows the WPATH and Endocrine Society guidelines. No minor is provided hormone therapy at ACH before undergoing a comprehensive psychological evaluation and being fully informed (along with their parents) of the potential risks and benefits of treatment. App. 249-53; R. Doc. 283, at 18-22. Treatment must be approved by the patient, their parents, their doctor, the clinic psychologist, and the patient's therapist.[9] Many adolescent patients seen by the clinic do not receive gender-affirming medical interventions. App. 250, 252; R. Doc. 283, at 19, 21.

Doctors at ACH have observed "great distress in their gender dysphoric adolescent patients" and have noted that "[s]uicidal ideation and self-harm were common" and that "some patients had attempted suicide, sometimes multiple times." App. 253, 280-81; R. Doc. 283, at 22, 49-50. They have also observed how gender-affirming medical care alleviates the distress of gender dysphoria in their patients, positively impacting their health and well-being. App. 286, 298; R. Doc. 283, at 55, 67.

---

[9]    Few clinic patients have been treated with puberty blockers because most patients come to the clinic at ages after which blockers would be prescribed. App. 250; R. Doc. 283, at 19.

## B. Arkansas's Ban on Gender-Affirming Medical Care

On April 6, 2021, the Arkansas Legislature passed Act 626. The Act prohibits health care professionals from providing "gender transition procedures" to any individual under eighteen years of age or from referring any individual under eighteen years of age to any healthcare professional for "gender transition procedures." ARK. CODE ANN. §§ 20-9-1501 to 1504. The Act defines "gender transition" as "the process in which a person goes from identifying with and living as a gender that corresponds to his or her biological sex to identifying with and living as a gender different from his or her biological sex, and may involve social, legal, or physical changes." *Id.* § 20-9-1501(5)(A). And it defines "gender transition procedures" as "any medical or surgical service … related to gender transition." *Id.* § 20-9-1501(6)(A).

Governor Hutchinson vetoed the Act, explaining that "leading Arkansas medical associations, the Academy of Pediatrics and medical experts across the country all" opposed the law because "denying best practice medical care to transgender youth can lead to significant harm to the young person." App. 233-34; R. Doc. 283, at 2-3. Governor Hutchinson also expressed concern that the Act constituted "vast

government overreach," created "new standards of legislative interference with physicians and parents as they deal with some of the most complex and sensitive matters concerning our young people," and "put[] the state as the definitive oracle of medical care, overriding parents, patients and health-care experts."  App. 233; R. Doc. 283, at 2. The General Assembly overrode Governor Hutchinson's veto.

The Act was one of multiple bills introduced in Arkansas that year targeting transgender people.  Others included bills banning transgender students from participating in school sports, *see* ARK. CODE ANN. §§ 6-1-107, 16-130-101, and banning transgender people from using restrooms or other public facilities in accordance with their gender identity, *see* H.B. 1882, 93rd Gen. Assemb., Reg. Sess. (Ark. 2021); H.B. 1905, 93rd Gen. Assemb., Reg. Sess. (Ark. 2021); and H.B. 1951, 93rd Gen. Assemb., Reg. Sess. (Ark. 2021).  The majority in both chambers also passed resolutions expressing their view that "gender reassignment medical treatments" are not "natural."  H.R. 1018, 93rd Gen. Assemb., Reg. Sess. (Ark. 2021); S.R. 7, 93rd Gen. Assemb., Reg. Sess. (Ark. 2021).

## C. The Plaintiffs

The Plaintiffs in this case are four Arkansas youth with gender dysphoria (Parker Saxton, Dylan Brandt, Sabrina Jennen, and Brooke Dennis); their parents (Donnie Saxton, Joanna Brandt, Lacey and Aaron Jennen, and Amanda and Shayne Dennis); and a physician who provides gender-affirming medical care to adolescents at the ACH gender clinic (Dr. Stambough).  App. 253; R. Doc. 283, at 22.[10]

Parker Saxton was 17 years old at the start of trial.  He was assigned female at birth but has known that his gender identity is male since he was about nine.  Puberty caused Parker significant distress.  He suffered from anxiety and depression, would not socialize or answer his phone even with his closest friends, and covered the mirror to avoid seeing his reflection.  App. 259-60; R. Doc. 283, at 28-29; R. Doc. 220, at 433.  His father took him to a therapist and psychiatrist to treat his anxiety and depression.  When he was 15, his psychiatrist referred him to the ACH gender clinic.  After the Act was introduced, Parker was in

---

[10]    The Court dismissed Dr. Michele Hutchison as a party because she no longer practices medicine in Arkansas.  App. 234; R. Doc. 283, at 3.

"such a 'dark place' that his father started sleeping near him because of concern he might hurt himself."  App. 260-61; R. Doc. 283, at 29-30.

In May 2021, about a year after his first visit to the gender clinic, Parker began testosterone therapy.  Before being approved for treatment, he underwent a psychological evaluation, which included a confirmation of his gender dysphoria diagnosis, and had extensive discussions with his doctor and father about the risks and benefits of treatment.  The treatment has "significantly alleviated Parker's gender dysphoria." App. 260-61; R. Doc. 283, at 29-30.  Parker's father testified that after starting treatment, Parker was "a new person, … a complete turnaround of the broken, depressed, anxious shell that he was before testosterone." R. Doc. 220, at 443.

Like Parker, Dylan Brandt and Sabrina Jennen were diagnosed with gender dysphoria, experienced significant distress, and eventually—with the support of their parents and doctors—began gender-affirming medical care, which greatly improved their health and well-being.  App. 254-59; R. Doc. 283, at 23-28.  Dylan testified that, above all, receiving treatment for gender dysphoria has made him "hopeful."  R. Doc. 275, at 696-97.

For these families, the decision to begin medical treatment for gender dysphoria was not made lightly. App. 254-61; R. Doc. 283, at 23-30 (describing the lengthy process that each family underwent after their child came out as transgender before they were assessed for and treated with hormone therapy). Aaron Jennen explained that when Sabrina came out to him, he had "concerns" and wondered if it could be a phase. R. Doc. 220, at 451. Donnie Saxton recalled that at the time Parker came out to him, he "didn't have a clue what transgender meant." *Id.* at 434-35. From those initial experiences of doubt and uncertainty, Aaron and Donnie sought therapy for their children and eventually determined that medical treatment was needed. In each case, the parent Plaintiffs first consulted with doctors and did their own research. App. 255, 257-61; R. Doc. 283, at 24, 26-27, 29-30. Aaron recalls, "It is something that we took a lot of time, thought, and prayer in deliberating before making that decision." R. Doc. 220, at 456; *see also* App. 258; R. Doc. 283, at 27. And, for each family, gender-affirming medical treatment relieved the distress that Parker, Sabrina, and Dylan experienced due to their gender dysphoria. App. 256, 259, 261; R. Doc. 283, at 25, 28, 30.

The fourth youth plaintiff, Brooke Dennis, who has gender dysphoria and has expressed her female gender identity since second grade, is being seen at the ACH gender clinic but had not yet started puberty at the time of trial and therefore had not yet received any gender-affirming medical care. Brooke has expressed fear, anxiety, and distress about undergoing a male puberty. App. 262-63; R. Doc. 283, at 31-32.

