No. 23-2681

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

DYLAN BRANDT, et al.,
Plaintiffs-Appellees,

v.

TIM GRIFFIN,
in his official capacity as the Arkansas Attorney General, et al.,
Defendants-Appellants.

On Appeal from the United States District Court for the
Eastern District of Arkansas
No. 4:21-CV-00450 JM (Hon. James M. Moody, Jr.)

## Defendants-Appellants' Reply Brief

TIM GRIFFIN
  Arkansas Attorney General

NICHOLAS J. BRONNI
  Arkansas Solicitor General

DYLAN L. JACOBS
  Deputy Solicitor General

MICHAEL A. CANTRELL
  Assistant Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
dylan.jacobs@arkansasag.gov

# TABLE OF CONTENTS

Table of Contents ........................................................................................ ii

Table of Authorities ................................................................................... iv

Argument ....................................................................................................... 1

I.   The SAFE Act does not violate the Equal Protection Clause. ........................ 1

   A.  This Court should join the Sixth and Eleventh Circuits in holding that rational-basis review applies to regulations of gender-transition procedures. ................................................... 2

      1.  The SAFE Act does not discriminate based on sex. ........................... 2

      2.  Transgender identification is not a suspect classification. ................................................................... 7

      3.  The SAFE Act does not discriminate based on transgender identification—even if that were a suspect classification. ................................................................... 11

   B.  Even if heightened scrutiny applied, the SAFE Act is constitutional. ........................................................................ 12

      1.  Sex- and status-based classifications based on biological reality are permissible. ........................................................ 13

      2.  The Safe Act permissibly classifies based on biological reality. ................................................................................. 16

      3.  Intermediate scrutiny does not give courts *carte blanche* to substitute their own policy judgments for a state legislature's. ........................................................................ 17

      4.  The SAFE Act survives rational basis. ............................................ 20

II.  There is no fundamental right to subject a child to experimental medical procedures. ........................................................................ 21

III.  The Act's regulation of medical referrals targets professional conduct, not speech. ......................................................................... 22

Conclusion .................................................................................................. 25

Certificate of Compliance ......................................................................... 26

Appellate Case: 23-2681    Page: 2    Date Filed: 12/26/2023 Entry ID: 5347769

Certificate of Service ..............................................................................27

Appellate Case: 23-2681     Page: 3     Date Filed: 12/26/2023 Entry ID: 5347769

# TABLE OF AUTHORITIES

**Cases**

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*,
  495 F.3d 695 (D.C. Cir. 2007) (en banc)............................................................18

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*,
  57 F.4th 791 (11th Cir. 2022) ............................................................. 10, 14, 18

*Bostock v. Clayton Cnty.*,
  140 S. Ct. 1731 (2020)....................................................................................... 6-7

*Brandt by and through Brandt*,
  2022 WL 16957734 (8th Cir. Nov. 16, 2022) ....................................................6

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985)...............................................................................................7

*Craig v. Boren*,
  429 U.S. 190 (1976)..............................................................................................14

*Dobbs v. Jackson Women's Health Org.*,
  142 S. Ct. 2228 (2022)................................................................... 5, 12, 24

*E.E.O.C. v. Fed. Lab. Rels. Auth.*,
  476 U.S. 19 (1986) (per curiam)........................................................................25

*Eknes-Tucker v. Governor of Ala.*,
  80 F.4th 1205 (11th Cir. 2023) .............................................................. *passim*

*Frontiero v. Richardson*,
  411 U.S. 677 (1973)................................................................................................8

*Geduldig v. Aiello*,
  417 U.S. 484 (1974)................................................................................................5

*Gonzales v. Carhart*,
  550 U.S. 124 (2007)..............................................................................................18

*Kirchberg v. Feenstra*,
  450 U.S. 455 (1981)..............................................................................................14

*L. W. by & through Williams v. Skrmetti*,
  83 F.4th 460 (6th Cir. 2023) .................................................................. *passim*

*Lyng v. Castillo*,
  477 U.S. 635 (1986)................................................................................................7

iv

*Miss. Univ. for Women v. Hogan*,
   458 U.S. 718 (1982)............................................................................13

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   138 S. Ct. 2361 (2018).......................................................................24

*Nguyen v. INS*,
   533 U.S. 53 (2001)................................................................. 14-15, 18

*Ohralik v. Ohio State Bar Ass'n*,
   436 U.S. 447 (1978).........................................................................23

*Planned Parenthood of Southeastern Pa. v. Casey*,
   505 U.S. 833 (1992).........................................................................24

*Reed v. Reed*,
   404 U.S. 71 (1971).......................................................................3, 14

*Sessions v. Morales-Santana*,
   582 U.S. 47 (2017)..................................................................... 13, 15

