No. 23-2681

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

DYLAN BRANDT, et al.,
Plaintiffs-Appellees,

v.

TIM GRIFFIN,
in his official capacity as the Arkansas Attorney General, et al.,
Defendants-Appellants.

On Appeal from the United States District Court for the
Eastern District of Arkansas
No. 4:21-CV-00450 JM (Hon. James M. Moody, Jr.)

## Defendants-Appellants' Supplemental Brief

TIM GRIFFIN
  Arkansas Attorney General

AUTUMN HAMIT PATTERSON
  Arkansas Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
101 West Capitol Avenue
Little Rock, Arkansas 72201
(501) 682-2007
autumn.patterson@arkansasag.gov

# TABLE OF CONTENTS

Table of Authorities.................................................................................iii

Introduction.........................................................................................1

Argument............................................................................................2

I.    *Skrmetti* Confirms That Plaintiffs' Equal Protection
    Claims Is Subject to Rational-Basis Review ...............................2

    A.   Like Tennessee's law, the SAFE Act classifies based
       only on age and medical use.......................................................2

    B.   Even if the SAFE Act classifies based on transgender
       status, rational-basis review applies .........................................9

II.   *Skrmetti* Confirms That the SAFE Act Easily Survives
    Rational-Basis Review ....................................................................12

Conclusion ...........................................................................................16

Certificate of Compliance...................................................................18

Certificate of Service ..........................................................................19

ii

# TABLE OF AUTHORITIES

**Cases**      **Page(s)**

*Dep't of Ed. v. Louisiana*,
    603 U.S. 866, 867 (2024) (per curiam) .................................................. 8

*FCC v. Beach Commc'ns, Inc.*,
    508 U.S. 307, 313 (1993) .................................................................. 12

*Geduldig v. Aiello*,
    417 U.S. 484 (1974) ........................................................................ 6

*L.W. v. Skrmetti*,
    83 F.4th 460 (6th Cir. 2023) ............................................... 4, 10-11, 14

*Lyng v. Castillo*,
    477 U.S. 635, 638 (1986) .................................................................. 10

*Mass. Bd. of Ret. v. Murgia*,
    427 U.S. 307, 314 (1976) .................................................................. 12

*Students for Fair Admissions, Inc. v. President and Fellows*
    *of Harvard College*, 600 U.S. 181, 308 (2023) .................................. 8

*United States v. Skrmetti*,
    145 S. Ct. 1816 (2025) ............................................................ *passim*

**Statutes**

Ark. Code Ann. § 20-9-1501 ............................................................. 3-4, 6

Ark. Code Ann. § 20-9-1502 ................................................................. 3-4

Tenn. Code Ann. § 68-33-101 ............................................................... 13

iii

**Miscellaneous**

H. Cass, Independent Review of Gender Identity Services
   for Children and Young People: Final Report (Apr. 2024) ............... 14

A. Ghorayshi, *Doctor, Fearing Outrage, Slows a Gender Study*,
   N. Y. Times, Oct. 24, 2024 ................................................... 16

P. Paul, *Gender Dysphoric Kids Deserve Better Care*, N. Y.
   Times, Feb. 4, 2024 ....................................................... 14-15

iv

Pursuant to this Court's June 27 order, Defendants-Appellants submit this supplemental brief "addressing only the equal protection claim in light of *United States v. Skrmetti*, 145 S. Ct. 1816 (2025)." *Skrmetti* resolves Plaintiffs' equal protection claim; it is foreclosed.

As a preliminary matter, *Skrmetti* establishes that rational-basis review applies to the SAFE Act. That is because the Supreme Court rejected the argument that Tennessee's similar law—which also protects minors from dangerous, experimental gender-transition procedures—classifies based on sex and transgender status. Instead, it concluded that the law classifies based only on age and medical use, making rational-basis review the appropriate standard. The same is true here.

Moreover, the concurring opinions persuasively explain why transgender status is not a suspect classification that would trigger heightened scrutiny. To address a circuit split on this issue, the en banc Court could alternatively hold that rational-basis review applies even if the SAFE Act classified based on transgender status.

Finally, *Skrmetti* demonstrates that the SAFE Act easily satisfies rational-basis review. Like Tennessee, Arkansas has a rational basis for

1

prohibiting gender-transition procedures for minors: protecting the health and safety of vulnerable children. *Skrmetti* thus decides the equal protection claim.

**ARGUMENT**

**I.** **S**KRMETTI **C**ONFIRMS **T**HAT **P**LAINTIFFS' **E**QUAL **P**ROTECTION **C**LAIM **I**S **S**UBJECT TO **R**ATIONAL-**B**ASIS **R**EVIEW.