All of the parent Plaintiffs experienced fear about their children's well-being if Act 626 took effect. Aaron Jennen testified that "Sabrina not receiving gender-affirming medical care is 'not an option'" as he would "worry about her withdrawing back into the person that she was before she started it, a person that was unhappy, that said things to her mother and I like, what's the point of life." App. 259; R. Doc. 283, at 28. These families have experienced stress about what they would do if they could not get care for their children in Arkansas. App. 264; R. Doc. 283, at 33. Amanda Dennis testified about the "great anxiety" Act 626 has caused her family, as they discussed the burdens of regularly traveling or moving out of state to get Brooke care, particularly with two other children and an aging relative to take care of. App. 263; R. Doc. 283, at

32. Other parent Plaintiffs testified they would face similar hardships. R. Doc. 220, at 445-56, 462, 675-76.

The physician Plaintiff, Dr. Stambough, treats patients with gender dysphoria, including with puberty blockers and hormone therapy. App. 286; R. Doc. 283, at 55. "Dr. Stambough has seen the distress of gender dysphoria experienced by her adolescent patients and how gender-affirming medical care alleviates that distress and improves her patients' health." *Id.* "If Act 626 takes effect, Dr. Stambough would be unable to provide medically necessary care to patients and would be forced to leave them to needlessly suffer," and she "would be unable to make all the referrals necessary to care appropriately for her Gender Clinic patients." *Id.*

### D.    Procedural History

On May 25, 2021, Plaintiffs filed a complaint alleging that the Act violated the Equal Protection and Due Process Clauses of the Fourteenth Amendment and the First Amendment. App. 73; R. Doc. 1, at 46.

Shortly thereafter, Plaintiffs sought a preliminary injunction barring enforcement of the law. R. Doc. 11, at 1. On July 21, 2021, the court preliminarily enjoined the Act. App. 76; R. Doc. 59, at 1; *see also*

*Brandt* v. *Rutledge*, 551 F. Supp. 3d 882, 891-94 (E.D. Ark. 2021). A panel of this Court affirmed (based only on Plaintiffs' equal protection claim) on August 25, 2022. *Brandt by & through Brandt*, 47 F.4th 661, 667 (8th Cir. 2022), *pet. for reh'g en banc denied*, 2022 WL 16957734 (8th Cir. Nov. 16, 2022).

In the fall of 2022, the district court held an eight-day bench trial. After hearing from eight expert witnesses and 13 fact witnesses, the court issued an 80-page decision with over 300 findings of fact, holding that Plaintiffs had prevailed on each of their claims and permanently enjoining the Act. App. 232-311; R. Doc. 283, at 1-80.

In addition to the testimony provided by Plaintiffs, the district court relied extensively on expert testimony. After hearing the testimony of each witness, the court credited the testimony of Plaintiffs' four expert witnesses—Drs. Dan Karasic, Jack Turban, Deanna Adkins, and Armand Antommaria:

> Plaintiffs' experts' extensive experience, their testimony in court, and their demeanor and responsiveness to questions asked by both sides and the Court, show that all four of Plaintiffs' expert witnesses have deep knowledge of the subject matter of their testimony and were fully qualified to provide the opinion testimony they offered. They have provided credible and reliable testimony relevant to core issues in this case.

App. 287; R. Doc. 283, at 56.[11]

By contrast, the court found that three of Defendants' four experts were not qualified to offer relevant expert testimony. Specifically, the court found that (i) Professor Mark Regnerus—a sociologist whose work focuses on sexual relationships and religion— "lack[ed] the qualifications to offer his opinions and failed to support them"; (ii) Dr. Patrick Lappert had "no training or professional experience in mental health or gender dysphoria and has never provided gender-affirming surgery," "acknowledge[d] that he [was] not an expert in the treatment of gender dysphoria," and was "not qualified to offer relevant opinions given his lack of experience related to gender dysphoria"; and (iii) Dr. Paul Hruz failed to support his opinions about the lack of evidence of efficacy and the risks of gender-affirming medical care with evidence and provided the same medications for patients with other conditions, even though he recognizes that most of the risks are the same. App. 288-92; R. Doc. 283,

---

[11] Defendants ask the Court to disregard Plaintiffs' experts on the ground that they make a living as doctors providing the care at issue in this case. Defendants did not offer any evidence showing their testimony was financially motivated. If their position was accepted, it would create a nonsensical rule whereby courts could not consider the views of the most qualified doctors when resolving factual disputes about medical treatments.

at 57-61.  The court also noted that "it [was] clear from listening to [the] testimony" of Prof. Regnerus and Drs. Lappert and Hruz that their opinions were "grounded in ideology rather than science."  App. 290, 293; R. Doc. 283, at 59, 62.

As for Dr. Stephen Levine, the court found that he had "no knowledge of how most gender clinics provide care" or "how care is provided by doctors in Arkansas," and could not support his claims that "doctors … encourage patients to identify as transgender and provide hormones immediately without assessing patients … or informing patients and their parents of the risks and the limitations of the evidence regarding treatments."  App. 288; R. Doc. 283, at 47.

The court further found that the testimony of Dr. Levine—the only one of Defendants' experts who has experience treating patients with gender dysphoria—cut *against* Act 626, noting that he had "enabled minor patients with gender dysphoria to access hormone therapy on a case-by-case basis," "does not support banning gender-affirming medical care for adolescents with gender dysphoria," and "has concerns about Act 626's impact on youth who are currently receiving gender-affirming hormones."  App. 287-88; R. Doc. 283, at 56-57.  Indeed, Dr. Levine

testified that cutting off gender-affirming medical care to adolescents currently receiving it would be psychologically "shocking" and "devastating," and believed doctors would find ways around the law to protect their patients.  App. 281; R. Doc. 283, at 50.

# SUMMARY OF ARGUMENT

The district court correctly held that Arkansas's ban on gender-affirming medical care for adolescents is unconstitutional.

First, the Act violates the Equal Protection Clause. Because the Act classifies on the basis of both sex and transgender status, the court correctly applied heightened scrutiny, placing the burden on Defendants to prove that the law was substantially related to an important governmental interest. The court held that Defendants failed to meet that burden. The court's findings were well supported by the record and Defendants do not claim otherwise.

Second, the Act unjustifiably infringes on parents' fundamental right to seek medical care for their children by banning widely accepted medical care that is available to adults that they, their children, and their children's doctors all agree is medically appropriate.

Third, the Act violates the First Amendment by prohibiting speech based on nothing more than the content and viewpoint expressed. Again, Defendants failed to meet their burden to justify this restriction on speech.

## ARGUMENT

The district court's permanent injunction barring enforcement of the Act should be affirmed.  To obtain a permanent injunction, Plaintiffs must demonstrate (i) "actual success on the merits," (ii) a "threat of irreparable harm," and (iii) that an injunction would serve the "public interest."  *Miller* v. *Thurston*, 967 F.3d 727, 735 (8th Cir. 2020).  Plaintiffs readily satisfied each factor.

## I.   The District Court Correctly Held That The Act Violates The Equal Protection Clause.

The Act violates the Equal Protection Clause.  Because it classifies individuals on the basis of both sex and transgender status, Defendants were required to prove at trial that the law was substantially related to an important governmental interest.  They failed to do so.  Rather than further Arkansas's asserted interest in protecting children, the district court found that the Act harms children by denying them healthcare that could improve their health and well-being.  The court further found that none of Arkansas's purported concerns about gender-affirming medical care—concerns that would equally apply to much of medicine—explained why gender-affirming medical care was singled out for prohibition.

Based on that record, the Act is so attenuated from any legitimate objective that it fails any level of equal protection scrutiny.

**A.** **The Act triggers heightened scrutiny because it classifies on the basis of sex.**

The Supreme Court has consistently and unequivocally held that *all* sex-based classifications trigger heightened scrutiny. *United States* v. *Virginia*, 518 U.S. 515, 555 (1996) ("*VMI*") (citing *J.E.B.* v. *Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994)). Because the Act classifies based on sex in multiple ways, heightened scrutiny applies. Defendants' arguments for avoiding the application of heightened scrutiny cannot be reconciled with controlling precedent.