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011).........................................................................23

*Stanton v. Stanton*,
   421 U.S. 7 (1975).............................................................................14

*United States v. Virginia*,
   518 U.S. 515 (1996)................................................................... 14-15

*Washington v. Davis*,
   426 U.S. 229 (1976)...........................................................................6

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
   576 U.S. 1 (2015).............................................................................24

**Statutes**

Ark. Code Ann. 20-9-1501(6)................................................................. 3-4

Ark. Code Ann. 20-9-1502(b)...................................................................23

Ark. Code Ann. 20-9-1502(c).....................................................................3

**Other Authorities**

*Standards of Care for the Health of Transgender and Gender Diverse People,
Version 8*, 23 Int'l J. of Transgender Health (2022)............................................9

v

*The Cross-Dressing Case for Bathroom Equality*,
    34 SEATTLE U. L. REV. 133 (2010)...............................................................10

Appellate Case: 23-2681    Page: 6    Date Filed: 12/26/2023 Entry ID: 5347769

**ARGUMENT**

Nearly half the States in the Nation have taken steps to restrict pediatric gender-transition procedures—an experimental pathway of puberty blockers, hormones, and surgeries that predictably result in sterilization. The district court reviewed Arkansas's law prohibiting those procedures under heightened scrutiny, credited the views of financially interested practitioners who say that their field doesn't need regulation, and permanently enjoined the statute. That would effectively and constitutionally exempt these experimental, life-altering procedures from any State regulation. And Plaintiffs' brief doesn't deny that; indeed, it makes all too clear that's exactly what they want.

This Court should reject that approach. Regulations of gender-transition procedures are not subject to heightened scrutiny because they treat both sexes equally and do not classify based on any other protected characteristic. This Court should join the Sixth and Eleventh Circuits in holding that pediatric gender-transition procedures are subject to the same state regulatory power as other medical practices and need only survive rational-basis review.

## I. The SAFE Act does not violate the Equal Protection Clause.

The district court erroneously held that the SAFE Act impermissibly discriminates based on sex and transgender identification. The SAFE Act does neither, and this Court should reverse.

1

A.  **This Court should join the Sixth and Eleventh Circuits in holding that rational-basis review applies to regulations of gender-transition procedures.**

The SAFE Act does not discriminate based on any protected characteristic. It does not classify based on sex, but rather treats both sexes equally. Under the Supreme Court's decision in *Dobbs*, regulations of sex-specific procedures like those at issue in this case do not receive heightened scrutiny. Nor is transgender status a suspect class under the Equal Protection Clause. But even if it were, the Act does not discriminate on that basis either.

Ultimately, this Court should follow the Sixth and Eleventh Circuits' decisions and hold that rational basis is the appropriate standard of review of gender-transition procedures. And applying that standard, regulations of experimental medical procedures that lead to child sterilization easily pass muster.

1.  The SAFE Act does not discriminate based on sex.

Regulations of gender-transition procedures for minors do not discriminate based on sex. As the Sixth and Eleventh Circuits have correctly held, such regulations classify based on age and procedure. And Plaintiffs don't dispute that adopting their position would mean that *every* regulation of pediatric gender-transition procedures would be subject to heightened scrutiny—forcing courts to decide the same kinds of benefits and burdens inquiry that the Court just rejected in *Dobbs*. This Court should join the Sixth and Eleventh Circuits and reject that approach.

2

a. The SAFE Act does not discriminate based on sex; it treats the sexes equally. Puberty blockers, testosterone, estrogen, and various surgeries are prohibited for minors of both sexes when used for gender-transition purposes. *See* Ark. Code Ann. 20-9-1501(6). They are allowed—for boys and girls—for other purposes. And both must wait until adulthood to access gender-transition procedures. Ark. Code Ann. 20-9-1502(c). Thus, the Act does not give a "preference to members of either sex over members of the other" and does not trigger heightened scrutiny. *Reed v. Reed*, 404 U.S. 71, 76 (1971); *see also Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1128 (11th Cir. 2023) (holding Alabama's similar law "establishes a rule that applies equally to both sexes"); *L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 480 (6th Cir. 2023) (same).