In earlier briefing, Defendants argued that rational-basis review applies because (1) the SAFE Act classifies on two grounds—"procedure and age"—not sex or transgender identification, and (2) transgender identification is not a suspect class. Appellants' Br. 20, 26. *Skrmetti* demonstrates that Defendants are right on both fronts.

**A.** **Like Tennessee's law, the SAFE Act classifies based only on age and medical use.**

Because Tennessee's law operates based on the same classifications as the SAFE Act, the Supreme Court's holding that Tennessee's law did not classify based on sex or transgender status and was subject only to rational-basis review applies with full force here. In *Skrmetti*, the Supreme Court analyzed Tennessee's law "banning the use of certain medical procedures for treating transgender minors," including prohibiting puberty blockers, hormones, and surgeries for gender-transition purposes. 145 S. Ct. at 1826. It noted two relevant limitations: that the law

2

(1) "does not restrict the administration of puberty blockers or hormones to individuals 18 and over" and (2) "does not ban fully the administration of such drugs to minors" because it allows their use for other purposes, such as treating a congenital defect or precocious puberty. *Id.* Accordingly, in evaluating plaintiffs' equal protection claim, the Supreme Court held that the law classified based "on age or medical use," which are two classifications that "are subject to only rational basis review." *Id.* at 1829.

Given the Tennessee law is substantively identical with the SAFE Act, *Skrmetti* compels the same conclusion here: the SAFE Act classifies based on only age and medical procedure—not sex or transgender status—so rational-basis review applies. Like the Tennessee law, the SAFE Act prohibits using certain medical procedures on minors for gender-transition purposes, including puberty blockers, hormones, and surgeries. *See* Ark. Code Ann. §§ 20-9-1501(6)(A); 20-9-1502. And like the Tennessee law, there are two relevant limitations on the prohibition: age and medical use. The SAFE Act does not prohibit individuals *over 18* from receiving medical procedures for gender-transition purposes, nor does it prohibit minors from receiving hormones and medical procedures *for*

3

*other purposes*, including congenital disorders.  *See id.* §§ 20-9-1501(6)(B), 20-9-1502.  Thus, whether individuals can access certain procedures, like puberty blockers and hormones, turns on their age and medical use, not on sex or transgender status.  And that means rational-basis review applies.  *See Skrmetti*, 145 S. Ct. at 1829.

Nevertheless, Plaintiffs' request for supplemental briefing suggests they may repeat their arguments that heightened scrutiny applies because the SAFE Act classifies based on sex and transgender status, discriminates based on sex under *Bostock*'s reasoning, and attempts to enforce gender conformity.  *See* Appellees' Br. 29–38.  But the *Skrmetti* plaintiffs made those exact same arguments about Tennessee's law, *see* Br. of Resps. ISO Pet'r, No. 23-477, at 20–38; the Supreme Court considered and rejected those arguments in *Skrmetti*, *see infra* pp. 5–8; and Plaintiffs have never disputed that the SAFE Act and Tennessee's law have the same classifications and operate in the same way.  Indeed, even when attempting to distinguish the Sixth Circuit's rejection of the equal protection challenge to Tennessee's law in *L.W. v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023), *aff'd Skrmetti*, 145 S. Ct. 1816, Plaintiffs did not argue that the law differed from the SAFE Act in any meaningful respect.  They

4

instead argued only that *L.W.* was "subject to further review" and lacked a trial record. Appellees' Br. 31; *see* Oral Arg. at 31:16-32:16 (distinguishing the Sixth Circuit case based on the lack of a full trial record, not based on differences between the States' laws).

In *Skrmetti*, the Supreme Court dismantled arguments that the Tennessee law classified based on sex and transgender status. 145 S. Ct. at 1829–34. The Supreme Court reasoned that the law "d[id] not prohibit conduct for one sex that it permits for the other." *Id.* at 1831. It explained that, under the law, "*no* minor may be administered puberty blockers or hormones to treat gender dysphoria, gender identity disorder, or gender incongruence; minors of *any* sex may be administered puberty blockers or hormones for other purposes." *Id.* It similarly explained that the law did not discriminate based on transgender status because it "does not exclude any individual from medical treatments on the basis of transgender status." *Id.* at 1833. Minors who identify as transgender can, like all other minors, be administered puberty blockers and hormones for some purposes (like precocious puberty) under Tennessee law; they simply cannot receive those same treatments for gender-transition purposes—the same rule that applies to all minors. *See id.* There was