**1.** **The Act classifies on the basis of sex assigned at birth.**

The Act facially classifies based on an adolescent's sex assigned at birth. It categorically prohibits "gender transition procedures," defined to include any medical treatment intended to "[a]lter or remove physical or anatomical characteristics or features that are typical for the individual's biological *sex*" or to "[i]nstill or create physiological or anatomical characteristics that resemble a sex different from the individual's biological *sex*." ARK. CODE ANN. § 20-9-1501(6)(A) (emphasis added).

By its plain terms, "[a] minor's sex at birth determines whether or not the minor can receive certain types of medical care under the law." *Brandt*, 47 F.4th at 669. As Defendants recognize, "gender transition itself cannot be defined without reference to biological sex." Br. 37. But the law does more than reference sex; it conditions treatment on the basis of it. For example, a minor can have breast augmentation surgery (even for cosmetic reasons) if her birth-assigned sex is female, but not if it is male. And a minor can be provided testosterone to masculinize his appearance if his birth-assigned sex is male (*e.g.*, if he is a late bloomer and wants to begin developing facial hair and growing taller), but not if it is female. That is a paradigmatic sex classification warranting heightened scrutiny.

Defendants offer various excuses for why the Act's facial sex classification should be exempted from heightened scrutiny. But none can be squared with the text of the law or well-established precedent.

First, Defendants argue that the Act does not trigger heightened scrutiny because it prohibits treatment for both sexes. Br. 21-22. But there is no exception to heightened scrutiny for laws that classify both men and women based on sex. *See J.E.B.*, 511 U.S. at 142 n.13 (holding

that peremptory challenges based on sex were impermissible even "if each side uses its peremptory challenges in an equally discriminatory fashion" because "the exclusion of even one juror for impermissible reasons harms that juror"); *id.* at 159-60 (Scalia, J., dissenting) (noting that "the system as a whole [wa]s evenhanded" and that "for every man struck by the government petitioner's own lawyer struck a woman"). It is long-standing equal protection doctrine that facial classifications do not somehow become neutral "on the assumption that all persons suffer them in equal degree." *Powers* v. *Ohio*, 499 U.S. 400, 410 (1991). This is the law, notwithstanding recent non-binding decisions from other circuits holding otherwise—in cases that were decided without the benefit of a trial record and are subject to further review. *See L.W.*, 83 F.4th 460, *petition for cert. filed*, No. 23-477 (U.S. Nov. 6, 2023); *Eknes-Tucker* v. *Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023), *petition for reh'g en banc filed*, No. 22-11707 (11th Cir. Sept. 11, 2023).

Second, Defendants argue that the law classifies not based on sex but on medical procedure. Br. 23-25. But the Act does not prohibit a particular medication, medical intervention, or surgical treatment; it prohibits "any" treatment that alters physical characteristics to be

different from their birth-assigned sex. ARK. CODE ANN. § 20-9-1501(6)(A). According to Defendants, the law is a procedure-based classification because, for example, the use of testosterone to treat gender dysphoria is a different procedure than its use to treat other conditions. Br. 23-24. But the law says nothing about condition—indeed, the law permits any medical treatments that feminize or masculinize the body, so long as that treatment conforms to the individual's birth-assigned sex, even if that individual has no medical condition at all.

Ultimately, Defendants' "different treatment" argument turns on the supposed "critical difference between experimental gender-transitions and recognized, established medical procedures." Br. 24. But any factual differences between treatments the law prohibits and those it permits go to whether the law is justified, not to the antecedent legal question of whether the law classifies on the basis of sex. Defendants cannot contort constitutional law to skirt their evidentiary burden.

Third, Defendants rely on *Dobbs* v. *Jackson Women's Health Org.*, 597 U.S. 215 (2022), to argue that the Act is not subject to heightened equal protection scrutiny because it concerns the regulation of medical treatments "that only one sex can undergo." Br. 24. But the Act does not

ban *a* particular treatment that only one sex can undergo. It bans *any* medical treatment prescribed for the purpose of gender transition. In any event, *Dobbs* was a substantive due process case that, as to equal protection, merely reiterated in dicta the Supreme Court's holding in *Geduldig* v. *Aiello*, 417 U.S. 484 (1974), that pregnancy classifications do not automatically trigger heightened scrutiny even if they have a disparate impact on members of one sex. *See also Pers. Adm'r of Mass.* v. *Feeney*, 442 U.S. 256, 273-74 (1979). This is not a disparate impact case. Whether the operative prohibition in the Act is triggered depends—in every single instance—on a person's sex assigned at birth. That is, a provider must know whether a patient was assigned male or female at birth to know whether treatment is prohibited. *Dobbs* did not somehow immunize from scrutiny all facial sex classifications in the healthcare context.

Finally, Defendants claim that heightened scrutiny does not apply because the Act classifies based on age and not sex. Br. 25. But including an age classification alongside a sex classification does not insulate the Act from heightened scrutiny. *See Craig* v. *Boren*, 429 U.S. 190, 197

(1976) (applying heightened scrutiny to sex classification even though it only affected men between the ages of 18 and 20).

> ## 2. The Act classifies based on incongruence between a person's sex assigned at birth and gender identity.

In *Bostock* v. *Clayton County*, 140 S. Ct. 1731 (2020), which interpreted Title VII of the Civil Rights Act, the Supreme Court established that laws are sex-based when they punish people for being identified as "one sex … at birth" and a different sex "today." *Id.* at 1746. The Act fits that description to a tee. For example, it "penalizes" people assigned male at birth for taking the same "action[]" (seeking to align their body with their female gender identity) that it "tolerates" in persons assigned female at birth. *Id.* at 1741.

By its plain terms, the Act prohibits treatment where such treatment "assist[s] an individual with a *gender transition*" or "[i]nstill[s] or create[s] physiological or anatomical characteristics that resemble a sex *different from* the individual's biological sex." ARK. CODE ANN. § 20-9-1501(6)(A)(ii) (emphasis added). Put differently, "without sex-based classifications, it would be impossible for [Arkansas's law] to define whether a puberty-blocking or hormone treatment involved transition from one's sex (prohibited) or was in accordance with one's sex

(permitted)." *K.C.* v. *Med. Licensing Bd. of Ind.*, 2023 WL 4054086, at *8 (S.D. Ind. June 16, 2023), *appeal filed*, No. 23-2366 (7th Cir. July 12, 2023).

To be sure, Title VII and the Equal Protection Clause apply different standards to determine whether a sex classification is *permissible*. Whereas Title VII imposes a categorical ban on sex discrimination, the Equal Protection Clause subjects such laws to heightened scrutiny. *Compare Bostock*, 140 S. Ct. at 1737 (holding that "in Title VII, Congress outlawed discrimination in the workplace on the basis of ... sex"), *with J.E.B.*, 511 U.S. at 152 (holding that all "gender-based classifications require an exceedingly persuasive justification in order to survive constitutional scrutiny" (internal quotations omitted)). But those differences have nothing to do with whether a sex classification in fact *exists*. And Defendants offer no sound basis for defining sex discrimination differently under Title VII and the Equal Protection Clause.

### 3. The Act intentionally enforces gender conformity.

The Act triggers heightened scrutiny for an additional reason: It intentionally penalizes people for failing to conform to expectations

associated with their sex assigned at birth, which is a form of sex discrimination subject to heightened scrutiny. The Supreme Court has long held that heightened scrutiny applies to government action that reinforces "fixed notions" about "roles and abilities" tied to one's sex. *Miss. Univ. for Women* v. *Hogan*, 458 U.S. 718, 724-25 (1982); *see also Grimm* v. *Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608-09 (4th Cir. 2020), *as amended* (4th Cir. Aug. 28, 2020).