Plaintiffs disagree with that commonsense conclusion and argue that the Act subjects both sexes to sex-based classifications "in an equally discriminatory fashion." Pls.' Br. 31 (quotations omitted). But that just assumes the conclusion without determining whether the Act discriminates in the first place. And the Act's actual language demonstrates otherwise. Indeed, whether a procedure is prohibited doesn't depend on sex but two other things: (1) whether the procedure will modify a child's primary or secondary sex characteristics, whether by "alter[ing]" or "removing" existing characteristics, or "[i]nstill[ing] or creat[ing] different ones; and

3

(2) whether it is being "performed for the purpose of assisting of a gender transition." Ark. Code Ann. 20-9-1501(6). Thus, under that standard, giving a male testosterone, *see* Pls.' Br. 30, is not a gender-transition procedure because testosterone won't alter his expected biological development, and males cannot use testosterone to transition. The same is true of females taking estrogen. So far from discriminating based on sex, the Act merely reflects the biological reality and prohibits certain types of procedures.

Plaintiffs, following the faulty logic of the *Brandt* panel opinion, argue that the distinction between procedures matters only as to the State's justification for the law, not whether it is discriminatory. But as both the Sixth and Eleventh Circuits explained, "[u]sing testosterone or estrogen to treat gender dysphoria (to transition from one sex to another) is a different *procedure* from using testosterone or estrogen to treat" other conditions because "the underlying condition and overarching goals differ." *L. W.*, 83 F.4th at 481 (emphasis added); *see also Eknes-Tucker*, 80 F.4th at 1228 ("The cross-sex hormone treatments for gender dysphoria are different for males and for females because of biological differences between males and females—females are given testosterone and males are given estrogen."). Because males and females seeking testosterone are not seeking the same *procedure*, they are not similarly situated for equal-protection purposes. Moreover, because each procedure is one "that only one sex can undergo," regulating each procedure

4

"does not trigger heightened constitutional scrutiny." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245-46 (2022). That's why both the Sixth and Eleventh Circuits have held that *Dobbs* forecloses Plaintiffs' argument that heightened scrutiny applies to the procedures at issue here. *L. W.*, 83 F.4th at 481; *see also Eknes-Tucker*, 80 F.4th at 1228.

Plaintiffs attempt to dispute this straightforward application of *Dobbs* too. First, they claim that *Dobbs*'s logic somehow doesn't apply because the Act bans multiple gender-transition procedures rather than "a particular treatment." Pls.' Br. 33 (emphasis omitted). They don't explain why the number of procedures banned makes any difference, but in any event, that framing ignores the fact that gender-transition procedures fall into two categories: one set of procedures that only males can undergo, and another set of procedures that only females can undergo. The number of sex-specific procedures the Act prohibits doesn't change how *Dobbs* applies.

Second, they claim *Dobbs*'s holding on the equal-protection issue wasn't really a holding, but a mere reiteration of dicta. Pls.' Br. 33. But far from reiterating dicta, *Dobbs* reaffirmed *Geduldig v. Aiello* when it held that claims that abortion regulations were sex-selective were "squarely foreclosed by [] precedent[]." 142 S. Ct. at 2246 (citing 417 U.S. 484, 496 n.20 (1974)).

5

b. Plaintiffs also claim that heightened scrutiny applies because the SAFE Act variously discriminates based on either gender incongruence or gender non-conformity. In essence, Plaintiffs ask the Court to import the sex-stereotyping framework from *Bostock v. Clayton County*'s interpretation of Title VII into its equal-protection analysis. 140 S. Ct. 1731 (2020).

That argument is equally misguided. *Bostock* interprets the meaning of "sex" in the text of Title VII, but that "text is not similar in any way" to the Equal Protection Clause. *Brandt by and through Brandt*, 2022 WL 16957734, at *1 n.1 (8th Cir. Nov. 16, 2022) (Stras, J., joined by Gruender, Erickson, Grasz, & Kobes, J.J., dissenting from the denial of rehearing en banc). Indeed, *Bostock* itself disclaims the notion that its reasoning controls "other federal or state laws that prohibit sex discrimination." 140 S. Ct. at 1753. And for good reason: The Equal Protection Clause "predates Title VII by nearly a century, so there is reason to be skeptical that [their] protections" are coextensive. *Brandt*, 2022 WL 16957734, at *1 n.1 (Stras, J., dissenting); *accord Washington v. Davis*, 426 U.S. 229, 239 (1976) (declining to hold that Title VII's race discrimination standards are "identical" to the Fourteenth Amendment's).

Yet even if *Bostock*'s approach was applicable in the equal-protection context, the SAFE Act would pass because it does not rely on sex stereotypes. *Bos-*

6

*tock*, 140 S. Ct. at 1749 (focusing on stereotypes, not biology). It doesn't, for instance, restrict the availability of gender-transition procedures based upon on how a child dresses or acts. Nor does it restrict gender-transition procedures based on sex or conformity with any sex-stereotypes. Rather, the Act targets the predictable effects of an experimental procedure; where a procedure will alter a child's body and possibly lead to sterilization, it is prohibited. Thus, even under *Bostock*'s Title VII framework, the Act would not "trigger" heightened scrutiny. *Id.* at 1739.