5

thus "a 'lack of identity' between transgender status and the excluded" medical procedures, just like there was a "'lack of identity' between sex and the excluded pregnancy-related disabilities" in *Geduldig v. Aiello*, 417 U.S. 484 (1974). *Id.* Although the Tennessee law regulated treatment for gender dysphoria that only transgender individuals seek, not all transgender individuals seek the prohibited treatment, and transgender individuals fall into the group that can receive the treatment for other purposes. *Id.* Accordingly, the Supreme Court concluded that Tennessee's law did not classify based on transgender status or sex. *Id.* at 1829–34. The same is true of the SAFE Act, so it does not classify based on sex or transgender status.[1]

The Supreme Court was clear that the Tennessee law's reference to sex did not change the conclusion. *Id.* at 1829. The Supreme Court explained that the Tennessee law's reference to sex was related to the med-

---

[1] *See* Appellees' Br. 33 ("[The Act] bans *any* medical treatment [for minors] prescribed for the purpose of gender transition."); Reply Br. 3 ("Puberty blockers, testosterone, estrogen, and various surgeries are prohibited for minors of both sexes when used for gender-transition purposes. They are allowed—for boys and girls—for other purposes. (citing Ark. Code Ann. § 20-9-1501(6)); *see also* Appellees' Br. 31–32, Reply Br. 11–12.

6

ical purpose of the treatment, so the law's prohibition still turned on medical purpose and "d[id] not turn on sex." *Id.* at 1831. As an example, the Supreme Court pointed out that a child taking puberty blockers to treat precocious puberty is receiving a different treatment than a child who is taking puberty blockers to stop puberty at the developmentally appropriate time for "gender incongruence." *Id.* at 1830. The dividing line in the Tennessee law's application was thus medical procedure (and age), not sex, and the same is true of the SAFE Act. *See* Appellants' Br. 23–26; Reply Br. 2–5.

Relatedly, the Supreme Court rejected arguments that the Tennessee law engaged in sex stereotyping by "forc[ing] conformity with sex" and that the law violated *Bostock*'s but-for test because it "prohibits a minor whose biological sex is female from receiving testosterone to live as a male but allows a minor whose biological sex is male to receive testosterone for the same purposes (and vice versa)." *Id.* at 1832, 1834. The Supreme Court reasoned that the law did not classify based on sex or sex-based stereotypes but rather reflected a legitimate interest in protecting children from experimental procedures that are associated with harmful risks, can irreversibly alter their bodies, and that they may "later regret."

*Id.* at 1832. After assuming without deciding that *Bostock*'s reasoning extended "beyond the Title VII context,"[2] the Supreme Court also concluded that "sex is simply not a but-for cause" in how the Tennessee law operated. *Id.* at 1835. It reiterated that determining whether a minor can access certain treatment turns on the medical purpose for which they seek the treatment, not their sex, so the law survived the *Bostock* test. *Id.* Therefore, *Skrmetti* refutes Plaintiffs' sex-stereotyping and *Bostock* arguments too.

*Skrmetti* thus compels this Court to conclude that the SAFE Act is "subject to only rational basis review" because it classifies "on the basis of age" and "medical use," not on the basis of sex, sex stereotypes, or transgender status. 145 S. Ct. at 1829.

_____

[2] In any event, this Court does not need to apply *Bostock*'s reasoning here. *See id.* at 1838–39 (Thomas, J., concurring) (explaining why courts do not need to apply *Bostock*'s reasoning to the Equal Protection Clause, including because it "is implausible on its face" that "such differently worded provisions" as Title VII and the Equal Protection Clause "should mean the same thing" (quoting *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 308 (2023) (Gorsuch, J., concurring), and citing *Dep't of Ed. v. Louisiana*, 603 U.S. 866, 867 (2024) (per curiam))).

Appellate Case: 23-2681     Page: 12     Date Filed: 07/16/2025 Entry ID: 5537580

**B. Even if the SAFE Act classifies based on transgender status, rational-basis review applies.**

Not only does the majority opinion demonstrate the SAFE Act does not trigger heightened scrutiny, but the concurring opinions also provide an additional reason for that conclusion—transgender status is not a suspect or quasi-suspect class. So the Court could "assume for the sake of argument that [the SAFE Act] classifies on the basis of transgender status" and hold that classification does not warrant heightened scrutiny. *Id.* at 1860 (Alito, J., concurring). Doing so would allow this Court to address en banc an "important question [that] has divided the Courts of Appeals." *Id.*

As a preliminary matter, Plaintiffs face a "high bar" to show that the Supreme Court would "recognize transgender status as a suspect classification." *Id.* at 1850 (Barrett, J., concurring); *see id.* at 1865 (Alito, J., concurring) (describing "identification of a suspect or 'quasi-suspect' class" as "exceedingly rare"). Indeed, several "vulnerable groups" have failed to satisfy it, including "the mentally disabled, the elderly, and the poor." *Id.* at 1851 (Barrett, J., concurring); *see id.* at 1865 (Alito, J., concurring) (similar).