On its face, the Act prohibits conduct based on generalizations about sex. Specifically, it defines the prohibited "gender transition procedures" as "any medical or surgical service" intended to, among other things, "[a]lter or remove physical or anatomical characteristics or features that are *typical* for the individual's biological sex." ARK. CODE ANN. § 20-9-1501(6)(A) (emphasis added). Enforcing the Act therefore reinforces and indeed compels conformity to sex-based generalizations (that which is "typical" for one's sex), namely the expectation that persons assigned as one sex at birth will identify as and conform their body to normative expectations of that sex. Under long-standing equal protection principles, Arkansas's attempt to legislate gender conformity triggers heightened scrutiny.

**B.     The Act triggers heightened scrutiny because it classifies on the basis of transgender status.**

Heightened scrutiny also applies because the Act classifies based on transgender status.  The plain text of the Act unequivocally targets transgender people for disfavored treatment.  And transgender people have all the hallmarks of a suspect class.

**1.     The Act explicitly classifies based on transgender status.**

The Act prohibits "gender transition procedures," where "gender transition" is defined as "the process in which a person goes from identifying with and living as a gender that corresponds to his or her biological sex to identifying with and living as a gender different from his or her biological sex."  ARK. CODE ANN. § 20-9-1501(5).  This is the very definition of being transgender.  As the district court found, "[t]ransgender people have a gender identity that does not align with their birth-assigned sex."  App. 236; R. Doc. 283, at 5.  Because being transgender means going through the process of gender transition, the law's prohibition on "gender transition procedures" is based on transgender status.  *Cf. Christian Legal Soc'y.* v. *Martinez*, 561 U.S. 661, 689 (2010) (rejecting argument that lines drawn based on same-sex intimacy were not based on sexual orientation and "declin[ing] to

distinguish between status and conduct" where there is such close alignment).

Defendants challenge that conclusion on the ground that the "'regulation of a medical procedure that only' transgender-identifying individuals 'undergo'" does not constitute a classification based on transgender status.  Br. 31 (quoting *Dobbs*, 597 U.S. at 236).  That argument is misplaced.  Act 626 does not classify based on a particular medical procedure that transgender people just happen to undergo; it draws a line based on what it means to be transgender.

### 2. Classifications based on transgender status warrant heightened scrutiny.

As the district court correctly held, transgender people satisfy the indicia of a suspect class:  "(1) they have historically been subject to discrimination; (2) they have a defining characteristic that bears no relation to their ability to contribute to society; (3) they may be defined as a discrete group by obvious, immutable, or distinguishing characteristics; and (4) they are a minority group lacking political power."  App. 296; R. Doc. 283, at 65.  Courts confronted with laws that classify based on transgender status routinely conclude that heightened scrutiny applies.  *See*, *e.g.*, *Grimm*, 972 F.3d at 610-13; *Karnoski* v.

*Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019). And even though it was not necessary to affirm the preliminary injunction, the *Brandt* panel concluded that the district court's conclusion that transgender people are a quasi-suspect class was supported by the record. *Brandt*, 47 F.4th at 670 n.4.[12]

In response, Defendants argue that the immutability prong is not met because "gender identity … can change over time." Br. 28. But as the district court found, "[g]ender identity is not something that an individual can control or voluntarily change," App. 236; R. Doc. 283, at 5, and "there is no treatment that can change a person's gender identity," App. 241; R. Doc. 283, at 10. Those findings were not clearly erroneous. In any event, there is no requirement that a characteristic be immutable in a strict sense to trigger heightened scrutiny; it is sufficient that transgender individuals "exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group." *Lyng* v. *Castillo*, 477 U.S. 635, 638 (1986). For that reason, heightened scrutiny applies

---

[12]    Although there is record evidence related to these factors, courts deciding the legal question of the applicable level of equal protection scrutiny for a classification are not confined to the record evidence. *See*, *e.g.*, *Frontiero* v. *Richardson*, 411 U.S. 677, 684-88 (1973); *Grimm*, 972 F.3d at 611-13.

to classifications based on alienage and "illegitimacy" even though both classifications are subject to change. *Windsor* v. *United States*, 699 F.3d 169, 183 n.4 (2d Cir. 2012), *aff'd on other grounds*, 570 U.S. 744 (2013). Accordingly, the "obvious" and "distinguishing" characteristic of having a gender identity that does not align with one's sex assigned at birth meets this factor.[13]

Second, Defendants argue that transgender people have not been subject to a history of purposeful discrimination and are not politically powerless. Br. 29-30. Those arguments are hard to take seriously. Expressions of transgender identity were criminalized for much of the nineteenth and twentieth centuries. *See* Jennifer Levi & Daniel Redman, *The Cross-Dressing Case for Bathroom Equality*, 34 SEATTLE U. L. REV. 133, 152-53 (2010). These efforts have recently reemerged through various means, including prohibitions on cross-gender expression in public and criminalization of restroom use by transgender adults. *See*, *e.g.*, ARK. CODE ANN. §§ 6-1-107, 16-130-104; FLA. STAT.

---

[13]     The fact that people use many terms to reference a gender identity that does not align with birth-assigned sex is irrelevant. The range of ways that people might understand and refer to their racial identity does not negate the fact that race is a suspect classification.

§ 553.865.  And in the Eighth Circuit alone, laws restricting rights for transgender people have proliferated.[14]

Ignoring that history, Defendants—referring to Title VII—claim that "transgender individuals have been protected by a 'major piece of federal civil rights legislation' for nearly a half-century."  Br. 29 (quoting *Bostock*, 140 S. Ct. at 1753).  But in *Bostock*, Arkansas filed a brief asking the Court to reject protections for transgender people, arguing that "[f]or decades, there was a consensus among lower courts that *the plain language of Title VII does not prohibit discrimination* based on sexual orientation or gender identity."  Amicus Br. of Tennessee et al. at 8, *Bostock*, 140 S. Ct. 1731 (No. 17-1618) (emphasis added).  The fact that the relative experience of transgender people "has improved markedly in recent decades," *Frontiero*, 411 U.S. at 685, does not suggest that transgender persons as a class wield political power.  The same was true of women when the Supreme Court recognized that sex-based restrictions are subject to heightened scrutiny.  *Id.* at 685-86.  Recent gains—modest

---

[14]     *See, e.g.*, ARK. CODE ANN. § 5-14-110(c)(1); N.D. CENT. CODE § 1-01-49(18); S.D. CODIFIED LAWS § 13-67-1.

and fragile as they are—do not erase a long history of discrimination and political powerlessness.

Defendants argue that transgender people cannot be politically powerless because various organizations and law firms are supporting Plaintiffs in this case. Br. 30. But the same contention could be leveled at any group that has effectively challenged discrimination through the court system. *See, e.g.*, Amicus Br. of American Fed. of Teachers, *Brown* v. *Board of Educ.*, 347 U.S. 483 (1954) (No. 1) (brief from major national organization opposing school segregation).

## C.  The Act fails heightened scrutiny.

The district court's decision was a textbook application of heightened scrutiny. It articulated Defendants' burden to prove that the Act was substantially related to an important governmental objective. It then walked through the voluminous record and found that Defendants failed to establish such a relationship between their stated interest in protecting minors and Arkansas's ban on gender-affirming medical care for adolescents.

In resisting that conclusion, it is notable what Defendants do not say. Nowhere do Defendants engage with the court's extensive factual

findings about the safety and efficacy of the proscribed treatments or the harms that individual Plaintiffs and other transgender adolescents would suffer if treatment were withheld. Instead, Defendants disregard long-standing equal protection precedent and invent an alternative heightened scrutiny standard that would make those facts irrelevant.