This Court should overrule the *Brandt* panel decision and hold that regulations of gender-transition procedures do not classify based on sex.

> 2. Transgender identification is not a suspect classification.

Individuals who identify as transgender are not part of a suspect class under the Equal Protection Clause. Courts analyze four factors to determine whether a group qualifies as a suspect class: (1) immutable characteristics that define (2) a discrete group, (3) historical discrimination, and (4) political powerlessness. *See Lyng v. Castillo*, 477 U.S. 635, 638 (1986). As Plaintiffs tacitly admit, the district court held otherwise without any evidence even being presented at trial. The Supreme Court has not been so quick to recognize new suspect or quasi-suspect classes. *See, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442-46 (1985). Neither should this Court.

7

*Immutable characteristic*. Transgender identification is not "an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). Plaintiffs don't dispute that the district court found that gender identity can change over time. Pls.' Br. 39. Rather, they point to findings that it can't be "voluntarily change[d]," or changed extrinsically through treatment. *Id.* But that doesn't make transgender identification immutable. *See L. W.*, 83 F.4th at 487 (detransitioner experiences demonstrates that transgender identification is not immutable).

Instead, Plaintiffs retreat to the position that even a changeable characteristic "is sufficient" if it is "obvious" and "distinguishing" enough. Pls.' Br. 39-40. But "gender identity" is neither of those things. As the district court found, "gender identity" is a "deeply felt internal sense." R. Doc. 283, at 5, App. 236. It does not depend on an outward presentation or conformity with sex stereotypes, and the only way one person can know another's "internal sense" of anything is if a person chooses to disclose it. R. Doc. 283, at 7, App. 238 (noting diagnostic criteria are based on an individual's self-report of their "experienced or expressed gender"). Thus, Plaintiffs' argument falls flat.

*Discrete group.* The class of transgender-identifying individuals is also far too broad and amorphous to qualify as a discrete group. The district court defined transgender people as anyone whose self-expressed gender identity does not align

8

with their sex.  App. 236, R. Doc. 283, at 5.  This includes "a huge variety of gender identities and expressions."  *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S15 (2022).  That means, even under the district court's theory of the case, what constitutes transgender identity lacks a clear definition and individuals identifying as such aren't a discrete group.

Plaintiffs downplay this problem by arguing that it "is irrelevant" that gender incongruence can be described in "many terms."  Pls.' Br. 40 n.15.  But the issue is not limited to the sheer number of varying transgender identifications.  It is further complicated by the fact that, Plaintiffs claim, each individual can only be classified based on their own internal sense of self.  That contrasts with typical suspect classifications and even those like alienage and illegitimacy that at least have objective criteria for inclusion.  *See also L. W.*, 83 F.4th at 487 (relying on the above-quoted WPATH guidelines to conclude that transgender identification is not a discrete group).

*Historical discrimination.*  The trial record is devoid of any evidence that transgender-identified individuals have been subject to discrimination.  Plaintiffs don't dispute this, but instead attempt to shore up the district court's ruling with non-record material.  They claim first that "[e]xpressions of transgender identity were criminalized for much of the nineteenth and twentieth centuries."  Pls.' Br. 40

9

(citing *The Cross-Dressing Case for Bathroom Equality*, 34 SEATTLE U. L. REV. 133, 152-53 (2010)). But the article they cite doesn't support that claim. Rather, that article simply discusses laws mandating individuals to dress consistent with sex stereotypes. *See, e.g., id.* at 153 (discussing laws responding to "demands for more comfortable and less restrictive women's clothing"). But one does not have to be transgender to dress differently or decline to follow sex stereotypes.

Plaintiffs next rely on more recent enactments to claim a history of discrimination. Pls. Br. 41 n.14. But the bathroom and sports laws that they point to simply define sex based on biology, and that's not discrimination. Indeed, as the Eleventh Circuit has held, this country's "long tradition in this country of separating sexes in" such circumstances is not discriminatory. *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 801 (11th Cir. 2022).

*Political powerlessness.* Plaintiffs also attempt to downplay the undisputed political power of transgender-identifying individuals. Again, Plaintiffs presented no evidence on this point below, and on appeal—far from lacking political support—they are supported by the United States, numerous, politically powerful health-policy advocacy organizations, influential clinician trade groups, and other well-heeled special interest groups. Moreover, as in the last appeal—and as in every other case challenging laws like the SAFE Act—"the only large law firms to

10

make an appearance in the case all entered the controversy in support of the plaintiffs." *L. W.*, 83 F.4th at 487. So Plaintiffs hardly lack political power.