To clear this high bar, Plaintiffs would need to make "a strong showing of multiple relevant criteria." *Id.* at 1866 (Alito, J., concurring). Those criteria include "whether members of the group in question 'exhibit obvious, immutable or distinguishing characteristics that define them as a discrete group,' whether the group has, '[a]s a historical matter, ... been subjected to discrimination,' and whether the group is 'a minority or politically powerless.'" *Id.* at 1851 (Barrett, J., concurring) (quoting *Lyng v. Castillo*, 477 U.S. 635, 638 (1986)). In other words, it requires showing "exclusion from equal participation in the political process" and "an immutable characteristic that tends to serve as an obvious badge of membership in a clearly defined and readily identifiable group." *Id.* at 1866 (Alito, J., concurring). Plaintiffs have not made—and cannot make—the strong showing required here.

Plaintiffs fail to establish a single criterion, much less all of them. Plaintiffs cannot satisfy the immutable-characteristic criterion because "transgender status is not an immutable characteristic." *Id.* at 1866. Not only is it "not defined by a trait that is 'definitively ascertainable at the moment of birth,'" but it also is not an unchangeable characteristic as "some transgender individuals 'detransition' later in life—in other words,

they begin to identify again with the gender that corresponds to their biological sex." *Id.* at 1851 (Barrett, J., concurring) (quoting *L.W.*, 83 F.4th at 487)).

Plaintiffs likewise cannot show that transgender status is "marked by the same sort of 'obvious'" or "'distinguishing characteristics' as race or sex." *Id.* To the contrary, transgender status "is often not accompanied by visibly identifiable characteristics" because "gender identity is an internal sense." *Id.* at 1866 (Alito, J., concurring) (quotation omitted). For similar reasons, Plaintiffs cannot show that the class is "clearly defined and readily identifiable" because "transgender people make up a diverse and amorphous class." *Id.* at 1866–67 (quotation omitted). The boundaries are simply "not defined by an easily ascertainable characteristic that is fixed and consistent across the group." *Id.* at 1852 (Barrett, J., concurring).

Finally, "there is no evidence that transgender individuals, like racial minorities and women, have been excluded from participation in the political process." *Id.* at 1866 (Alito, J., concurring). They have not been deprived of the right to vote or faced the same types of *de jure* discrimination that women and racial minorities historically experienced. *See id.*

11

at 1855 (Barrett, J., concurring) (concluding that establishing a suspect class requires "a demonstrated history of *de jure* discrimination").

Both the majority and concurring opinions in *Skrmetti* thus confirm that rational-basis review applies to the SAFE Act.

## II.   *SKRMETTI* CONFIRMS THAT THE SAFE ACT EASILY SURVIVES RATIONAL-BASIS REVIEW.

*Skrmetti* goes further than just dictate rational-basis review as the applicable standard; it also holds that state laws that protect minors from dangerous, experimental gender-transition procedures easily satisfy that standard.  The SAFE Act is no exception.  It survives rational-basis review, so Plaintiffs' equal protection claims fail.

In *Skrmetti*, the majority emphasized that rational-basis review is a "relatively relaxed standard reflecting . . . that the drawing of lines that create distinctions is peculiarly a legislative task."  *Id.* at 1835 (quoting *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 314 (1976)).  And it explained that under rational-basis review, courts must "uphold a statutory classification so long as there is 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'"  *Id.* (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).  The Supreme Court then held that Tennessee's law "clearly meets this standard," concluding

12

that the law's "age- and diagnosis-based classifications are plainly ration-
ally related to [the legislature's] findings and the State's objective of pro-
tecting minors' health and welfare." *Id.* at 1835–36.

The SAFE Act easily meets this standard too. Not only is the Act
identical to Tennessee's laws in all relevant respects, but both legisla-
tures made similar findings. *Compare* Tenn. Code Ann. § 68-33-101, *with*
Act 626, § 2. And the Supreme Court credited those legislative findings
regarding the known risks of serious harm, including irreversible steril-
ity, the risks that are not "yet fully known" given the experimental nature
of the procedures, concerns about the lack of high-quality evidence sup-
porting the use of these treatments, and the possibility of minors' regret-
ting irreversible changes to their bodies. *Skrmetti*, 145 U.S. at 1835–36.
It concluded that those determinations and the "ongoing debate among
medical experts regarding the risks and benefits" of these treatments for
gender-transition purposes are "a rational basis for [the law's] classifica-
tions." *Id.* at 1836. The same is true of the SAFE Act, and this Court
cannot reach another conclusion without defying *Skrmetti*.