### 1. The district court applied the proper heightened scrutiny test.

The district court properly recognized that heightened scrutiny "imposes a burden 'rest[ing] entirely on the State' to demonstrate an 'exceedingly persuasive' justification for the [law's] differential treatment." App. 297; R. Doc. 283, at 66 (*citing VMI*, 518 U.S. at 533). That test is derived directly from Supreme Court precedent, which requires the defendant to demonstrate a close "means-ends fit" between the challenged law and the "important governmental objectives" put forward to justify it. *Sessions* v. *Morales-Santana*, 582 U.S. 47, 59, 68 (2017) (quoting *VMI*, 518 U.S. at 533); *D.M.* v. *Minn. State High Sch. League*, 917 F.3d 994, 1001-02 (8th Cir. 2019).

Applying that standard, the court reviewed the trial evidence and held that Defendants failed to meet their burden. App. 305; R. Doc. 283,

at 74. That conclusion was based on numerous findings, each of which

had ample support in the record, including that:

- "[D]ecades of clinical experience in addition to a body of scientific research demonstrate the effectiveness of [the prohibited] treatments." App. 291; R. Doc. 283, at 60.

- Major national and Arkansas medical groups recognize the safety and effectiveness of gender-affirming medical care for adolescents with gender dysphoria. App. 239, 266; R. Doc. 283, at 8, 35.[15]

- Banning gender-affirming medical care for minors would cause significant harm to youth with gender dysphoria, including by "worsening anxiety, depression, hospitalization, and suicidality" and by forcing minors to go through "irreversible pubertal changes inconsistent with their gender identity." App. 279-83; R. Doc. 283 at 48-52.

- Defendants' own expert agreed that the psychological impact of cutting off this care to adolescents who are currently receiving it would be "shocking" and "devastating," going so far as to testify that doctors would likely find a way around the law to protect their patients. App. 281; R. Doc. 283, at 50.

After surveying the evidence related to the benefits of

gender-affirming medical care and the serious costs of banning it, the

---

[15] While Defendants point to some European countries that they say have "restrict[ed]" gender affirming medical care for minors, Br. 7, the court found that none of these countries has prohibited care. App. 293; R. Doc. 283, at 62. "For example, in Finland, the guidelines provide that hormone therapy can be provided to minors based on a thorough case-by-case consideration if it can be ascertained that the adolescent's identity as the other sex is of a permanent nature and causes severe dysphoria." *Id.*

court also found that none of "the various claims underlying the State's arguments that the Act protects children" were supported by the evidence. App. 305; R. Doc. 283, at 74.

Rather than engage with those findings, Defendants repeat on appeal many claims they failed to support at trial. Throughout their brief, they refer to the banned care as "experimental" and "having no proven benefits" as well as "dangerous," Br. 3, 6; assert that youth with gender dysphoria will naturally outgrow gender incongruence, Br. 3; claim that adolescents who receive treatment are likely to regret it, Br. 6; and accuse clinicians of providing treatment to adolescents without appropriate evaluation and informed consent, Br. 7-8. But the court found that these characterizations of the treatment were inaccurate, and that the premises of many of these claims could also be leveled against many other forms of treatment that Arkansas allows families to provide to their children.

*Efficacy.* The district court held that Defendants failed to support their claim that "there is a lack of evidence of efficacy" for gender-affirming medical care. App. 297; R. Doc. 283, at 66. The court noted that Defendants "put forth no evidence contesting the extensive

clinical experience of Plaintiffs' witnesses." App. 298; R. Doc. 283, at 67. Moreover, the court noted that Defendants had not rebutted the "testimony of the [p]arent Plaintiffs who explained how gender-affirming medical care positively transformed the lives of their adolescent children." App. 299; R. Doc. 283, at 68. The court also found that Defendants' experts' critiques of the body of research showing the benefits of the banned treatments also apply to much of the medical research relied on to support other medical treatments, and that "[t]he evidence base supporting gender-affirming medical care for adolescents is comparable to the evidence base supporting other medical treatments for minors." App. 265-66; R. Doc. 283, at 34-35.[16] Notably, the alternative treatment put forward by Defendants—waiting until age 18 to provide any treatment other than psychotherapy—lacks any evidence of efficacy.

---

[16] Defendants' experts criticized gender-affirming medical care research as "low quality," but that is a term used in medical grading systems to describe studies that do not use randomized controlled trials ("RCTs"). Although RCTs are generally considered the highest-quality, "low quality" study designs are widely relied on for medical treatment recommendations, particularly when—as discussed above—RCTs are not feasible or ethical. App. 266; R. Doc. 283, at 35.

Finally, Arkansas does not require other medical treatments to be supported by any particular level of evidence, and has allowed physicians to provide treatments that are not supported by *any* evidence of effectiveness at all. For example, even though the Arkansas Department of Health advised that there was *no* evidence that hydroxychloroquine was effective for the treatment of COVID-19, Arkansas left it to the discretion of doctors and patients to treat COVID-19 with that medication. App. 277; R. Doc. 283, at 46. Thus, asserted concerns about the sufficiency of the evidence does not explain why only gender-affirming medical care for adolescents was singled out for prohibition.

*Risks and side effects.* The district court found that the risks of gender-affirming medical care are "not categorically different than the types of risks that other types of pediatric healthcare pose" and that it is common for other pediatric treatments to carry "comparable or greater risks." App. 266-67; R. Doc. 283, at 35-36. The court also found that "[w]hen treatment is monitored by a doctor to ensure appropriate therapeutic levels, adverse health effects are rare." App. 270; R. Doc. 283, at 39. The court further found that "[f]or many adolescents the benefits of treatment greatly outweigh the risks." App. 266; R. Doc. 283,

at 35.  Finally, the court found that the State otherwise leaves medical decision-making to patients and their doctors (and for minors, their parents), and has addressed known risks through regulation mandating informed consent requirements—*not* by banning care.  App. 276; R. Doc. 283, at 45 (discussing informed consent regulations for gastric bypass surgery).

Given those findings, the court concluded that "[t]here is nothing unique about the risks of gender-affirming medical care for adolescents that warrants taking this medical decision out of the hands of adolescent patients, their parents, and their doctors."  App. 267; R. Doc. 283, at 36.[17]

*Desistance and regret.*  Defendants suggest that gender transition is unnecessary because transgender identity naturally "desists" as

---

[17]    In *L.W.*, the Sixth Circuit suggested the absence of FDA approval of medications for the treatment of gender dysphoria meant that the FDA disapproves of or is unwilling to support such use.  83 F.4th at 478.  That is incorrect.  The undisputed evidence in this case showed that once a drug receives FDA approval for one use, pharmaceutical companies often do not seek additional approvals for other uses because "off-label" use is permitted.  R. Doc. 220, at 397-98, 400.  Moreover, "off-label" use is widespread in medicine.  App. 267; R. Doc. 283, at 36.

children grow up.  Br. 4.[18]  But the district court found a "broad consensus in the field that once adolescents reach the early stages of puberty and experience gender dysphoria, it is very unlikely they will subsequently identify as cisgender or desist."  App. 302; R. Doc. 283, at 71.  And no medical treatments are indicated until after the onset of puberty. App. 242, 248; R. Doc. 283, at 11, 17.  While the court found that the possibility of regret is part of medicine generally, it also found that clinical experience shows that regret among those who received gender-affirming medical care is extremely rare.  App. 272; R. Doc. 283, at 41; *see also* R. Doc. 246, at 783-84, 920-21 (State's expert Dr. Levine was aware of only two of his more than 300 patients who regretted treatment).[19]

---

[18]    Defendants misleadingly suggest that "gender incongruence will naturally desist for most youth" absent medical treatment.  Br. 4.  But that assertion rests on a selective excerpt from the district court's finding:

> The desistance studies relied on by the State to assert that gender incongruence will naturally desist for most youth *were focused on prepubertal children and say nothing about the likelihood of gender incongruence desisting among adolescents, the group affected by Act 626*.