Ultimately, as the Supreme Court has warned, courts should be reluctant to create new suspect classifications. And here—where Plaintiffs opted not to present evidence to justify recognizing a new suspect class and the filings in this court demonstrate that transgender-identifying individuals are anything but politically powerless—there is no justification for creating one. The district court's conclusion to the contrary should be reversed.

3. The SAFE Act does not discriminate based on transgender identification—even if that were a suspect classification.

As explained above, the Act classifies based on age and procedure, not on sex or transgender identification. The district court concluded otherwise because, in its view, the Act "prohibits medical care that only transgender people choose to undergo*, i.e.*, medical or surgical procedures related to gender transition." App. 296, R. Doc. 283, at 65. Plaintiffs echo that claim. But it is wrong for the same reason as the district court's sex-discrimination ruling.

Plaintiffs claim that, by regulating procedures that are sought by those undergoing a gender transition, the law "draws a line based on what it means to be transgender." Pls.' Br. 38. That argument ignores the experience of detransitioners, *i.e.*, individuals who received various gender-transition procedures and nevertheless do not identify as transgender. *See* Tr. Vol. VII 1147, 1150-52, 1192,

11

1196-97. And it ignores the fact that an individual can identify as transgender without ever undergoing any procedures.

But even if that were not the case, as other circuits have held, "the regulation of a course of treatment that, by the nature of things, only transgender individuals would want to undergo would not trigger heightened scrutiny." *Eknes-Tucker*, 80 F.4th at 1230; *accord Dobbs*, 142 S. Ct. at 2245-46. If a regulation necessarily affects only transgender-identifying individuals, then it does not classify on that basis, just as abortion regulations do not classify based on sex. *Id.* And this court should join the Sixth and Eleventh Circuits and reject the district court's misapplication of equal-protection precedent.

B.    Even if heightened scrutiny applied, the SAFE Act is constitutional.

Even if regulations of pediatric gender-transition procedures were subject to heightened scrutiny, they pass muster. The procedures are based on the patient's biological sex to produce a sex-specific goal. A State could not regulate gender-transition procedures at all without at least some reference to sex. States have plenary authority to regulate the practice of medicine, including prohibiting procedures they deem experimental or unsafe. Thus, any sex-based classification drawn by the Act is not only substantially related to, but entirely necessary to achieve, the State's compelling interest in restricting these procedures. The Act thus survives intermediate scrutiny.

12

The district court's contrary approach required Arkansas to prove to that court's satisfaction that its regulation—or any regulation of gender-transition procedures performed on minors—is good policy. *See* App. 302, R. Doc. 283, at 71 ("The State has failed to meet their burden to show that the risks of [gender-transition procedures] banned by Act 626 substantially outweigh the benefits."). Coupled with the district court's reliance on financially interested practitioners testifying against laws that regulate how they make money, that approach would effectively prohibit States from regulating pediatric gender transitions. But that is not the law.

> 1. Sex- and status-based classifications based on biological reality are permissible.

To prevail under intermediate scrutiny, the State "must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Sessions v. Morales-Santana*, 582 U.S. 47, 59 (2017) (cleaned up). The State's burden is to show a "direct, substantial relationship between" its "objective and means." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982). "Intermediate scrutiny . . . does not require us to ask whether a law is good or bad policy, but whether a government has a good reason for using a sex-based classification in a law." *Eknes-Tucker*, 80 F.4th at 1234 (Brasher, J., concurring).

13

Intermediate scrutiny exists to ensure that States do not legislate based on "overbroad generalizations about the different talents, capacities, or preferences of males or females"—generalizations that have no basis in biology. *United States v. Virginia*, 518 U.S. 515, 533 (1996). Indeed, "the biological differences between males and females are the reasons intermediate"—rather than strict—scrutiny "applies in sex-discrimination cases in the first place." *Adams*, 57 F.4th at 809; *accord id.* at 803 n.6 (describing biological differences as "the driving force behind the Supreme Court's sex-discrimination jurisprudence"). Thus, using that framework, the Supreme Court has struck down policies grounded on outmoded sex stereotypes *See, e.g.*, *Virginia*, 518 U.S. at 541 (single-sex military academy); *Kirchberg v. Feenstra*, 450 U.S. 455, 459-60 (1981) (husband solely controlled marital property); *Reed v. Reed*, 404 U.S. 71, 74 (1971) (mandatory preference for males as executor of an estate); *Craig v. Boren*, 429 U.S. 190, 192 (1976) (earlier drinking age for females); *Stanton v. Stanton*, 421 U.S. 7, 14 (1975) (child support requirement terminated earlier for female children).