In trying to argue that *Skrmetti* does not compel this conclusion,
Plaintiffs may point to minor differences between the legislative findings

13

or to the existence of a trial record in this case. But that is immaterial. As the Supreme Court reiterated in *Skrmetti*, the question is whether "any reasonably *conceivable* state of facts . . . could provide a rational basis," 145 S. Ct. at 1835 (quotation omitted and emphasis added), and here the Supreme Court has definitively answered the question in the affirmative, *see id.* at 1836 ("there is a rational basis"); *see also L.W.*, 83 F.4th at 489 ("Plenty of rational bases exist for these laws, with or without evidence.").

Moreover, the Supreme Court pointed to "[r]ecent developments" that post-dated Tennessee's law as "underscor[ing]" the need to give States "legislative flexibility in this area." 145 S. Ct. at 1836. New reports show that the evidence supporting "the use of puberty blockers and hormones" for gender-transition purpose is "remarkably weak." *See id.* at 1836–37 (quoting H. Cass, Independent Review of Gender Identity Services for Children and Young People: Final Report 13 (Apr. 2024)); *see also id.* at 1844 (Thomas, J., concurring) (explaining how medical professionals in other countries "have recognized that early research on medical interventions for childhood gender dysphoria was either faulty or incomplete" (quoting P. Paul, *Gender Dysphoric Kids Deserve Better Care*,

14

N. Y. Times, Feb. 4, 2024, p. 9)). They also reveal that previous claims regarding the purported benefits of medical interventions for gender dysphoria, including that it would reduce suicide risks, are unsupported by evidence. *See id.* at 1845 (Thomas, J., concurring) (discussing the Cass Review's conclusion that evidence does "not support the conclusion that hormone treatment reduces the elevated risk of death by suicide among children suffering from gender dysphoria," nor does it "support the claim that gender-affirming treatment reduces suicide risk" (quoting Cass Review at 33, 187 (citation modified)). Thus, the purported consensus about the efficacy of gender-transition treatments for minors lacked an evidentiary basis and, even worse, reports have shown that those proclaiming a consensus brushed aside scientific evidence and children's well-being in favor of political concerns. *See id.* at 1848 (explaining how WPATH's conclusion that treatments are "safe and effective" are "self-referencing" "rather than evidence-based," and that "WPATH changed its medical guidance to accommodate external political pressure"); *id.* (describing a leaked recording indicating that WPATH does not genuinely believe that teenagers are able to give "informed consent" regarding these treatments despite WPATH's public position); *id.* at 1849 n. 9 (explaining how a

"'doctor and advocate of adolescent gender treatments' declined to publish 'a long-awaited study of puberty-blocking drugs' that suggested her initial hypothesis about the drugs efficacy had not 'borne out'" (quoting A. Ghorayshi, *Doctor, Fearing Outrage, Slows a Gender Study*, N. Y. Times, Oct. 24, 2024, pp. A1, A23)).

These recent developments underscore that the SAFE Act easily satisfies rational-basis review (and that the Act can satisfy a heightened standard). The developments also highlight why "[d]eference to legislatures, not experts, is particularly critical," *id.* at 1849, and how the district court's analysis was flawed across the board. Therefore, this Court should follow *Skrmetti* and conclude that the SAFE Act "does not violate the equal protection guarantee of the Fourteenth Amendment" and leave policy questions "to the people, their elected representatives, and the democratic process." *Id.* at 1837.

## Conclusion

*Skrmetti* confirms that the SAFE Act does not violate the Equal Protection Clause and that the district court's judgment should be reversed.

16

Respectfully submitted,

TIM GRIFFIN
  Arkansas Attorney General

AUTUMN HAMIT PATTERSON
  Arkansas Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
101 West Capitol Avenue
Little Rock, Arkansas 72201
(501) 682-2007
autumn.patterson@arkansasag.gov

Appellate Case: 23-2681    Page: 21    Date Filed: 07/16/2025 Entry ID: 5537580

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the Court's June 27 order because it contains 3,158 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in 14-point Century Schoolbook, using Microsoft Word.

I further certify that this PDF file was scanned for viruses, and no viruses were found on the file.

*/s/  Autumn Hamit Patterson*
Autumn Hamit Patterson

## CERTIFICATE OF SERVICE

I certify that on July 11, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

/s/ *Autumn Hamit Patterson*

Autumn Hamit Patterson