App. 272; R. Doc. 283, at 41 (emphasis added).

[19]    Defendants' amici suggest the risk of regret is high because youth are seeking gender-affirming medical care due to social influence.  Public

*Proper evaluation and informed consent.* The district court found there was "no evidence that doctors in Arkansas negligently prescribe puberty blockers or cross-sex hormones to minors." App. 303; R. Doc. 283, at 303. Moreover, the court described the comprehensive assessment and informed consent process required by the WPATH and Endocrine Society guidelines and found that gender-affirming medical care providers in Arkansas adhere to those guidelines. App. 249, 303-05; R. Doc. 283, at 18, 72-74. Defendants' assertion that "multiple practitioners" in Arkansas do not require a gender dysphoria diagnosis prior to treatment misconstrues the record. Br. 8. There is no evidence that any practitioner would prescribe gender-affirming medical care to an individual who had not been evaluated and diagnosed with gender dysphoria. R. Doc. 224, at 747, 759, 761; *see also* App. 304; R. Doc. 283, at 73. And, to the extent there are any doctors in Arkansas providing care inappropriately, banning care categorically is not substantially related to addressing that concern. As the court found, the State—

---

Advocate Br. 9. Their claims find no support in the record. On the contrary, if youth were to seek treatment based on social influence, they would not be considered for medical interventions absent long-standing gender dysphoria. App. 239; R. Doc. 283, at 8.

through the Arkansas State Medical Board—has processes for addressing those concerns without banning care. App. 275-79; R. Doc. 283, at 44-48. For example, when the over-prescription of opioids resulted in the opioid epidemic, the State responded with regulations providing a system of sanctions for doctors who overprescribe opioids; it did not bar patients from accessing those treatments. App. 275-76; R. Doc. 283, at 44-45.

All told, the district court's findings debunk Defendants' claim that the Act is substantially related to protecting children. App. 297-98, 302, 305; R. Doc. 283, at 66-67, 71, 74. On the contrary, the court found that gender-affirming medical care improves the mental health and well-being of patients and that, by prohibiting it, the State undermined the very interests it claimed to be advancing. App. 305; R. Doc. 283, at 74.

### 2. Defendants' alternative approach to heightened scrutiny is meritless.

Defendants have not attempted to identify any clear error in the district court's factual findings. Nor could they, given the voluminous record evidence supporting them. Instead, Defendants seek to bypass the factual record altogether by proposing a version of "heightened scrutiny" that would, in practice, result in no scrutiny at all.

First, Defendants claim that the law survives heightened scrutiny because it is "necessary" to advance Arkansas's "compelling interest in protecting minors from gender-transition procedures." Br. 32. The Supreme Court has long rejected such circular arguments. In *VMI*, the defendants argued that excluding women from the Virginia Military Institute served the "important governmental objective" in "single-sex education at VMI." 518 U.S. at 545. The Court held that such "notably circular" reasoning "bent and bowed" the heightened scrutiny test. *Id.* The *VMI* Court recognized that accepting such an argument would give states a blank check to engage in invidious discrimination by claiming an interest in doing so. Instead of simply claiming an interest in preventing gender-transition procedures, Defendants had to show that the "means" employed—*i.e.*, categorically banning gender-transition procedures— served important "ends." *Id.* After reviewing the record, the court held they do not.

Second, Defendants suggest that any sex classification connected to biology automatically survives heightened scrutiny. Br. 34-35. But that argument also runs headlong into binding precedent. The fact that a sex classification is said to be based on biological sex differences does not

mean the government action automatically survives heightened scrutiny. *Compare Tuan Anh Nguyen* v. *I.N.S.*, 533 U.S. 53, 73 (2001) (holding that federal immigration law that differentiated between unwed mothers and unwed fathers survived heightened scrutiny), *with Morales-Santana*, 582 U.S. at 76 (holding that federal immigration law that differentiated between unwed mothers and unwed fathers did not survive heightened scrutiny).

The purpose of heightened scrutiny is to test the state's claims— whether based on biology or other sex-based assumptions—to ensure both that the law serves a legitimate purpose and that its chosen regulation bears a substantial relationship to it. *See Michael M.* v. *Superior Ct. of Sonoma Cnty.*, 450 U.S. 464, 472-74 (1981). But according to Arkansas, it need only invoke a biological difference to meet its burden. That is not the law; if it were, bedrock precedents would have come out the other way. *See*, *e.g.*, *VMI*, 518 U.S. at 540 (rejecting argument that VMI could bar admission for woman based on physiological differences between men and women and the need to preserve its physical training program).

Finally, Arkansas's claim that the court was "required to defer to the legislature's permissible judgment" that the banned care is too risky and ineffective is manifestly incorrect. Br. 44. In the equal protection context, heightened scrutiny requires a court to "smoke out" improper uses of suspect lines, *Johnson* v. *California*, 543 U.S. 499, 506 (2005), and to ensure that the law does not "classify unnecessarily and overbroadly by gender when more accurate and impartial lines can be drawn." *Morales-Santana*, 582 U.S. at 64 n.13, 68. A court cannot perform that important function if it must disregard factual findings and reflexively defer to the legislature. Defendants' highly deferential version of heightened scrutiny is the antithesis of heightened scrutiny and bears no resemblance to the test long applied by the Supreme Court and this Court.

### D. The Act fails rational-basis review.

Even if the Court decides that heightened scrutiny should not apply, the Act is unconstitutional. While rational-basis review gives deference to the legislature, a rational-basis for a law must still be grounded in a "factual context." *Romer* v. *Evans*, 517 U.S. 620, 632-33 (1996); *see also Heller* v. *Doe*, 509 U.S. 312, 321 (1993) (rational-basis

review must have a "footing in the realities of the subject matter addressed by the legislation"). Here, given the factual context, the Act does not bear even a rational relationship to any legitimate state interest.

The State's asserted justifications for banning this care for minors, even if accepted as true, "ma[k]e no sense in light of how" Arkansas treats medical care provided for purposes other than "gender transition." *Bd. of Trustees of Univ. of Ala.* v. *Garrett*, 531 U.S. 356, 366 n.4 (2001) (internal quotations omitted). Arkansas otherwise leaves medical decisions to families and doctors, regardless of the level of evidence supporting a treatment and the potential risks. That is true even when the state recognizes that there is *no* evidence supporting a treatment and that the risks of a treatment are serious. *Supra*, at Section I.C.1. Indeed, Arkansas allows non-transgender adolescents to receive the same medications that it bans for transgender adolescents—even though almost all of the risks are identical. App. 295-96; R. Doc. 283, at 64-65. There is no rational-basis to believe that allowing parents, adolescents, and doctors to make medical decisions about gender-affirming medical care would "threaten legitimate interests of [Arkansas] in a way that" other types of medical care would not. *See City of Cleburne* v. *Cleburne*

*Living Ctr.*, 473 U.S. 432, 448 (1985) (holding that denial of special-use permit for home for developmentally disabled adults failed rational-basis review because the asserted justifications—*e.g.*, a concern about traffic—applied equally to other multiple-resident facilities that were permitted).

And even if Defendants could explain why *only* gender-affirming medical care was singled out for prohibition, their justifications do not explain why *all* gender-affirming medical care is banned. For example, Defendants' supposed concerns about fertility and irreversibility, Br. 5, 6, 8, are not present for treatment with puberty blockers. App. 269; R. Doc. 283, at 38. The proscriptions of the law are "so far removed from [the asserted] justifications" that those assertions are "impossible to credit." *Romer*, 517 U.S. at 635.