But it has consistently upheld distinctions based on biological reality. Take *Nguyen v. INS*, which upheld a citizenship statute requiring children born out-of-wedlock and abroad to U.S. citizen fathers to meet a different standard of proof than children with citizen mothers. 533 U.S. 53, 58 (2001). That distinction was permissible because "[f]athers and mothers are not similarly situated with regard to

14

the proof of biological parenthood." *Id.* at 63. But a seemingly similar law in *Sessions v. Morales-Santana*, which applied different standards for unwed fathers and unwed mothers passing on citizenship to their child, was struck down because it was instead rooted in the "stereotype" that "unwed citizen fathers . . . would care little about, and have scant contact with, their nonmarital children." 582 U.S. 47, 62 (2017). These cases were not, as Plaintiffs argue, both based on biological distinctions.

Nor was *VMI*. There, the defendants argued that "single-sex education" was an important objective for which exclusion was necessary, but the Court held that this put the cart before the horse. 518 U.S. at 545. Given women's participation in more and more fields that were historically limited to men, including military service, VMI's continued exclusion ultimately rested on nothing more than outmoded stereotypes and generalizations about "the way women are." *Id.* at 550. Biology, the Court concluded, was an excuse rather than the reason for disqualification.

Defendants do not, as Plaintiffs claim, argue that "any sex classification connected to biology automatically survives heightened scrutiny." Pls.' Br. 52. Rather, where a State has a legitimate policy goal, and drawing a sex-based distinction is necessary to further that goal, the law survives. And that's the case here.

15

2. The Safe Act permissibly classifies based on biological reality.

That is exactly the case with regulation of pediatric gender-transition procedures. Arkansas has a compelling interest in regulating medicine to protect its citizens, especially children. App. 306, R. Doc. 283, at 75. Gender-transition procedures are not somehow exempted from the State's ordinary power to regulate clinicians. *See L. W.*, 83 F.4th at 474 (noting that "State[s] [can] prohibit individuals from receiving [procedures that] they want[] and their physicians wish[] to provide"). So if drawing a sex-based distinction is necessary in order to regulate these procedures, a State can do so and pass heightened scrutiny.

For the reasons explained above, the SAFE Act doesn't classify based on sex for equal-protection purposes. But as both the Sixth and Eleventh Circuits explained, at least some level of reference to sex is necessary to regulate gender-transition procedures. *See L. W.*, 83 F.4th at 482 ("The Acts mention the word 'sex,' true. But how could they not? The point of the hormones is to help a minor transition from one gender to another, and laws banning, permitting, or otherwise regulating them all face the same linguistic destiny of describing the biology of the procedures."); *Eknes-Tucker*, 80 F.4th at 1228 ("[I]t is difficult to imagine how a state might regulate the use of puberty blockers and cross-sex hormones for the relevant purposes in specific terms without referencing sex in some way."). The same is true for transgender identification. When a legislature regulates a procedure that,

16

as the district court found, is only sought by transgender-identifying individuals, the law unsurprisingly might draw some distinction on that basis. Otherwise, it would be impossible to regulate.

But while Plaintiffs don't say it: that's their goal. They want to prevent States from regulating experimental procedures so that financially-motivated practitioners are free to do business however they'd like. Indeed, that's why Plaintiffs tellingly didn't present any evidence that States could regulate such procedures under the framework they propose. That isn't the law, and this Court should reject that approach.

Instead, consistent with equal protection doctrine, to the extent the SAFE Act classifies based on sex or status, it does so only in recognition of biological reality and only as necessary to facilitate Arkansas's goal of regulating risky, life-altering pediatric procedures. That satisfies intermediate scrutiny.

### 3. Intermediate scrutiny does not give courts *carte blanche* to substitute their own policy judgments for a state legislature's.

The district court's version of intermediate scrutiny bears no resemblance to how the Supreme Court has treated regulations of medicine or biology-based sex classifications. Instead, it held that the State has a "heavy burden" to justify its regulation of gender-transition procedures, a burden that stands alone among regulations. App. 297, R. Doc. 283, at 66. In fact, its approach looked more like the undue-burden standard eschewed by the Court in *Dobbs* than heightened scrutiny.

17

*See, e.g.*, App. 302, R. Doc. 283, at 71 ("The State failed to meet their burden to show that the risks . . . substantially outweigh the benefits.").

Such a standard is ill-suited to review of medical regulations, where there is often competing evidence of risks and benefits. The Supreme Court "has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007); *see also Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 713 (D.C. Cir. 2007) (en banc) ("Our Nation's history and traditions have consistently demonstrated that the democratic branches are better suited to decide the proper balance between the uncertain risks and benefits of medical technology, and are entitled to deference in doing so."). Indeed, the type of over- and under-inclusiveness approach Plaintiffs advocate for is inappropriate in the context of heightened scrutiny, where "[n]one of [the Supreme Court's] gender-based classification equal protection cases have required that the statute under consideration must be capable of achieving its ultimate objective in every instance." *Nguyen*, 533 U.S. at 70; *see also Adams*, 57 F.4th at 801 ("[T]he Equal Protection Clause does not demand a perfect fit between means and ends when it comes to sex.").