The text of the Act and Defendants' defense of it make clear that its purpose is not to protect minors by limiting care that lacks a certain level of evidence of efficacy or that poses a risk of particular harm, but rather to limit care that affirms an adolescent's gender identity when it differs from their sex assigned at birth. But under rational-basis review, it is not enough for Defendants to simply assert an interest in preventing minors from accessing gender-transition procedures. The Act must "bear

a rational relationship to an *independent* and legitimate *legislative end.*" *Romer*, 517 U.S. at 633 (emphasis added). Preventing gender transition cannot be both the means and the ends of the constitutional inquiry.

Because the court held that heightened scrutiny applied, it did not consider whether the Act also failed under rational-basis review. But this Court can affirm on any ground "disclosed in the record." *Palavra* v. *I.N.S.*, 287 F.3d 690, 693 (8th Cir. 2002). And the record demonstrates that the Act fails under any level of scrutiny.

## II. The District Court Correctly Held That The Act Violates The Due Process Clause.

The Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington* v. *Glucksberg*, 521 U.S. 702, 720 (1997). "[P]erhaps the oldest of the[se] fundamental liberty interests recognized by" the Supreme Court is the right of parents to direct the care, custody, and control of their minor children. *Troxel* v. *Granville*, 530 U.S. 57, 65 (2000). Courts have afforded parents "plenary authority to seek [] care for their children, subject to a physician's independent examination and medical judgment." *Parham* v. *J.R.*, 442 U.S. 584, 604 (1979). Those decisions reflect the bedrock principle that "parents generally do act in

their child's best interests" and that the State must carry a heavy burden before it interferes with the parent-child relationship. *Hodgson* v. *State of Minn.*, 853 F.2d 1452, 1464 (8th Cir. 1988) (citing *Parham*, 442 U.S. at 604); *see also Troxel*, 530 U.S. at 68.

Far from "inventing a novel new constitutional right," Br. 44, the district court correctly determined that the Act infringed the parent Plaintiffs' fundamental right "to seek medical care for their children and, in conjunction with their adolescent child's consent and doctor's recommendation, make a judgment that medical care is necessary." App. 307; R. Doc. 283, at 76. This decision followed from the deeply rooted "concept[] of the family as a unit with broad parental authority over minor children." *Parham*, 442 U.S. at 602; *see also Wisconsin* v. *Yoder*, 406 U.S. 205, 232 (1972).

Defendants recognize that "[p]arents may have a (qualified) right to decide which lawful medical procedures their children receive," but argue that parents do not have a right to "expand the menu of legally available options" by obtaining "experimental and life-altering procedures" that the state has otherwise banned. Br. 46. That argument fails for two critical reasons. First, Defendants repeatedly recast the

fundamental right at issue as being the "right to subject a child to experimental medical procedures." Br. 44. In so doing, Defendants ignore the district court's extensive factual findings as to the safety and efficacy of this medical care and fail "to appreciate the extent of the liberty at stake." *Lawrence* v. *Texas*, 539 U.S. 558, 566-67 (2003) (overturning *Bowers* v. *Hardwick*, 478 U.S. 186 (1986), in part because the Court erred by narrowly construing the right at issue as the "right [for] homosexuals to engage in sodomy").

Second, even if it were true that parents cannot "overrid[e] general medical regulations," Br. 45, that is irrelevant because the Act does not prohibit gender transition procedures across the board. Instead, it prohibits care *only* for minors. This case does not involve a situation where the State is imposing a generally applicable rule to protect Arkansans; this is a textbook example of a state attempting to insert itself into the parent-child relationship. *See, e.g.*, *Troxel*, 530 U.S. at 66-69. Given Arkansas's decision to enact a regulation aimed at only the medical treatment of transgender minors, "the issue is not the what of medical decision-making—that is, any right to a particular treatment or a particular provider. Rather, the issue is the who—who gets to decide

whether a treatment otherwise available to an adult is right or wrong for a child?" *L.W.*, 83 F.4th at 510 (White, J., dissenting).

Through its ban on gender-affirming medical care for minors, Arkansas "inject[ed] itself into the private realm of the family" and undermined "the ability of [a fit] parent to make the best decisions concerning the rearing of that parent's children." *Troxel*, 530 U.S. at 68-69. That sort of intrusion is permitted only when it is "narrowly tailored to serve a compelling state interest." *Washington*, 521 U.S. at 719-21; *see also Troxel*, 530 U.S. at 80 (Thomas, J., concurring). For the reasons stated above, Defendants cannot meet that demanding standard. *Supra*, at Section I.C.

## III. The District Court Correctly Held That The Act Violates The First Amendment.

The First Amendment prohibits states from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content." *Reed* v. *Town of Gilbert*, 576 U.S. 155, 163 (2015) (internal quotations omitted). Content-based regulations of speech are "presumptively unconstitutional" and are subject to strict scrutiny. *Id.* Regulations that discriminate on the basis of viewpoint are a "more

blatant" and "egregious form of content discrimination." *Id.* at 168 (internal quotations omitted).

The Act directly prohibits speech based on content and viewpoint. *See* ARK. CODE ANN. § 20-9-1504(a) (the "Referral Prohibition"); *see also* App. 309; R. Doc. 283, at 78. As the district court explained, the Act "restricts healthcare professionals from making referrals" for only "gender transition procedures," rather than prohibiting speech that reflects other views about the proper course of treatment for a patient. *Id.* Put differently, the Act "target[s] speech based on its communicative content," *Reed*, 576 U.S. at 163, and "exacts a penalty on the basis of the content of speech," *Telescope Media Grp.* v. *Lucero*, 936 F.3d 740, 753 (8th Cir. 2019) (internal quotations omitted); *see Gerlich* v. *Leath*, 861 F.3d 697, 705 (8th Cir. 2017) (quoting *Rosenberger* v. *Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)) (applying strict scrutiny to a speech regulation based on "the specific motivating ideology or the opinion or perspective of the speaker").

Defendants try to avoid strict scrutiny by claiming that the Act's Referral Prohibition regulates conduct, not speech. Br. 48-50. But the First Amendment protects the "dissemination of information," *Sorrell* v.

*IMS Health Inc.*, 564 U.S. 552, 570 (2011), and applies even when speech is intertwined with conduct. *Spence* v. *Washington*, 418 U.S. 405, 409-10 (1974). A referral is the act of providing information to assist a patient in seeing another health care provider and is, therefore, speech. "There is a real difference between laws directed at conduct sweeping up incidental speech on the one hand and laws that directly regulate speech on the other." *Otto* v. *City of Boca Raton*, 981 F.3d 854, 865 (11th Cir. 2020). The Act clearly falls into the latter category, as it "is directed at certain content and is aimed at particular speakers." *Sorrell*, 564 U.S. at 567.

Defendants resist that conclusion by arguing that referrals are no different from the act of writing a prescription or obtaining informed consent, both of which can be regulated. Br. 49-50. But that argument again ignores precedent. In *National Institute of Family & Life Advocates* v. *Becerra*, the Court held that a law requiring doctors to notify patients of particular state-sponsored services violated the First Amendment. 138 S. Ct. 2361, 2372 (2018). If a law requiring a doctor to notify a patient of a particular procedure violates the First Amendment, then surely a law prohibiting a doctor from referring a patient for a

specific procedure does as well.  *See, e.g., Conant* v. *Walters*, 309 F.3d 629, 639 (9th Cir. 2002) (striking down regulation that prohibited doctors from informing patients of the benefits of medical marijuana).  And despite Defendants' repeated reference to doctors engaging in professional conduct, it is well established that "[s]peech is not unprotected merely because it is uttered by 'professionals.'"  App. 309; R. Doc. 283, at 78 (quoting *Becerra*, 138 S. Ct. at 2371-72; *NAACP* v. *Button*, 371 U.S. 415, 439 (1963)).