Plaintiffs, however, complain that applying the Supreme Court's usual frameworks for biology-based and medical regulations is too deferential. But, at

18

most, that argument merely underscores that courts aren't suited to make the sorts of cost-benefit determinations that are part-and-parcel of legislating. Indeed, the only instance in which the Supreme Court attempted to take on the task of weighing the risks, benefits, and burdens of medical regulations was in the abortion context, and that proved so disastrous that the Court correctly abandoned it. And this Court should decline Plaintiffs' invitation to reopen Pandora's box here.

Finally, Plaintiffs claim that this Court should abandon traditional heightened scrutiny principles because that standard, they say, would require appellate courts to "disregard factual findings and reflexively defer to the legislature." Pls.' Br. 54. But that isn't the case. Rather, on the district court's own findings, even under heightened scrutiny, the SAFE Act must be upheld. Indeed, as that court acknowledged: 1) there are significant risks to these procedures, most importantly sterilization, App. 270-71, 301, R. Doc. 283, at 39-40, 70; 2) there "are no randomized controlled clinical trials evaluating the efficacy of gender-affirming medical care for adolescents," App. 265, R. Doc. 283, at 34, and the studies conducted thus far are rated as "low or very low-quality evidence," App. 266, R. Doc. 283, at 35; and 3) "Some individuals [] undergo gender-affirming medical treatment" and "later come to regret" it and "identify with their" biological sex rather than the gender identity they perceived earlier in life. App. 271-72, R. Doc. 283, at 40-41.

Against that backdrop, even under heightened scrutiny, it is the legislature's role to decide whether caution is warranted—not the district court's. And that court was not entitled to substitute its own view of the best response to the dangers of life-long sterilization. Nor was it entitled to disregard the testimony of any medical practitioner who does not perform these experimental procedures. That is not factfinding; that is simply picking a side. And recognizing as much is entirely consistent with heightened scrutiny. The decision below should be reversed.

### 4. The SAFE Act survives rational basis.

Because heightened scrutiny does not apply, rational basis is the appropriate standard for medical regulations like those at issue here. The SAFE Act is rationally related to the State's interest in regulating medicine and protecting children. As the Sixth Circuit explained, "[p]lenty of rational bases exist for these laws, with or without evidence. Rational basis review requires only the possibility of a rational classification for a law. It does not generally turn on after-the-fact evidentiary debates." *L. W.*, 83 F.4th at 489 (citation omitted); *see also Eknes-Tucker*, 80 F.4th at 1225 (upholding Alabama's statute). Arkansas has singled out a narrow category of previously unregulated, experimental treatments that sterilize children. That is rational.

## II.     There is no fundamental right to subject a child to experimental medical procedures.

States have regulated the practice of medicine since the Nation's founding, including prohibiting procedures they have deemed unsafe. States may prohibit procedures for both adults and children. Adults generally have the right to direct their own medical care, yet neither the Supreme Court nor any court of appeals has held that this right can override a State's decision to generally prohibit a particular course of treatment. Plaintiffs cite no decision doing so. Yet the district court held that under so-called substantive due process, state regulation of medicine must give way when a parent, "in conjunction with their adolescent child's consent and doctor's recommendation, make[s] a judgment that [prohibited] medical care is necessary." App. 306, R. Doc. 283, at 75.

No precedent supports this result. Plaintiffs barely defend the district court's reasoning, relying entirely on the lone dissenting judge among the two court of appeals decisions that have decided this issue. Pls.' Br. 60 (citing *L. W.*, 83 F.4th at 510 (White, J., dissenting)). And, tellingly, neither the United States nor Plaintiffs' State *amici* argue that substantive due process impairs their ability to regulate the practice of medicine. *See* Br. of District of Columbia et al., Docket Entry # 5344562 (Dec. 14, 2023); Br. of United States, Docket Entry # 5344922 (Dec. 15, 2023) (omitting substantive-due-process claim).