To defend its view of the law, Defendants also argue that it was the Arkansas Legislature's intent to regulate medical procedures rather than speech.  Br. 50.  That is a highly questionable way to read a statute that singles out referrals for special punishment.  But even if that intent were plausible, this Court should not elevate vague assertions of legislative purpose over the text of the law.  The Supreme Court has consistently rejected efforts to evade the First Amendment by arguing that a regulation of speech was really aimed at "particular … activity."  *Barr* v. *Am. Ass'n of Pol. Consultants*, 140 S. Ct. 2335, 2347 (2020) (holding that the First Amendment applied to a law regulating robocalls).  This Court should do the same here.

Perhaps recognizing the constitutional defect in the law as written, Defendants now claim that the Referral Prohibition applies only when a referral is made to another Arkansas practitioner. Br. 47. That is not the interpretation of the Act that Defendants previously advanced. *See* Reply Br. of Defs.-Appellants at 24, *Brandt*, 47 F.4th (No. 21-2975) (explaining that the Act prohibits "Arkansas practitioners from sending children out-of-state for gender-transition procedures"). And it cannot be squared with the law's text, which outlaws "*[a]ny referral* for or provision of gender transition procedures," without limitation. ARK. CODE ANN. § 20-9-1504(a) (emphasis added). There is no ambiguity in the Act's categorical prohibition on referrals.

As the district court emphasized, Arkansas's interest in protecting minors "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brandt*, 551 F. Supp. 3d at 894 (E.D. Ark. 2021) (quoting *Brown* v. *Ent. Merch. Ass'n*, 564 U.S. 786, 794 (2011)). That is what Arkansas did here, and it cannot avoid the rigors of strict scrutiny by claiming that a regulation squarely aimed at what a doctor *says* is somehow outside the bounds of the freedom of speech.

**IV.    The District Court Did Not Abuse Its Discretion By Enjoining The Act.**

Because Plaintiffs prevailed on the merits, they were entitled to a permanent injunction so long as two other factors were satisfied—that the Act would cause irreparable harm to Plaintiffs and that an injunction would serve the public interest.  *See Nken* v. *Holder*, 556 U.S. 418, 434-35 (2009).  As the district court recognized, both of those factors cut decisively in Plaintiffs' favor.

The court found that "[t]estimony from the [m]inor Plaintiffs, their parents, Dr. Stambough and the experts proved that [Plaintiffs] would suffer immediate and irreparable harm … if [the Act] were to go into effect."  App. 310; R. Doc. 283, at 79.  The court specifically found that "[d]enying gender-affirming medical care to adolescents with gender dysphoria until they reach age 18 means their bodies would go through irreversible pubertal changes inconsistent with their gender identity"; that "[d]elaying gender-affirming medical care when indicated puts patients at risk of worsening anxiety, depression, hospitalization, and suicidality"; and that many adolescents throughout Arkansas "experience[d] anxiety and distress" when they were unable to receive gender-affirming medical care.  App. 280; R. Doc. 283, at 49.  The court

also found that the parent Plaintiffs would "have to pick up and leave" if their children could no longer get the care they need in Arkansas. App. 261; R. Doc. 283, at 30.

Second, the district court rightly concluded that enjoining the Act is in the public interest, as a state has no interest in enforcing an unconstitutional law. *See Rodgers* v. *Bryant*, 942 F.3d 451, 457 (8th Cir. 2019).

After holding that an injunction was appropriate, the district court properly issued statewide relief. "The scope of injunctive relief is dictated by the extent of the violation established." *Rodgers*, 942 F.3d at 458 (quoting *Califano* v. *Yamasaki*, 442 U.S. 682, 702 (1979)). Accordingly, "injunctive relief should extend statewide [when] the violation established … impacts the entire state of Arkansas." *Id.*[20] That requirement is met here, as the Act bars every adolescent with gender dysphoria in Arkansas from obtaining the proscribed care and bars every

---

[20] Facial relief is warranted because there is "no set of circumstances … under which the Act would be valid." *United States* v. *Salerno*, 481 U.S. 739, 745 (1987). The district court correctly concluded that banning gender-affirming medical care for adolescents is not substantially related to an important governmental interest. There are no factual circumstances in which the law would be appropriately tailored to advance an important governmental interest.

provider in Arkansas from offering that care or referring patients to other

providers.

# CONCLUSION

This Court should affirm the judgment below.

Dated: December 6, 2023                     Respectfully submitted,

/s/ *Leslie Cooper*
_____

Leslie Cooper                          Beth Echols, Ark. Bar No. 2002203
Chase Strangio                         Christopher Travis, Ark. Bar
James Esseks                           No. 97093
American Civil Liberties Union         Drake Mann, Ark. Bar No. 87108
Foundation                             Gill Ragon Owen, P.A.
125 Broad St.                          425 W. Capitol Avenue, Suite 3800
New York, NY 10004                     Little Rock, AR 72201
Telephone: (917) 345-1742              Telephone: (501) 376-3800
lcooper@aclu.org                       echols@gill-law.com
cstrangio@aclu.org                     travis@gill-law.com
jesseks@aclu.org                       mann@gill-law.com
lnowlin-sohl@aclu.org                  *On behalf of the Arkansas Civil*
*Attorneys for the Plaintiffs*         *Liberties Union Foundation, Inc.*
                                       *Attorneys for the Plaintiffs*

Garrard R. Beeney*
Lauren M. Goldsmith*                   Sarah Everett, Ark.
Alexander S. Holland*                  Bar No. 2017249
Maxime D. Matthew*                     Arkansas Civil Liberties Union
Sullivan & Cromwell LLP                Foundation, Inc.
125 Broad Street                       904 W. 2nd Street
New York, NY 10004                     Little Rock, AR 72201
Telephone: (212) 558-4000              Telephone: (501) 374-2842
beeneyg@sullcrom.com                   sarah@acluarkansas.org
goldsmithl@sullcrom.com                *Attorney for the Plaintiffs*
hollanda@sullcrom.com
matthewm@sullcrom.com                  Laura Kabler Oswell*
*Attorneys for the Plaintiffs*         Aviv S. Halpern*

-68-

Daniel J. Richardson*
Sullivan & Cromwell LLP
1700 New York Avenue, N.W.
Suite 700
Washington, D.C.  20006
Telephone: 202-956-7500
richardsond@sullcrom.com
*Attorney for the Plaintiffs*

Sullivan & Cromwell LLP
550 Hamilton Avenue
Palo Alto, CA  94301
Telephone: (650) 461-5600
oswelll@sullcrom.com
halperna@sullcrom.com
*Attorneys for the Plaintiffs*

*Admitted pro hac vice

# CERTIFICATE OF COMPLIANCE

I hereby certify that the attached Brief complies with Fed. R. App. P. 32(a)(7)(B) because it contains 12, 974 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that the attached Brief complies with Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in proportionally spaced typeface with 14-point CenturyExpd BT and uses the word-processing system Microsoft Word.

Additionally, pursuant to Eighth Circuit Local Rule 28A(h), I further certify that this PDF file was scanned for viruses, and no viruses were found on the file.

/s/ *Leslie Cooper*
LESLIE COOPER

DECEMBER 6, 2023

# CERTIFICATE OF SERVICE

I hereby certify that, on December 6, 2023, a copy of the attached Brief was filed electronically through the CM/ECF system with the Clerk of this Court. The participants in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ *Leslie Cooper*
LESLIE COOPER

DECEMBER 6, 2023