21

Rather, Plaintiffs make just two discernable points in rebuttal. First, they tacitly concede that States may prohibit experimental procedures, but rely on the district court's views about the safety of gender-transition procedures for minors. But substantive-due-process precedents do not license federal courts to intrude into State regulation of the practice of medicine because there is no "'deeply rooted' tradition of preventing governments from regulating . . . certain treatments." *L. W.*, 83 F.4th at 473. Second, Plaintiffs claim that Arkansas's decision to leave adults free to undergo these procedures amounts to an "attempt[] to insert itself into the parent-child relationship." Pls.' Br. 59. But again, the due-process analysis does not depend on whether a State has enacted regulations "for adults or their children" because there is no "'deeply rooted' tradition of preventing governments" from doing either. *Id.*

The district court's novel and dangerous suggestion that regulations of pediatric medicine receive strict scrutiny should be reversed.

## III. The Act's regulation of medical referrals targets professional conduct, not speech.

The purpose of the SAFE Act is to ensure that no Arkansas child is subjected to experimental gender-transition procedures. To accomplish that goal, it targets not only the practitioners who perform illegal procedures, but also those who assist that illegal conduct by providing medical referrals. Practitioners remain free to express any viewpoint they like about gender-transition procedures. But

22

they may not provide their patients with a medical referral to another Arkansas-licensed practitioner for the purpose of undergoing an illegal procedure. *See* Ark. Code Ann. 20-9-1502(b).

Echoing the district court, Plaintiffs wrongly insist the statute is a content-based regulation of speech. In so doing, they misread both the statute and case law. By regulating the provision of medical referrals, the Act does not regulate the "dissemination of information." Pls.' Br. 61 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011)). Rather, it prevents the formal handoff of a patient from one practitioner to another who specializes in gender-transition procedures. A licensed medical practitioner exercising his or her medical judgment to formally direct a patient toward a particular course of treatment with a specialist engages in conduct for which he or she must be licensed; a layperson can speak, but they cannot provide a medical referral.

This sort of professional conduct is well within the State's traditional regulatory authority. Just as a State may discipline an attorney who knowingly advises a client to act illegally, it may punish a medical practitioner who assists in the provision of an illegal procedure. *See Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978) ("[T]he State bears a special responsibility for maintaining standards among members of the licensed professions.").

Appellate Case: 23-2681    Page: 29    Date Filed: 12/26/2023 Entry ID: 5347769

Plaintiffs cite no case holding that a State may not punish a licensed professional for assisting another professional in engaging in illegal behavior, "even though that conduct incidentally involves speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018) (*NIFLA*). The law at issue in *NIFLA*, for example, failed because it compelled speech "regardless of whether a medical procedure is ever sought, offered, or performed." *Id.* at 2373. The Act's referral prohibition, by contrast, resembles the informed-consent requirement challenged in *Planned Parenthood of Southeastern Pa. v. Casey*, which the Court held regulated speech incidentally only "as part of the practice of medicine, subject to reasonable licensing and regulation by the State." 505 U.S. 833, 884 (1992) (joint opinion of O'Connor, Kennedy, and Souter, JJ.), *overruled on other grounds by Dobbs*, 142 S. Ct. 2228. Here, to the extent Arkansas has regulated any speech incidental to the provision of a formal medical referal, it has done so only as part of regulating the medical profession.

Licensed medical practitioners have no First Amendment right to refer their patients for illegal procedures.[1] The district court's conclusion to the contrary should be reversed.

---

[1] Plaintiffs point out that Arkansas advanced, at the preliminary-injunction stage, a different reading of the scope of the Act's reach. Pls.' Br. 64 (noting the prior position that the statute prohibited out-of-state referrals). First, a party is not bound by legal arguments advanced at the preliminary-injunction stage, and "[p]arties

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

TIM GRIFFIN
   Arkansas Attorney General

NICHOLAS J. BRONNI
   Arkansas Solicitor General

DYLAN L. JACOBS
   Deputy Solicitor General

MICHAEL A. CANTRELL
   Assistant Solicitor General

OFFICE OF THE ARKANSAS
   ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
dylan.jacobs@arkansasag.gov

---

cannot waive the correct interpretation of the law." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 41 n.2 (2015) (Thomas, J., concurring in the judgment in part and dissenting in part) (citing *E.E.O.C. v. Fed. Lab. Rels. Auth.*, 476 U.S. 19, 23 (1986) (per curiam)).  Second, whether prohibiting a medical referral regulates speech or conduct does not depend on the regulation's geographic scope.

25

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Fed. R.

App. P. 32(a)(7)(B) because it contains 5,224 words, excluding the parts exempted

by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App.

P. 32(a)(5)-(6) because it has been prepared in 14-point Times New Roman, using

Microsoft Word.

I further certify that this PDF file was scanned for viruses, and no viruses

were found on the file.

/s/ *Dylan L. Jacobs*
Dylan L. Jacobs

## CERTIFICATE OF SERVICE

I certify that on December 22, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

*/s/ Dylan L. Jacobs*
Dylan L. Jacobs